## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## ASHLAND DIVISION

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **APPALACHIAN FUELS, LLC,** *ET AL.* | ) | **CASE NO. 09-10343** |
| | ) | **JOINTLY ADMINISTERED** |
| **DEBTORS** | ) | |
| | ) | **JUDGE JOSEPH M. SCOTT, JR.** |

## DEBTORS' MOTION FOR AN ORDER APPROVING BIDDING PROCEDURES AND BID PROTECTIONS FOR A SALE NO. 3; AUCTION PROCESS; RELATED RELIEF AND NOTICE

Come the Debtors, Appalachian Fuels, LLC and its affiliates (collectively, the "Debtors"),[1] by and through counsel, and move for an Order Approving Bidding Procedures and Bid Protections for a Sale No. 3 of certain unexpired leases and approving an Auction Process ("Bidding Procedures Motion"). In support of this Bidding Procedures Motion, the Debtors state as follows:

### BACKGROUND, JURISDICTION AND VENUE

1.    The Court has subject matter jurisdiction over this Bidding Procedures Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The Court can exercise its subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(1). Venue of this case and this Bidding Procedures Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 105(a), 363, 365 and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

---

[1] The cases being jointly administered with Appalachian Fuels, LLC, Case No. 09-10343 include Appalachian Holding Company, Inc., Case No. 09-10372, Appalachian Premium Fuels, LLC, Case No. 09-10373, Appalachian Environmental, LLC, Case No. 09-10374, Kanawha Development Corporation, Case No. 09-10375, Appalachian Coal Holdings, Inc., Case No. 09-10405 and Southern Eagle Energy, LLC, Case No. 09-10406.

2.     On June 29, 2009, the Court entered an Order of Relief (Docket No. 117). Upon conversion of these cases to a Chapter 11 (Docket No. 144), the Debtors began operating as debtors and debtors-in-possession pursuant to Code §§ 1107(a) and 1108.

3.     No request has been made for the appointment of a trustee or examiner, and a Committee to represent the unsecured creditors has been appointed in this case, has retained counsel, and is active in this Case.

4.     The Debtors are limited liability corporations with their headquarters in Ashland, Kentucky. The Debtors have various coal mining operations throughout Kentucky and West Virginia, with mining equipment located in those two states and in Illinois. The Debtors' mines are idle except for the performance of required reclamation thereon.

5.     On June 26, 2009, Appalachian Fuels and several related entities filed voluntary Chapter 11 cases in the U.S. Bankruptcy Court for the Eastern District of Kentucky and two more entities filed voluntary bankruptcy petitions on July 9, 2009. Thereafter, this Court appointed James H. Frazier III as the Chief Liquidating Officer of the Debtors.

6.     Mr. Frazier has determined that the Debtors are incapable of returning to the active mining of coal. Consequently, the Debtors intend to liquidate their assets instead of reorganizing operations as a going concern. Mr. Frazier has also determined that there are limited sale opportunities for the Debtors' closed mines and related assets due to the current low price of coal and the tight credit markets. These circumstances have prompted the Debtors' decision to pursue sales of their assets via auctions and negotiated sales.

7.     The Debtors are in the process of or have concluded selling many of their assets, including (a) a sale of a substantial portion of their equipment to Richie Bros. (Sale No. 1), which was approved by the Court on August 31, 2009; and (b) the sale of the Alloy Mine Complex in West

Virginia (Sale No. 2), which is awaiting approval from this Court. Certain assets, however, still remain unliquidated, including, *inter alia*, certain unexpired leased real property.

8.      Because the Debtors can no longer operate due to, *inter alia*, their severe cash flow problems, they believe that prompt sales of their assets are in the best interests of their estates. Specifically, the Debtors believe that a negotiated sale of certain Assets (as defined subsequently herein) that is conditioned upon the right of other qualified bidders to submit higher bids will produce the highest and best value for such Assets in the best interest of the estates.

## RELIEF REQUESTED

9.      By this Motion, the Debtors seek the entry of an order approving bidding procedures and bid protections for the sale (the "Sale") of the assets descried in Section 2.1 of the Agreement (collectively, the "Assets"), an unsigned copy of which is attached hereto as Exhibit A (the "Stalking Horse Agreement").

10.      The Debtors are attempting to finish the final version of the Stalking Horse Agreement between the Debtors and Wolf Run Mining Company (the "Stalking Horse Bidder"), and will file the signed Stalking Horse Agreement with the Court as soon as it is executed, provided, however, such signed version will be substantially like Exhibit A.

11.      The Stalking Horse Agreement contemplates a break-up fee with the Stalking Horse Bidder (the "Termination Fee") if a Competing Bidder (as defined subsequently) is a successful bidder that ultimately consummates a sale based on its competing bid. The amount of the Termination Fee is $50,000 as defined in the Stalking Horse Agreement.

## The Bidding Procedures

12.    The Debtor seeks this Court's approval of the following proposed bidding procedures

("Bidding Procedures"):

(a)    An individual or entity interested in submitting an offer to purchase the Assets ("Competing Bidder"), may have access to the Debtors' books and records at reasonable times and on reasonable notice.

(b)    On or before 5:00 p.m. prevailing time on October 12, 2009 (the "Competing Offer Deadline"), a Competing Bidder may submit to the Debtors a signed, written offer to purchase the Assets (a "Competing Offer"). If there is a Stalking Horse Agreement, then the Competing Offer shall include the same or substantially similar terms and conditions as the Stalking Horse Agreement. The Debtors shall deliver a copy of any Competing Offers to counsel for the Committee upon receipt.

(c)    A Competing Offer shall be submitted with a deposit in the amount of $50,000 (the "Deposit") by wire transfer to an account designated by the Debtors' Counsel. Any interest on the Deposit shall accrue to the benefit of the Debtors' estates.

(d)    After the Competing Offer Deadline, the Debtors, using their business judgment, will select the Stalking Horse Agreement or a Competing Offer that they determine to be the highest and best offer for the Assets (the "Initial Approved Offer").

(e)    On October 14, 2009, the Debtors will conduct an auction (the "Auction") if they receive a Competing Offer. The Auction will be conducted at 11:00 a.m. prevailing Eastern time at law office of Bunch and Brock, 271 West Short Street, Lexington, Kentucky 40507. Prior to the Auction, copies of the Initial Approved Offer shall be distributed to the Stalking Horse Bidder and to all Competing Bidders that have submitted timely Competing Offers. The Auction may be extended to the extent the Competing Offer Deadline is moved, provided that the Auction occurs before the Sale Hearing.

(f)    The Auction shall be governed by the following rules and procedures (the "Auction Procedures"):

(1)    The Auction of the Assets will begin with an opening overbid (the "Opening Overbid") at least equal to (i) the proposed purchase price of the Initial Approved Offer, plus (ii) an incremental overbid of $50,000, plus (iii) the Termination Fee if the Initial Approved Offer is the Stalking Horse Agreement or an opening overbid of $100,000.

Bids after the Opening Overbid ("Overbids") shall be in an amount not less than $10,000 in excess of the immediate prior Overbid.

(2)     The final and highest Overbid at the end of the Auction as determined by the Debtors, in consultation with the Committee, becomes the "Final Approved Offer", and the bidder making the Final Approved Offer becomes the "Successful Bidder". The Final Approved Offer shall be filed with the Court and presented to the Court for consideration and approval at the Sale Hearing.

(3)     The Debtors shall have the right to adopt such other ministerial procedures or rules for the Auction Procedures that, in their judgment and with input from the Committee, will supplement and better promote the goals of the Auction Procedures. At the Auction, the Debtors may announce any such supplemental procedural rules for conducting the Auction.

(g)     After the Auction, the Court will conduct a hearing on the motion to sell Assets (the "Sale Hearing No. 3") to consider approval of the Final Approved Offer. If the Debtors have a Stalking Horse Agreement and did not timely receive a Competing Offer, then the Court will hold the Sale Hearing No. 3 to consider the approval of the Stalking Horse Agreement without the Debtors having conducted the Auction.

(h)     The Debtors shall only be deemed to have accepted a Final Approved Offer when it has been approved by the Court after the Sale Hearing No. 3. The Sale Hearing Date shall be 9:00 a.m. in the United States Bankruptcy Courtroom, Second Floor, 100 East Vine Street, Lexington, Kentucky 40507 on October 16, 2009

(i)     Promptly following the conclusion of the Sale Hearing No. 3, Debtors' Counsel shall return the Deposit provided by any Competing Bidder who is not the Successful Bidder. In the event that the Successful Bidder fails to consummate such transaction in breach of any of the terms of the Final Approved Offer, the Deposit shall be forfeited to and retained by the Debtors.

(j)     In the event that the Successful Bidder fails to close the Sale, the Debtors are authorized to close with the Stalking Horse Bidder (to the extent it was not the Successful Bidder), at the Stalking Horse Bidder's sole discretion, within ten (10) days after receiving written notice from Debtors of the failure to close, with such closing being under the same terms and conditions as the Stalking Horse Agreement.

(k)     The Debtors shall provide copies of a notice of auction containing these Bidding Procedures and any relevant document(s) relating thereto to: (1) parties on any current master service list, (2) persons identified by the

Debtors, the Debtors', secured creditors or the Committee as persons other than the Stalking Horse Bidder that may have an interest in acquiring the Assets, and (3) any other entity making a written request to the Debtors prior to the Competing Offer Deadline.

## APPLICABLE AUTHORITY

### The Bidding Procedures Are Fair and Reasonable Under the Debtors' Business Judgment

13.     Bidding procedures are practices generally accepted by bankruptcy courts to govern the sale of assets from a debtor's bankruptcy estate. *See Corporate Assets, Inc. v. Paloian*, 368 F.3d 761 (7th Cir. 2004); *In re Integrated Resources*, 147 B.R. 650 (Bankr. S.D.N.Y. 1992); *In re Hupp Industries, Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992); *In re 995 Fifth Avenue*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989). Bidding procedures have been recognized to encourage potential purchasers to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of its assets, despite the inherent risks and uncertainties associated with the Chapter 11 process. The establishment of such procedures is within the discretion of the Bankruptcy Court. *See Matter of Gould*, 977 F.2d 1038 (7th Cir. 1992).

14.     The Bidding Procedures here reflect the exercise of the Debtors' business judgment with respect to what is both commercially reasonable and necessary as an incentive to advance the Sale process, and to motivate potential Competing Bidders to spend the time and resources necessary to participate in that process.

15.     The Bidding Procedures are reasonable and will assist the Debtors in obtaining the highest and best offer available for the Assets. The Debtors believe that the Bidding Procedures are reasonable considering (a) the Assets are not being used for traditional business operations because the Debtors have shutdown; and (b) they create a process that is well known in bankruptcy cases in this jurisdiction and other jurisdictions where Competing Bidders may reside.

16.    The Debtors believe that the Bidding Procedures are in the best interests of the estates because they provide an efficient and effective mechanism for marketing and liquidating the Assets. The Debtors also believe that they will be unable to effectively market and sell the Assets without Court approval of the Bidding Procedures.

### Termination Fee and Bid Protections

17.    As discussed below, the Termination Fee and Overbids (collectively "Bid Protections") under the Bid Procedures should be approved because they are necessary to attract and compensate bidders whose bids will be subject to higher or better offers that will benefit the estates.

18.    Historically, bankruptcy courts have approved break-up fees and other bidding incentives under the "business judgment rule," which proscribes judicial second-guessing of the actions of debtors taken in good faith and in the exercise of their honest judgment. *See, e.g., In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.*, Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").[2]

19.    In particular, courts have recognized the value of bid protections as a reasonable and necessary expense associated with the sale of significant assets in bankruptcy. *See In re Anchor Glass Container Corporation*, 650, 657-58 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (establishing three basic factors for determining whether to permit such fees in bankruptcy:

---

2. *See also In re Anchor Glass Container Corporation*, Case No. 96-01434 (PJW) (Bankr. D. Del. 1996) (authorizing termination fee); *In re FoxMeyer Corp.*, Case No. 96-01329 (HSB) (Bankr. D. Del. 1996) (same); *In re Lomas Financial Corp.*, Case No. 95-01235 (PJW) (Bankr. D. Del. 1995) (same).

"whether (1) relationship of parties who negotiated break-up fee is tainted by self-dealing or manipulation; (2) whether fee hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to purchase price").

20.    Other courts have applied another test to review break-up fee provisions. In *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit opted to evaluate a break-up fee arrangement under the rubric of what it tentatively opined was the "most likely source of authority" for break-up fees – section 503 of the Bankruptcy Code. *Id.* at 532. According to the Third Circuit, break-up fees must be shown to be "actually necessary to preserve the value of the estate" or to "provide some benefit to the estate." *Id.* at 535, 536.

21.    The Debtors believe that the requested Bid Protections are appropriate under either the "business judgment rule" or "benefits the bankruptcy estate" standards applied in the aforementioned cases because: (1) the relationship between the Debtors and the Stalking Horse Bidder will not be tainted with self-dealing or manipulation, and the Bid Protections are the product of an arms-length negotiations and consideration; (2) the Bid Protections will not hamper or create a "chilling effect" on bidding as it is an insignificant sum in relation to the potential value of the Assets; and (3) the Termination Fee and Overbid amounts are reasonable.

22.    A potential Stalking Horse Bidder will not submit an offer without the requested Bid Protections. The Bidding Procedures will thus induce "a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien*, 181 F.3d, at 537. Similarly, if there is a Stalking Horse Agreement, it will provide a minimum bid on which other potential bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth." *Id.* Finally, the mere existence of the Bidding Procedures permits the Debtors to

insist that competing bids be materially higher or otherwise better than either the offer in the Stalking Horse Agreement or a Initial Approved Offer.

23.    The Termination Fee is fair and reasonable in amount, particularly in view of the effort required of a potential purchaser, and the risk to the Stalking Horse Bidder of being used as a "stalking horse." Here, the amount of the Termination Fee is $50,000 from the Debtors. This Termination Fee is within the range of standard, widely-accepted procedures and inducements frequently offered to stalking horse bidders in transactions of this type. Also, the Termination Fee is set at an amount that will cover the Stalking Horse Bidder's actual costs, and will not result in a windfall to the Stalking Horse.

## CONCLUSION

24.    The Debtors have filed this Motion in good faith and only as a result of determining, after a full exploration of all of their prospects, that they cannot effectuate a greater return on the Assets than what would be accomplished by the Bidding Procedures. Accordingly, based on the authority and reasoning outlined herein, the Debtors submit that approval of the Bidding Procedures and Bid Protections will enhance the Sale process for the benefit of all creditors and parties in interest.

WHEREFORE, the Debtors respectfully request that this Court (i) enter an order approving the Bidding Procedures and Bid Protections; and (ii) grant the Debtors such other and further relief as is just and appropriate under the circumstances.

## NOTICE OF HEARING

Please take notice that the foregoing Motion shall be heard by the Court on September 25, 2009, at 9:00 a.m. on shortened notice at the United States Bankruptcy Court, Eastern District of

Kentucky, 100 East Vine Street, Second Floor Courtroom, Lexington, Kentucky, or as soon thereafter as counsel may be heard.

Respectfully submitted,

/s/ *W. Thomas Bunch*
W. Thomas Bunch
271 West Short Street
805 Security Trust Building
PO Box 2086
Lexington, Kentucky 40588
COUNSEL FOR DEBTORS

## CERTIFICATE OF SERVICE

This is to certify that on September 23, 2009, a true and correct copy of the foregoing was served electronically by the Clerk of the Bankruptcy Court in the method established under CM/ECF Administrative Procedures Manual and the Local Court Standing Order dated July 25, 2002, and by e-mail upon the Master Service List No. 1 (Doc. No. 235).

/s/ *W. Thomas Bunch*
COUNSEL TO THE DEBTOR

EXHIBIT A

## AGREEMENT

This Agreement (the "Agreement") is dated as of September 23, 2009, between (i) WOLF RUN MINING COMPANY, a West Virginia corporation (the "Buyer"), and (ii) APPALACHIAN FUELS, LLC, a Kentucky limited liability company, APPALACHIAN RESOURCES, LLC, a Kentucky limited liability company, and KANAWHA DEVELOPMENT CORPORATION, a West Virginia corporation (collectively referred to in the singular as the "Seller").

## RECITALS

A.      Each Seller is a debtor and debtor in possession in a bankruptcy case jointly administered under case no. 09-10343 (the "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court").

B.      Seller is engaged in the business of mining coal and activities directly or indirectly relating thereto.

C.      Seller has determined that it is in the best interest of Seller and its bankruptcy estate to sell and assign to Buyer all right, title and interest of Seller in and to the Purchased Assets, for the consideration, and upon the terms and conditions, hereinafter set forth.

NOW THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth herein and of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE 1 - DEFINITIONS

1.1      Definitions.  Except as otherwise expressly defined in this Agreement, as used herein, the following terms have the meanings set forth below:

"Affiliate" means, with respect to a specific Person, any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.  The term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract or otherwise.

"Assignment of Leases" means an Assignment of Leases substantially in the form attached hereto as Exhibit A.

"Bankruptcy Code" means 11 U.S.C. Sections 101, et seq.

"Bill of Sale" means the Bill of Sale between Buyer and Seller, substantially in the form attached hereto as Exhibit B.

"Business Days" means any day other than a Saturday, Sunday or other day on which national or state banking associations are required or permitted by law to be closed in Kentucky or West Virginia.

"Claim" means any action, suit, Proceeding, hearing, investigation, litigation, charge, complaint, claim, or demand.

"Cure Amounts" means the payment necessary to cure all monetary defaults under the Leases to allow the assumption and assignment of the Leases pursuant to this Agreement as described in Section 8.5(b)(xi), the known cure amounts at execution being those described on Exhibit C; provided, that, the Cure Amounts may not exceed the Purchase Price.

"Environmental Law" means any federal, state or local law, statute, rule, regulation, ordinance, and similar provision having the force and effect of law, all judicial or administrative orders or determinations and all common law, relating to or concerning pollution, preservation or protection of human health, safety, the environment, or natural resources, or the restoration of natural resources or the environment, including but not limited to any concerning the presence, use, control of, emission, discharge, Release or threatened Release of pollutants, contaminants, hazardous materials or wastes and all common law claims such as nuisance, negligence and trespass.

"Governmental Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

"Hazardous Materials" means (a) petroleum or petroleum products, fractions, derivatives or additives, natural or synthetic gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls and radon gas; (b) any substances defined as or included in the definition of "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "extremely hazardous substances," "restricted hazardous wastes," "toxic substances," "toxic chemicals" or "toxic pollutants," "contaminants" or "pollutants" or words of similar import under any Environmental Law; (c) radioactive materials, substances and waste, and radiation; and (d) any other substance exposure to which is regulated under any Environmental Law or with respect to which Liability or standards of conduct are imposed under any Environmental Law.

"Knowledge" or "Seller's knowledge" means the actual knowledge of James H. Frazier, III as the Chief Liquidating Officer, pursuant to an Agreed Final Order entered on July 24, 2008 by the Bankruptcy Court, after inquiry believed by him in good faith to be reasonable in the circumstances and, as applied to the Sellers, means such knowledge after such inquiry of the Sellers' principal operating and financial personnel.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority and includes, without limitation, all Environmental Laws.

"Liabilities" means all Indebtedness, obligations, claims and other liabilities of a Person, whether absolute, accrued, contingent, fixed or otherwise or whether due or to become due.

2

"Liens" means any mortgage, pledge, assessment, security interest, lease, judgment lien, tax lien, mechanic's lien, materialman's lien, other lien, adverse Claim, levy, charge, option, right of first refusal, charge, debenture, indenture, deed of trust, right-of-way, restriction, encroachment, license, lease, security agreement, or other encumbrance of any kind, and other restrictions or limitations on the use or ownership of real or personal property or irregularities in title thereto or any conditional sale contract, title retention contract or other contract to give any of the foregoing.

"Material Adverse Effect" means (a) an adverse effect on the validity or enforceability of this Agreement or any of the Related Agreements in any material respect, (b) an adverse effect on the condition (financial or other), business, assets, results of operations, ability to conduct business or properties of Seller or Buyer (as applicable), or the Purchased Assets, taken as a whole, in any material respect, or (c) an impairment of the ability of Seller or Buyer (as applicable) to fulfill its obligations under this Agreement or any of the Related Agreements in any material respect.

"Order" means any writ, judgment, decree, injunction, stay or similar order of any Governmental Authority or court of competent jurisdiction, including the Bankruptcy Court, or other administrative body with jurisdiction over any matters covered by this Agreement, in each such case whether preliminary or final.

"Permitted Lien" means any Lien (a) which is assumed or consented to by Buyer herein (including, without limitation, Liens included in the Assumed Liabilities), or (b) created by Buyer.

"Person" means any natural person, corporation, limited liability company, general partnership, limited partnership, proprietorship, other business organization, entity, trust, union, association or Governmental Authority.

"Premises" has the meaning given in Section 5.5.

"Proceeding" means any action, suit, proceeding, arbitration, investigation or audit, whether or not by any Governmental Authority.

"Procedures Motion" has the meaning given in Section 8.5(b).

"Procedures Order" has the meaning given in Section 8.5(b).

"Purchase Price" has the meaning given in Section 3.3(a).

"Purchased Assets" has the meaning given in Section 2.1.

"Related Agreements" means the (a) the Assignment of Leases, (b) the Bill of Sale and (c) any other agreement, certificate or similar document to be executed by any party hereto in connection with this Agreement.

"Release" means any release, issuance, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any property, including the

3

movement of Hazardous Materials through the air, soil, surface water, ground water or property other than as specifically authorized by and in compliance with all Environmental Laws.

"Ross Lease" means that certain Agreement of Lease between S. M. Kaemmerling and Badger Coal Company, dated April 25, 1955, as supplemented, amended and assigned, with Mike Ross, Inc. being the current lessor and Kanawha Development Corporation being the current lessee.

"Ross Litigation" has the meaning given in Section 8.4(a).

"Sale Order" has the meaning given in Section 8.5(b).

"Taxes" means any and all taxes, fees, levies, duties, tariffs, import and other charges, imposed by any taxing authority, together with any related interest, penalties or other additions to tax, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profit, environmental, custom duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

"Tax Return" means all federal, state, local, provincial and foreign returns, declarations, claims for refunds, forms, statements, reports, schedules, and information returns or statements, and any amendments thereof (including, without limitation, any related or supporting information or schedule attached thereto) required to be filed with any Taxing authority in connection with an Tax.

    1.2    Rules of Interpretation.

    (a)    The singular includes the plural and the plural includes the singular.

    (b)    The word "or" is not exclusive.

    (c)    A reference to a Person includes its permitted successors and permitted assigns.

    (d)    The words "include," "includes" and "including" are not limiting.

    (e)    A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated.  Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.

    (f)    References to any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.

4

(g)     The words "hereof," "thereof," "herein," "therein," "hereunder" and "thereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

(h)     References to "days" shall mean calendar days, unless the term "Business Days" shall be used.

(i)     This Agreement is the result of negotiations among, and has been reviewed by, the parties hereto. Accordingly, this Agreement shall be deemed to be the product of all parties, and no ambiguity shall be construed in favor of or against any party

## ARTICLE 2 - PURCHASE AND SALE OF ASSETS

2.1     Purchase and Sale of Assets.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of Seller's right, title, and interest in and to the following assets, free and clear of all Liens, except Permitted Liens, subject to approval of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code (the "Purchased Assets"):

(a)     the leased real property identified on Schedule 2.1(a) (the "Leases");

(b)     any and all leasehold improvements made by Seller under the Leases that are identified on Schedule 2.1(c);

(c)     all prepaid royalties and deposits that relate to the Leases; and

(d)     all maps, reserve studies, engineering reports, and other records relating to the Leases, in each case whether in hard copy or electronic form;.

2.2     Assumed Liabilities.  At the Closing, Buyer will assume only the obligations of Seller under the Leases first arising after the Closing Date from or related to Buyer's ownership, possession or operation of the Purchased Assets, and no other Liabilities (the "Assumed Liabilities").

2.3     Excluded Liabilities.  Notwithstanding anything to the contrary contained herein or any other agreement or instrument to the contrary, Buyer shall not assume, agree to pay or discharge or in any way be liable or responsible for, any Liabilities of Seller or any other Person except for the Assumed Liabilities.  Without limiting the generality of the foregoing, Buyer shall not assume, and Seller, or any other Person, as the case may be, shall remain solely and exclusively liable and responsible for the following (the "Excluded Liabilities"):

(a)     any Liabilities or obligations (whether absolute, contingent, or otherwise), including, without limitation, any such liabilities or obligations arising under any Environmental Law that accrue or result from any conditions, events or activities occurring or existing on or before the Closing Date with respect to the Leases and the Premises;

5

(b)     any Liability or obligation of Seller for any Taxes of any kind accrued for, applicable to or arising from any period whether before, on or after the Closing Date; and

(c)     any Liabilities or obligations which accrue with respect to the Excluded Assets, whether before, on or after the Closing Date.

2.4     Transfer Taxes.  To the extent that the transactions proposed by this Agreement are not otherwise exempt under section 1146(c) of the Bankruptcy Code, Buyer shall be liable for all sales, use and other transfer Taxes and all filing and recording fees arising from or relating to the consummation of the transactions contemplated by this Agreement.

## ARTICLE 3 - CLOSING AND DELIVERIES

3.1     Closing.  The parties shall hold a closing (the "Closing") on the third (3rd) Business Day after the conditions in Article 7 have been satisfied or waived at 10:00 a.m. at the offices of Greenebaum Doll & McDonald PLLC, 300 West Vine Street, Suite 1100, Lexington, Kentucky 40507 (the "Closing Date"), or as otherwise mutually agreed.  The transactions contemplated hereby shall take place pursuant to, and in accordance with, the protections afforded Buyer under section 363(m) of the Bankruptcy Code and the terms and conditions hereof.

3.2     Seller's Deliveries.  The sale, transfer, assignment and delivery by Seller of the Purchased Assets to Buyer, as herein provided, shall be effected on the Closing Date by Seller's execution and delivery of the Related Agreements to which it is a party, and other instruments of transfer and conveyance reasonably satisfactory in form and substance to counsel for Buyer and Seller.

3.3     Buyer's Deliveries.  At the Closing:

(a)     The aggregate consideration for the Purchased Assets paid by Buyer to Seller shall be Six Hundred Fifty Thousand Dollars ($650,000.00) (the "Purchase Price").  The Purchase Price, less the Cure Amounts, shall be paid to Seller on the Closing Date.

(b)     Buyer shall pay the Cure Amounts on Seller's behalf to the appropriate party out of the Purchase Price on the Closing Date.

(c)     Buyer shall execute and deliver to Seller the Related Agreements to which it is a party and such other agreements as are reasonably satisfactory in form and substance to counsel for Buyer and Seller.

## ARTICLE 4 - REPRESENTATIONS AND WARRANTIES OF BUYER

In order to induce Seller to enter into this Agreement, Buyer makes the representations and warranties set forth below, which are true, correct and complete on the date hereof and shall be true, correct and complete as of the Closing:

4.1     Organization.  Buyer is duly organized and validly existing under the Laws of the State of West Virginia, and is authorized to do business in every jurisdiction in which the failure

6

to be so qualified could result in a Material Adverse Effect. Buyer has all requisite corporate power and authority to own its properties and assets and to consummate the transactions contemplated hereby.

4.2     Authorization and Validity. Buyer has all requisite corporate power and authority to enter into this Agreement and the Related Agreements to which it is a party. The execution and delivery of this Agreement and the Related Agreements to which it is a party and the performance of the obligations hereunder and thereunder have been duly authorized by all necessary corporate action by Buyer. This Agreement and the Related Agreements, to which Buyer is a party has been, or will be, duly executed by Buyer and constitute its valid and binding obligation, enforceable against it in accordance with their terms.

4.3     Consents and Approvals. No consent, approval or action of, filing with or notice to, any Governmental Authority or any other Person, on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements to which Buyer is a party or the consummation of the transactions contemplated hereby or thereby.

4.4     Adequate Assurances Regarding Executory Contracts. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(i)(c) and 365(f) of the Bankruptcy Code with respect to the Leases.

4.5     Financial Advisors. Neither Buyer nor any Person on Buyer's behalf has agreed to pay any brokerage fee, finder's fee or commission which could reasonably be expected to become the obligation of Seller with respect to the transactions contemplated by this Agreement.

4.6     Financial Ability to Perform. Buyer has available to it funds sufficient to enable Buyer to deliver the Purchase Price to Seller as contemplated by this Agreement at the Closing and perform its obligations hereunder.

ARTICLE 5 – REPRESENTATION AND WARRANTIES OF SELLER

In order to induce Buyer to enter into this Agreement, each Seller jointly and severally makes the representations and warranties set forth below which are true, correct and complete on the date hereof and shall be true, correct and complete as of the Closing:

5.1     Organization. Based on Seller's knowledge, each Seller is duly organized and validly existing under the Laws of its state of incorporation or organization, and is authorized to do business in every jurisdiction in which the failure to be so qualified could result in a Material Adverse Effect. Each Seller has all requisite corporate or limited liability company power and authority to own its properties and assets and to consummate the transactions contemplated hereby, subject to (a) the Bankruptcy Court's entry of the Sale Order, and (b) the receipt of the consents, waivers, authorizations and approvals set forth in Section 5.2.

5.2     Consents and Approvals. Based on Seller's knowledge, Schedule 5.2 sets forth a true and complete list of each material consent, waiver, authorization or approval of any Governmental Authority (other than the Bankruptcy Court's entry of the Sale Order) or of any

7

other Person that is required in connection with the execution, delivery and performance of this Agreement and the Related Agreements.

5.3    Compliance with Law.    Based on Seller's knowledge, Seller is in material compliance with all Laws in respect of the ownership and operation of the Purchased Assets and has not received written notice of any violation of any Law, nor is Seller in default with respect to any Order, applicable to the Purchased Assets, other than violations or defaults that have been abated or which would not reasonably be expected to result in a Material Adverse Effect.

5.4    Litigation.    Based on Seller's knowledge, except for the Bankruptcy Case and the Ross Litigation, there are no Claims, actions, suits, Proceedings or investigations related to the Purchased Assets pending or, to Seller's knowledge, threatened, before any federal or state court or Governmental Authority brought by or against Seller.    Further, there are no facts or circumstances known to any Seller that could reasonably be expected to give rise to any Claim, action, suit, Proceeding or investigation that would be required to be disclosed pursuant to this Section.    There are no material Orders outstanding against Seller with respect to the Purchased Assets.

5.5    Environmental Matters.    Based on Seller's knowledge with respect to any of the real property that is the subject of the Leases (the "Premises"):

(a)    Seller is in compliance in all material respects with all Environmental Laws;

(b)    During the prior five (5) years, Seller has not received, nor does it expect, any communications or other information, whether from a Governmental Authority, citizens group, employee of Seller, or otherwise, that allege that the Premises are not in compliance with any Environmental Law, or any actual or threatened obligation to bear the cost of any environmental, health or safety Liabilities, except for such communications that have been resolved in all material respects.

(c)    No Release has occurred on or beneath the Premises, except for inventories of Hazardous Materials to be used, and wastes generated therefrom, in the ordinary course of business of Seller (which inventories and wastes, if any, were and are stored or disposed of in accordance with applicable Environmental Laws).

(d)    There are no pending or threatened claims, Liens, or other restrictions of any nature, resulting from any environmental, health, and safety Liabilities or arising under or pursuant to any Environmental Law, with respect to or affecting any of the Purchased Assets.

(e)    There are no Hazardous Materials present on or in the environment at any of the Premises, including any Hazardous Materials contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Premises.    Neither Seller, nor any other Person for whose conduct Seller is or may be held responsible, has permitted or conducted, or is aware of, any hazardous activity conducted with respect to any of the Premises involving Hazardous Materials or the Release

8

thereof, except such activities as are and were in full compliance with all applicable Environmental Laws.

5.6    Leased Real Property.

(a)    To Seller's knowledge and except as disclosed on Schedule 5.6, (i) Seller has delivered to Buyer correct and complete copies of the Leases, (ii) Seller has not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the Leases, and (iii) Seller has made available to Buyer copies of all engineering studies, environmental impact reports or assessments, coal reserves and coal quality studies and other reports and studies that are in its possession or control relating to the Premises.

(b)    To Seller's knowledge, none of the real property that is the subject of the Leases or the improvements conveyed by Seller or the use thereof contravenes or violates any building, zoning, administrative, occupational safety and health or other applicable Laws in any material respect.  Seller has not received notice of, and has no knowledge of any Proceedings pending or, to the knowledge of Seller, threatened regarding the ownership, use or possession of the real property that is the subject of the Leases, including subsidence claims, condemnation, expropriation or similar Claims.

(c)    To Seller's knowledge, Seller is not a party to any lease, assignment or similar arrangement under which Seller is a lessor or assignor with respect to any of the real property that is the subject of the Leases other than to an Affiliate or under which any portion of such real property is made available for use by an other party other than an Affiliate (collectively, "Affiliate Arrangements").

ARTICLE 6 – REPRESENTATIONS AND WARRANTIES - GENERAL

6.1    Warranties Exclusive.  Except as stated in Article 5, Buyer acknowledges that Seller has made no representations and/or warranties and that all other express or implied warranties are disclaimed.

6.2    As Is, Whereas.  Without limiting the foregoing Buyer acknowledges that the Purchased Assets are conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING BUYER ACKNOWLEDGES THAT SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE PURCHASED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE PURCHASED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) EXCEPT AS EXPRESSLY PROVIDED HEREIN, ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS, OR (D) EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 5, THE CONDITION OF THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS.  "Related

9

Person" means, with respect to a specific Person, any officer, director, employee, agent, shareholder, representative, successor or assign of such Person.

## ARTICLE 7 - CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

7.1    Conditions Precedent to Performance by Seller.    The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by Seller in its sole discretion:

(a)    Representations, Warranties and Obligations of Buyer. All representations and warranties made by Buyer in Article 4 taken as a whole, shall be true and correct in all material respects on the date of this Agreement and on and as of the Closing Date (except to the extent that any such representation and warranty is made as of a specified date, in which case such representation and warranty shall continue to be made as of such specified date), and the covenants and agreements of Buyer to be performed on or before the Closing Date shall have been duly performed in all material respects in accordance with this Agreement, and Seller shall have received a certificate, dated the Closing Date and signed by an officer of Buyer, to that effect.

7.2    Conditions Precedent to Performance by Buyer.    The obligation of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

(a)    Representations, Warranties and Obligations of Seller. All representations and warranties made by Seller in Article 5 taken as a whole, shall be true and correct in all material respects on the date of this Agreement and on and as of the Closing Date (except to the extent that any such representation and warranty is made as of a specified date, in which case such representation and warranty shall continue to be made as of such specified date), and the covenants and agreements of Seller to be performed on or before the Closing Date shall have been duly performed in all material respects in accordance with this Agreement, and Buyer shall have received a certificate, dated the Closing Date and signed by an officer of Seller, to that effect.

(b)    Transfer Free of Liens.    The Purchased Assets shall be transferred to Buyer free and clear of all Liens and Liabilities, except for Permitted Liens and the Assumed Liabilities.

(c)    No Seller Material Adverse Effect. Except as specifically disclosed on the schedules to this Agreement, there shall not have occurred any Material Adverse Effect or any event or development which, individually or together with such other events, could reasonably be expected to result in a Material Adverse Effect.

7.3    Conditions to each Party's Obligations.    The respective obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver on or before the Closing of the following conditions:

10

(a)    Bankruptcy Court Approval of Procedures Order.  The entry of an order by the Bankruptcy Court approving the Procedures Order.

(b)    Bankruptcy Court Approval of Sale Order.  The entry of the Sale Order by the Bankruptcy Court, which order is not subject to a stay pending appeal, approving the sale of the Purchased Assets pursuant to the terms hereof and in the manner set forth in Section 8.5. Seller shall provide all holders of Liens and Claims (including all landlords, mortgagees, creditors and shareholders, to the extent required by the Bankruptcy Code) on the Purchased Assets notice of Seller's bankruptcy case and the Bankruptcy Court's entry of the Sale Order approving the transactions contemplated by this Agreement, copies and proof of service of which, together with certified copies of the Sale Order, shall be delivered to Buyer and filed with the Bankruptcy Court on or before the Closing.

(c)    Injunctions. There shall not be outstanding any Order prohibiting the consummation of the transactions contemplated by this Agreement and no action shall have been commenced which could reasonably be expected to prohibit the consummation of the transactions contemplated hereby.

(d)    No Change in Law. There shall not have been any action taken or any statute enacted by any Governmental Authority which would render the parties unable to consummate the transactions contemplated hereby or make the transactions contemplated hereby illegal or prohibit the consummation of the transactions contemplated hereby.

## ARTICLE 8 - COVENANTS

8.1    Covenants of Seller.  Seller covenants as follows:

(a)    Access to Properties and Records; Confidentiality.  Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access during normal business hours throughout the period before the Closing (or the earlier termination of this Agreement pursuant to Article 10) to all books and records of Seller relating to the Purchased Assets and the Assumed Liabilities.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account Seller's resources and other commitments, during normal business hours, to all Purchased Assets throughout the period before the Closing.  During the period from the date hereof to the Closing Date, all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this Section or otherwise) will be governed and protected by the confidentiality agreement executed by Buyer.

(b)    Further Assurances.  At the request and the sole expense of Buyer, at any time after the Closing Date, Seller shall execute and deliver such documents as Buyer or its counsel may reasonably request to effectuate the purposes of this Agreement.

(c)    Affiliate Arrangements.  Seller will terminate any Affiliate Arrangements prior to Closing.

(d)    Rejected Leases.  Without the express consent of Buyer, Seller agrees that it will not reject any Lease in any Bankruptcy Case following the date hereof unless this

11

Agreement is terminated in accordance with its terms. Seller will withdraw the Leases from any pending motion to reject filed in the Bankruptcy Cases.

      8.2    <u>Covenants of Buyer</u>. Buyer covenants as follows:

      (a)    <u>Financing</u>. Buyer covenants and agrees to do all things necessary to pay the Purchase Price.

      (b)    <u>Access to Books and Records</u>. Buyer agrees to furnish or cause to be furnished to Seller, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any inquiry from any Governmental Authority relating to Tax matters. Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Purchased Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder, or (ii) coming into existence after the Closing Date that relate to the Purchased Assets or the Assumed Liabilities before the Closing, for a period of at least six years from the Closing Date, and will give Seller notice and an opportunity to retain any such records if Buyer determines to destroy or dispose of any or all of them after such period. In addition, from and after the Closing, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Purchased Assets or the Assumed Liabilities as Seller may deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding or answer or (y) administer or complete any cases of Seller under Chapter 11 of the Bankruptcy Code (and Buyer shall give Seller notice and an opportunity to retain any such records if Buyer determines to destroy and dispose of any or all of them prior to the completion of such cases). Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Purchased Assets or the Assumed Liabilities.

      (c)    <u>Notification by Buyer of Certain Matters</u>. Buyer agrees to notify Seller in writing promptly upon Buyer's or its authorized representatives' discovery of any information prior to the Closing Date relating to Seller or the operations by Seller of the business which constitutes (or would constitute) or indicates (or would indicate) a breach of any representation, warranty or covenant of Seller contained herein.

      (d)    <u>Adequate Assurances Regarding Leases</u>. With respect to the Leases, Buyer shall provide adequate assurance of the future performance by Buyer.

      8.3    <u>Covenants of the Parties</u>.

      (a)    <u>Consents</u>. The parties shall promptly apply for and diligently prosecute all applications for, and shall use commercially reasonable efforts promptly to obtain, such consents, authorizations and approvals from such Governmental Authorities and third parties as

shall be necessary or appropriate to permit the consummation of the transactions contemplated by this Agreement, and shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions necessary to effect the consummation of the transactions contemplated by this Agreement. Notwithstanding anything to the contrary contained herein, the parties hereto agree that as a condition to obtaining the consent of any third party to any real property lease, personal property lease or any other agreement to permit the consummation of the transactions contemplated hereby, no party hereto shall have any obligation to (i) pay any remuneration to third parties in exchange for such party's consent or approval; (ii) file any lawsuit or take other legal action as against such third party with respect to any thereof; or (iii) make any amendment thereof or waive any rights thereunder if as a result of such amendment or waiver such real property lease, personal property lease or any other agreement would contain terms and conditions that are less favorable in any material respect than the terms and conditions of such coal supply contract, real property lease or personal property lease as in existence on the Closing Date. Each party will also use all reasonable efforts to take or cause to be taken all actions necessary, proper or advisable to comply with all legal requirements that may be imposed on it with respect to this Agreement and the transactions contemplated hereby, and, subject to the provisions hereof, to consummate the transactions contemplated by this Agreement as promptly as applicable.

(b)    Tax Exemption. Each party hereto agrees to use commercially reasonable efforts to caused the Sale Order to provide that the sale of the Purchased Assets shall be exempt from stamp or similar Taxes pursuant to 11 U.S.C. § 1146(c).

(c)    Whether before or after the Closing, Seller and Buyer shall cooperate with one another and provide commercially reasonable assistance as needed to the other to effect assignment of the Leases.

(d)    Indemnification. Buyer and Seller shall indemnify and hold harmless the other, its Affiliates, and their respective Related Persons from and against any and all Liabilities and Claims arising from or related to the other's breach of any representation, warranty or covenant contained herein or in any Related Agreement.

8.4    Ross Litigation.

(a)    The Ross Lease is the subject of litigation styled *Mike Ross, Inc. v. Appalachian Environmental, LLC*, being case no. 05-P-33 in the Circuit Court for Barbour County, WV (the "Ross Litigation").

(b)    Upon entry of the Sale Order, or before, if agreed by Seller and Buyer, Buyer shall, at its cost and using its own counsel, have the right to pursue all Claims and defenses belonging to the Debtor arising before and after the date of this Agreement of any kind, character, type, nature and description, in law or in equity, if any, related to the Ross Lease and the Ross Litigation. Buyer shall have the right after Closing to compromise all or any part of the Ross Litigation, but Seller shall not, without the approval of Buyer, compromise the Ross Litigation at any time.

13

(c)    Seller agrees that Buyer may intervene in the Ross Litigation and assert the rights of Seller therein. Further, to the extent any Claim or defense may only be asserted by Seller itself or as a trustee in bankruptcy, Seller agrees that Buyer may assert and litigate such claims or defenses in its name, or a successor's name, and Seller shall, if necessary or required by the Bankruptcy Court, Bankruptcy Code and/or the Federal Rules of Bankruptcy Procedure, appoint Buyer to litigate such Claims or defenses and shall file or cause to be filed all papers necessary for such appointment.

(d)    Seller shall remove the Ross Litigation to the Bankruptcy Court, but makes no representations that the Ross Litigation will remain in that forum.

8.5    <u>Bankruptcy Action.</u>

(a)    Seller will within five (5) Business Days following the date of execution of this Agreement, file a motion ("Procedures Motion") and form of order ("Procedures Order") pursuant to Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, in form and substance acceptable to Buyer in its reasonable discretion, including, but not limited to, payment of the Termination Fee and deadlines sufficient to allow the Closing by the date required herein. If required, Seller shall seek an expedited hearing of the Procedures Motion by the Bankruptcy Court. Seller further agrees not to amend or modify the Procedures or seek Bankruptcy Court approval to amend such Procedures in a manner adverse to Buyer without the prior written consent of Buyer.

(b)    Within ten (10) Business Days following the date of execution of this Agreement, Seller shall file with the Bankruptcy Court a motion and a form of order or orders (the "Sale Order") pursuant to Section 363 and other applicable provisions of the Bankruptcy Code in form and substance acceptable to Buyer in its reasonable discretion (x) authorizing and approving the sale of the Purchased Assets to Buyer pursuant to this Agreement, (y) approving the terms of this Agreement, and (z) making the following findings:

(i)    the Bankruptcy Court has "core" jurisdiction over the Bankruptcy Case;

(ii)    due and proper notice of the sale of the Purchased Assets to Buyer has been given to all parties entitled thereto in accordance with all applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court;

(iii)    the Purchased Assets are property of Seller's estate, within the meaning of Section 541 of the Bankruptcy Code, and that upon entry of the Sale Order, Seller will have the power to convey the property to Buyer;

(iv)    for each Lien on the Purchased Assets that does not constitute a Permitted Encumbrance or an Assumed Liability, subsection of Section 363(f) of the Bankruptcy Code applies, and, upon consummation of the transactions contemplated by this Agreement, the Purchased Assets will be sold to Buyer free and clear of such Lien;

14

(v)     the Bankruptcy Court has authorized the assumption by the applicable Seller and the assignment to Buyer of the Leases, all in the manner and subject to the terms and conditions set forth in the Agreement and in the Sale Order;

(vi)    the Purchased Assets have been reasonably marketed, and the offer of Buyer is the best offer received by Seller's estate and, accordingly, it is in the best interest of Seller's estate and its creditors that the sale of the Purchased Assets to Buyer be approved;

(vii)   Buyer is acting in good faith, and is entitled to the protections of Buyer under Section 363(m) of the Bankruptcy Code, and reversal or modification of the Sale Order on appeal will not affect the validity of the sale of the Purchased Assets to Buyer;

(viii)  each objection to the sale of the Purchased Assets to Buyer has either been withdrawn with prejudice or is specifically overruled on the merits;

(ix)    any competitive bidding in connection with the sale of the Purchased Assets has been non-collusive and the sale of the Purchased Assets to Buyer may not be set aside under Section 363(n) of the Bankruptcy Code;

(x)     this Agreement is approved, and Seller is authorized and directed to enter into and perform it according to its terms;

(xi)    the Cure Amounts are correct and, if paid, there are no other payments or actions required to cure any defaults under the Leases;

(xii)   Buyer is capable of performing under the Leases as required by Sections 365(b)(i)(C) and 365(f) of the Bankruptcy Code;

(xiii)  the Bankruptcy Court retains jurisdiction to construe and enforce the Sale Order; and

(xiv)   such other findings and provisions as may be reasonably requested by Buyer.

(c)     The Procedures Motion should provide for approval of the Termination Fee as described in Section 9.2(b), hereof.

(d)     If Seller is authorized to enter into an alternative transaction as allowed by the Procedures Order, the Sale Order and Procedures Order shall provide that in the event that the alternative transaction does not close by the Outside Closing Date, Buyer shall have the sole option to close on the same terms and conditions as provided herein within ten (10) days after receiving written notice from Seller of the failure to close.

(e)     Seller and Buyer shall each use their reasonable best efforts, and shall cooperate, assist and consult with each other, to secure the Bankruptcy Court's approval of the Procedures Order and the Sale Order by such date as will reasonably allow the Closing to occur not later than the Outside Closing Date. Seller and Buyer shall consult with, and seek the advice of, one another regarding pleadings that any of them intend to file, or positions any of them

15

intend to take, with the Bankruptcy Court in connection with or which might reasonably affect, the Bankruptcy Court's approval of the sale of the Purchased Assets. Neither Seller nor Buyer shall file any pleading or take any position that is inconsistent with obtaining the Bankruptcy Court's approval of any such order.

(f)     If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to the Sale Order or other such order), Seller and Buyer shall cooperate in taking such steps diligently to prosecute such appeal, petition or motion and each of Seller and Buyer shall use its reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

8.6     Transition.  Seller shall cooperate with Buyer and shall provide commercially reasonable assistance in effecting transfers of vendor accounts and services at the time of the Closing so as to avoid interruption or temporary cessation of operations as a result of change of ownership.

## ARTICLE 9 - TERMINATION

9.1     Termination.  This Agreement may be terminated:

(a)     By mutual consent of Buyer and Seller;

(b)     By Buyer after [October 30], 2009 (the "Outside Closing Date"), or such later date to which the Closing has been extended by agreement of Buyer, if the Closing has not occurred by such date; provided, however, that as of such date Buyer is not in default under this Agreement;

(c)     Provided the terminating party is not otherwise in material default or breach of this Agreement, and has not failed or refused to close without justification hereunder, by either Buyer or Seller, without prejudice to other rights and remedies which the terminating party may have, if the other party shall (i) have materially failed to perform its covenants or agreements contained herein required to be performed on or prior to the Closing Date, or (ii) have materially breached any of its representations or warranties contained herein; provided, however, that in the case of clause (i) or (ii), the defaulting party shall have a period of ten (10) days following written notice from the non-defaulting party to cure any breach of this Agreement, if such breach is curable, but in no event later than the Outside Closing Date;

(d)     This Agreement may be terminated by Seller or Buyer if, pursuant to the Procedures Order, Seller determines it will convey a material portion of the Purchased Assets to a purchaser or purchasers other than Buyer or effecting any other transaction the consummation of which would be substantially inconsistent with the transaction herein contemplated pursuant to an alternative offer satisfying the conditions of the Procedures Order; provided, however, that Seller's ability to terminate this Agreement for such reason is conditioned upon the payment by Seller to Purchaser of the Termination Fee at or before the Closing with the alternative buyer.

16

(e)    By either Seller or the Buyer if the Bankruptcy Court confirms a plan of reorganization for the debtors in the Bankruptcy Case that does not contemplate the transactions contemplated by this Agreement;

(f)    By Buyer, if the form of Sale Order is not, in form and substance, reasonably acceptable to Buyer or does not provide Buyer the protection afforded by Section 363(m) of the Bankruptcy Code;

(g)    By either Seller or Buyer if (A) any court of competent jurisdiction (other than the Bankruptcy Court) or other competent Governmental Authority has issued an order which has become final and nonappealable or (B) any Law (other than the Bankruptcy Code) is in effect, in either case restricting, restraining or altering in a material manner or enjoining or otherwise prohibiting or making illegal the effectuation of the transactions contemplated by this Agreement.

9.2    Effect of Termination; Remedies.

(a)    In the event of termination pursuant to Section 9.1, this Agreement shall become null and void and have no effect (other than Articles 9 and 10, which shall survive termination), with no Liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the Liability of a party for its own expenses pursuant to Section 10.1; and (ii) any Liability provided for in this Section 9.2, provided, however that any such termination shall be without prejudice to the rights of any party hereto arising out of the material breach by any other party of any covenant or agreement contained in this Agreement.

(b)    Seller shall pay to Buyer a "Termination Fee" of $50,000 if a Termination Fee Event (as defined below) shall occur at any time. This condition is part of Seller's consideration for this Agreement, without which Buyer would not agree. This obligation shall survive the termination of this Agreement and shall constitute an administrative expense of Seller's bankruptcy estates in the Bankruptcy Case under Sections 503(b) and 507(a)(1) of the Bankruptcy Code. The Termination Fee shall be fully earned and payable upon the occurrence of a Termination Fee Event. A "Termination Fee Event" is the occurrence of any of the following:

(i)    Termination of this Agreement pursuant to Sections 9.1(d), (e) and (f); and

(ii)    Termination of this Agreement by Buyer pursuant to Section 9.1(c).

In the event of the occurrence of Termination Fee Event described above, the Termination Fee shall be immediately due and payable, but Seller may delay payment until the Closing Date. The Termination Fee remains payable even if the alternative purchaser does not complete the closing of the sale of the Purchased Assets.

17

## ARTICLE 10 - MISCELLANEOUS

10.1    Expenses.    Whether or not the transactions contemplated hereby are consummated, Seller and Buyer shall bear their own expenses, including, without limitation, fees, disbursements and other costs of any brokers, finders, investment bankers, attorneys, accountants and other advisors, in connection with this Agreement and the transactions contemplated hereby.

10.2    Notices.    All notices under this Agreement shall be given to the parties at the following addresses (i) by personal delivery; (ii) by facsimile transmission; (iii) by registered or certified mail, postage prepaid, return receipt requested; or (iv) by nationally recognized overnight or other express courier services:

|  | | |
|---|---|---|
| (a) | If to Buyer: | Wolf Run Mining Company<br>Attn: President<br>1 Edmiston Way, Suite 211<br>Buckhannon, WV 26201 |
|  | With a copy to: | ICG, LLC<br>Attn: General Counsel<br>300 Corporate Centre Drive<br>Scott Depot, WV 25560 |
| (b) | If to Seller: | Appalachian Fuels, LLC<br>Appalachian Resources, LLC<br>Kanawha Development Corporation<br>Attn: James H. Frazier<br>Chief Liquidating Officer<br>McBrayer, McGinnis, Leslie & Kirkland<br>163 W Short St, Ste 300<br>Lexington, KY 40507-1378 |
|  | With a copy to: | W. Thomas Bunch Sr.<br>Bunch & Brock<br>805 Security Trust Building<br>271 West Short Street<br>Lexington, Kentucky 40507 |

All notices shall be effective and shall be deemed delivered (i) if by personal delivery, on the date of delivery if delivered during normal business hours of the recipient, and if not delivered during such normal business hours, on the next business Day following delivery; (ii) if by facsimile transmission, on the next business Day following dispatch of such facsimile; (iii) if by national courier service for next business Day delivery, on the third (3rd) business Day after dispatch thereof; and (iv) if by mail, on the next business Day after dispatch thereof. Any party hereto may change its address by notice to all parties hereto delivered in accordance with this Section 10.2.

18

10.3   Amendments. No supplement, modification or waiver of this Agreement shall be binding unless in writing and executed by each party hereto.

10.4   Waiver. At any time prior to the Closing, Buyer or Seller may (a) extend the time for the performance of any of the obligations or other acts of the other party hereto, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the obligations of the other party or any of the conditions to its own obligations contained herein to the extent permitted by law. Any agreement on the part of Buyer, on the one hand, and Seller, on the other hand, to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of Buyer and Seller. The failure of a party to exercise any right or remedy shall not be deemed or constitute a waiver of such right or remedy in the future. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other similar or dissimilar provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

10.5   Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

10.6   Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties, provided, however, that Buyer shall be permitted and required to assign all of its rights and interests hereunder to any Person who purchases the equity interests or substantially all of the assets of the business from Buyer or any of its Affiliates. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective successors and assigns.

10.7   Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their successors and permitted assigns, and nothing in this Agreement, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement.

10.8   Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties hereto.

10.9   Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such which may be hereafter declared invalid, void or unenforceable. In such case, the parties hereto shall promptly meet and negotiate substitute provisions for those rendered or declared illegal or unenforceable so as to

19

preserve as nearly as possible the contemplated economic effects of the transactions contemplated hereby.

10.10 <u>Entire Agreement</u>. This Agreement and the exhibits and schedules hereto and the Related Agreements constitute the entire agreement among the parties hereto and supersede all prior agreements and understandings oral or written, among the parties hereto with respect to the subject matter hereof and thereof. There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

20

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of Buyer and Seller on the date first above written.

WOLF RUN MINING COMPANY

By: _____

Name: _____

Title: _____

("Buyer")

APPALACHIAN FUELS, LLC

By: _____

Name: _____

Title: _____

APPALACHIAN RESOURCES, LLC

By: _____

Name: _____

TITLE: _____

KANAWHA DEVELOPMENT CORPORATION

By: _____

Name: _____

Title: _____

(collectively, "Seller")

S-1

## SCHEDULE 2.1(a)

("Leases")

1. Lease dated October 17, 1978, by and between Morgan H. Lyons and Hilda S. Lyons and Badger Coal Company, as supplemented, amended and assigned.

2. Lease dated February 20, 1979, by and between Morgan H. Lyons and Hilda S. Lyons and Badger Coal Company, as supplemented, amended and assigned.

3. Agreement of Lease dated April 25, 1955, by and between S. M. Kaemmerling and Badger Coal Company, as supplemented, amended and assigned.

4. Lease dated August 2, 1978, by and between Chas. E. Compton and Julia C. Compton and Badger Coal Company, as supplemented, amended and assigned.

5. Lease dated August 2, 1978, by and between Chas. E. Compton and Julia C. Compton and Badger Coal Company, as supplemented, amended and assigned.

6. Lease dated April 4, 1977, by and between Lucille C. Chesser and Badger Coal Company, as supplemented, amended and assigned.

7. Lease dated September 21, 1966, with Willa Kemper Smith involving a 213 Ac parcel, which interest is now in one or more of the Sellers.

For good and valuable consideration, including the benefits accruing to the related companies, Appalacian Environmental, LLC joins in this Agreement to confirm it will comply with the obligations of Seller hereunder, and specifically those related to the Ross Litigation and Section 8.4.

APPALACHIAN FUELS, LLC

By: _____

Name: _____

Title: _____

## SCHEDULE 2.1(c)

("Leasehold Improvements")

NONE

## SCHEDULE 5.2

("Consents and Approvals")

NONE

## SCHEDULE 6

("Encumbered Leases")

NONE

## ASSIGNMENT OF LEASES

This Assignment of Leases (this "Agreement") is made and effective as of _____, 2009, by and among (i) APPALACHIAN FUELS, LLC, a Kentucky limited liability company, APPALACHIAN RESOURCES, LLC, a Kentucky limited liability company, and KANAWHA DEVELOPMENT CORPORATION, a West Virginia corporation (the "Sellers"), and (ii) WOLF RUN MINING COMPANY, a West Virginia corporation ("Buyer").

RECITALS

A.    This Agreement is entered into to effect the transactions contemplated by that certain Agreement dated September __, 2009, by and between the Sellers and Buyer (the "Agreement"). Capitalized terms used herein but not otherwise defined shall have the meaning given to them in the Agreement.

B.    One or more of the Sellers is a party to the Leases described on Schedule 1 attached hereto and incorporated herein by reference ("Leases").

D.    The Sellers desire to assign to the Buyer, and the Buyer desires to assume, all of the Sellers' right, title and interest in and to the Leases, pursuant to the terms of the Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment. The Sellers assign, transfer and set over unto Buyer all of Sellers' right, title, interest in, to and under the Leases.

2.    Assumption. The Buyer assumes all of Sellers' rights, title, interest, duties and obligations in, to and under the Leases and agrees to be bound by all of the terms and conditions of the Leases and agrees to pay, perform and discharge, all duties and obligations of the Sellers under the Leases that arise on or after the date hereof, subject to the conditions and limitations in the Agreement and the Sale Order.

3.    Conflict. This Agreement is subject to all the terms and conditions of the Agreement. No provision of this Agreement shall be deemed to enlarge, alter or amend the terms or provisions of the Agreement. Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Agreement and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

4.    Governing Law. This Agreement shall be governed by and construed according to the laws of the Commonwealth of Kentucky without regard to or application of its conflict of laws rules.

5.    Counterparts. This Agreement may be executed in one or more counterparts (including by means of facsimile or e-mail signature pages) and all such counterparts taken together shall constitute one and the same Agreement.

6.    Severability. If any provision of this Agreement or its application will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired. If any court shall determine that any provision of this Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

7.    Entire Agreement. All prior negotiations and agreements by and among the parties hereto with respect to the subject matter hereof are superseded by this Agreement and the Agreement, and there are no representations, warranties, understandings or agreements with respect to the subject matter hereof other than those expressly set forth in this Agreement, the Agreement and the related Agreements.

8.    Headings. Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any provision in it.

IN WITNESS WHEREOF, the parties hereto have caused their authorized representatives to execute this Agreement as of the date first set forth above.

**SELLERS:**                                   APPALACHIAN FUELS, LLC

                                               By: _____

                                               Its: _____


                                               APPALACHIAN RESOURCES, LLC

                                               By: _____

                                               Its: _____


                                               KANAWHA DEVELOPMENT CORPORATION

                                               By: _____

                                               Its: _____


                                                      (collectively, the "Sellers")

**BUYER:**                                    WOLF RUN MINING COMPANY

                                              By: _____

                                              Its: _____

                                                        ("Buyer")


STATE OF _____        )
                                 )SS
COUNTY OF _____         )

    Subscribed and sworn to before me by _____, as _____,
on behalf of Appalachian Fuels, LLC on this the ____ day of _____, 2009.


                                   _____
                                   NOTARY PUBLIC

                                   My Commission Expires: _____


STATE OF _____        )
                                 )SS
COUNTY OF _____         )

    Subscribed and sworn to before me by _____, as _____,
on behalf of Appalachian Resources, LLC on this the ____ day of _____, 2009.


                                   _____
                                   NOTARY PUBLIC

                                   My Commission Expires: _____

STATE OF _____    )
                                              )SS
COUNTY OF _____    )

    Subscribed and sworn to before me by _____, as _____,
on behalf of Kanawha Development Corporation on this the _____ day of _____, 2009.

_____

NOTARY PUBLIC

My Commission Expires: _____

STATE OF _____    )
                                              )SS
COUNTY OF _____    )

    Subscribed and sworn to before me by _____, as _____,
on behalf of Wolf Run Mining Company on this the _____ day of _____, 2009.

_____

NOTARY PUBLIC

My Commission Expires: _____

This instrument was prepared by:

_____
Gregory R. Schaaf
Greenebaum Doll & McDonald PLLC
300 West Vine Street, Suite 1100
Lexington, Kentucky 40507-1665
(859) 231-8500

3575953_1.doc

**<u>Schedule 1</u>**

(Leases)

## **EXHIBIT A**

(Assignment of Leases)

## **EXHIBIT B**

(Bill of Sale)

## BILL OF SALE

THIS BILL OF SALE ("Bill of Sale") is made and effective as of _____, 2009, by and among (i) APPALACHIAN FUELS, LLC, a Kentucky limited liability company, APPALACHIAN RESOURCES, LLC, a Kentucky limited liability company, and KANAWHA DEVELOPMENT CORPORATION, a West Virginia corporation (the "Sellers"), and (ii) WOLF RUN MINING COMPANY, a West Virginia corporation ("Buyer")..

RECITALS:

A. This Bill of Sale~~Agreement~~ is entered into to effect the transactions contemplated by that certain Agreement dated September __, 2009, by and between the Sellers and Buyer (the "Agreement").

B. So that Buyer is in possession of an instrument vesting title in Buyer to the assets being acquired, Seller executes and delivers to Buyer this Bill of Sale.

AGREEMENT:

NOW, THEREFORE, the parties hereby agree as follows:

1. DEFINITIONS; CONSTRUCTION. Capitalized terms not expressly defined in this Bill of Sale shall have the meaning ascribed to them in the Agreement. In the event of any conflict between any provisions of this Bill of Sale and the Agreement, the Agreement shall control.

2. TRANSFER OF ASSETS. Seller hereby sells, transfers, conveys, assigns and delivers unto Buyer, its successors and assigns, free and clear of all encumbrances, all of Seller's right, title and interest under, in and to the assets described in the Agreement as the "Purchased Assets".

3. NO MODIFICATION TO AGREEMENT. This Bill of Sale is delivered pursuant -to the Agreement, and is subject in all respects to the provisions thereof and is not intended and shall not be construed to alter, enlarge, or otherwise modify the provisions of the Agreement. This Agreement is also subject to the terms of the Sale Order.

4. GOVERNING LAW. This Bill of Sale is executed and delivered in, and shall be governed, enforced and interpreted in accordance with the laws of the Commonwealth of Kentucky without regard to its conflicts of laws rules.

5. PARTIES IN INTEREST. This Bill of Sale shall be binding upon and inure solely to the benefit of the parties hereto and their successors and permitted assigns, and nothing in this Bill of Sale, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Bill of Sale.

4.6. COUNTERPARTS. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties hereto.

EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT, THE TRANSACTION IS, AS IS, WHERE IS, WITH ALL FAULTS. SELLER MAKES NO OTHER

WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED WITH RESPECT TO THE
CONDITION, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF
THE PROPERTY.

IN WITNESS WHEREOF, the parties have entered into this Bill of Sale as of the date first written above.

SELLERS:                          APPALACHIAN FUELS, LLC

                                  By: _____

                                  Its: _____


                                  APPALACHIAN RESOURCES, LLC

                                  By: _____

                                  ITS: _____


                                  KANAWHA DEVELOPMENT CORPORATION

                                  By: _____

                                  Its: _____


                                      (collectively, the "Sellers")


BUYER:                            WOLF RUN MINING COMPANY

                                  By: _____

                                  Its: _____

                                          ("Buyer")


-3-

STATE OF _____        )
                                 )SS
COUNTY OF _____         )

Subscribed and sworn to before me by _____, as _____, on
behalf of Appalachian Fuels, LLC on this the _____ day of _____, 2009.

_____
NOTARY PUBLIC

My Commission Expires: _____


STATE OF _____        )
                                 )SS
COUNTY OF _____         )

Subscribed and sworn to before me by _____, as _____, on
behalf of Appalachian Resources, LLC on this the _____ day of _____, 2009.

_____
NOTARY PUBLIC

My Commission Expires: _____


STATE OF _____        )
                                 )SS
COUNTY OF _____         )

Subscribed and sworn to before me by _____, as _____, on
behalf of Kanawha Development Corporation on this the _____ day of _____, 2009.

_____
NOTARY PUBLIC

My Commission Expires: _____

-4-

STATE OF _____   )
                                              )SS
COUNTY OF _____   )

Subscribed and sworn to before me by _____, as _____, on
behalf of Wolf Run Mining Company on this the ____ day of _____, 2009.

_____
NOTARY PUBLIC

My Commission Expires: _____

3575955_2.doc

-5-

## EXHIBIT A

(the Dante Leases)

1.  Lease dated October 17, 1978, by and between Morgan H. Lyons and Hilda S. Lyons and Badger Coal Company, as supplemented, amended and assigned.

2.  Lease dated February 20, 1979, by and between Morgan H. Lyons and Hilda S. Lyons and Badger Coal Company, as supplemented, amended and assigned.

3.  Agreement of Lease dated April 25, 1955, by and between S. M. Kaemmerling and Badger Coal Company, as supplemented, amended and assigned.

4.  Lease dated August 2, 1978, by and between Chas. E. Compton and Julia C. Compton and Badger Coal Company, as supplemented, amended and assigned.

5.  Lease dated August 2, 1978, by and between Chas. E. Compton and Julia C. Compton and Badger Coal Company, as supplemented, amended and assigned.

# EXHIBIT B

(Leasehold Improvements Associated with the Dante Leases)

**[Define/List if Available]**

3571787_1.doc

## **EXHIBIT C**

### (Cure Amounts)

Mike Ross – 4 years minimum rents ($5,000 x 4yrs = $20,000).

Compton leases (combined)   $54,600

3565169_7.doc