UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| APPALACHIAN FUELS, LLC, *ET AL.* | ) | CASE NO. 09-10343 |
| | ) | JOINTLY ADMINISTERED |
| DEBTORS | ) | |
| | ) | JUDGE JOSEPH M. SCOTT, JR. |

---

### SALE MOTION NO. 5

### DEBTORS' MOTION FOR AN ORDER APPROVING BIDDING PROCEDURES AND BID PROTECTIONS FOR A SALE NO. 5; AUCTION PROCESS; RELATED RELIEF AND OPPORTUNITY NOTICE

### (M-21 and Hannco Liabilities)

Come the Debtors, Appalachian Fuels, LLC and its affiliates (collectively, the "Debtors"),[1] by and through counsel, and move for an Order Approving Bidding Procedures and Bid Protections for a Sale No. 5 of certain unexpired leases and approving an Auction Process ("Bidding Procedures Motion"). In support of this Bidding Procedures Motion, the Debtors state as follows:

### BACKGROUND, JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction over this Bidding Procedures Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The Court can exercise its subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(1). Venue of this case and this Bidding Procedures Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 105(a), 363, 365 and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

---

[1] The cases being jointly administered with Appalachian Fuels, LLC, Case No. 09-10343 include Appalachian Holding Company, Inc., Case No. 09-10372, Appalachian Premium Fuels, LLC, Case No. 09-10373, Appalachian Environmental, LLC, Case No. 09-10374, Kanawha Development Corporation, Case No. 09-10375, Appalachian

2.      On June 29, 2009, the Court entered an Order of Relief (Docket No. 117).  Upon conversion of these cases to a Chapter 11 (Docket No. 144), the Debtors began operating as debtors and debtors-in-possession pursuant to Code §§ 1107(a) and 1108.

3.      No request has been made for the appointment of a trustee or examiner, and a Committee to represent the unsecured creditors has been appointed in this case, has retained counsel, and is active in this Case.

4.      The Debtors are limited liability corporations with their headquarters in Ashland, Kentucky.  The Debtors have various coal mining operations throughout Kentucky and West Virginia, with mining equipment located in those two states and in Illinois.  The Debtors' mines are idle except for the performance of required reclamation thereon.

5.      On June 26, 2009, Appalachian Fuels and several related entities filed voluntary Chapter 11 cases in the U.S. Bankruptcy Court for the Eastern District of Kentucky and two more entities filed voluntary bankruptcy petitions on July 9, 2009.  Thereafter, this Court appointed James H. Frazier III as the Chief Liquidating Officer of the Debtors.

6.      Mr. Frazier has determined that the Debtors are incapable of returning to the active mining of coal.  Consequently, the Debtors intend to liquidate their assets instead of reorganizing operations as a going concern.  Mr. Frazier has also determined that there are limited sale opportunities for the Debtors' closed mines and related assets due to the current low price of coal and the tight credit markets.  These circumstances have prompted the Debtors' decision to pursue sales of their assets via auctions and negotiated sales.

7.      The Debtors are in the process of or have concluded selling many of their assets, including (a) a sale of a substantial portion of their equipment to Richie Bros. (Sale No. 1), which

---

was approved by the Court on August 31, 2009; (b) the sale of the Alloy Mine Complex in West Virginia (Sale No. 2), which is awaiting approval from this Court; and (c) the sale of Bent Mountain – Bevins Branch in Pike County, Kentucky, which is awaiting entry of Sale Order No. 3.  Certain assets, however, still remain unliquidated, including, *inter alia*, the M-21 Mine and the Hannco Liabilities.

8.      Because the Debtors can no longer operate due to, *inter alia*, their severe cash flow problems, they believe that prompt sales of their assets are in the best interests of their estates. Specifically, the Debtors believe that a negotiated sale of certain Assets (as defined subsequently herein) that is conditioned upon the right of other qualified bidders to submit higher bids will produce the highest and best value for such Assets in the best interest of the estates.

### RELIEF REQUESTED

9.      By this Motion, the Debtors seek the entry of an order approving bidding procedures and bid protections for the sale (the "Sale") of the assets descried in Section 2.1 of the Agreement (collectively, the "Assets"), (the M-21 Mine, a Kentucky mine site and the Hannco Liabilities, a series of mine sites in Kentucky to which the Debtors have reclamation responsibility by contract).

10.     The Debtors have entered into the final version of the Stalking Horse Agreement with Revelation Energy, LLC, a Kentucky limited liability company (the "Stalking Horse Bidder"), and an executed copy thereof is attached hereto as Exhibit A ("Stalking Horse Agreement").

11.     The Stalking Horse Agreement contemplates a break-up fee with the Stalking Horse Bidder (the "Termination Fee") if a Competing Bidder (as defined subsequently) is a successful bidder that ultimately consummates a sale based on its competing bid.  The amount of the Termination Fee is $5,000 as defined in the Stalking Horse Agreement and the amount of the

Purchase Price for the Assets is $10,000 plus payment of the Cure Costs, more particularly as

defined in the Stalking Horse Agreement.

## The Bidding Procedures

12.     The Debtor seeks this Court's approval of the following proposed bidding procedures

("Bidding Procedures"):

(a)     An individual or entity interested in submitting an offer to purchase the Assets ("Competing Bidder"), may have access to the Debtors' books and records at reasonable times and on reasonable notice.

(b)     On or before 5:00 p.m. prevailing time on November 11, 2009 (the "Competing Offer Deadline"), a Competing Bidder may submit to the Debtors a signed, written offer to purchase the Assets (a "Competing Offer"). The Competing Offer shall include the same or substantially similar terms and conditions as the Stalking Horse Agreement.  The Debtors shall deliver a copy of any Competing Offers to counsel for the Committee upon receipt.

(c)     A Competing Offer shall be submitted with a deposit in the amount of $10,000 (the "Deposit") by wire transfer to Debtors' Counsel's IOLTA Escrow Account.   No interest on the Deposit shall be accrued.

(d)     After the Competing Offer Deadline and if there is no Competing Offer, the Debtors shall accept the Stalking Horse Agreement and seek approval of same from the Court at the Sale Hearing as defined infra.

(e)     If there is a Competing Offer higher than the offer of the Stalking Horse Agreement amount for the Assets, then the Debtors will conduct an auction (the "Auction") on November 12, 2009 at 4:00 p.m. prevailing Eastern time at law office of Bunch and Brock, 271 West Short Street, Lexington, Kentucky 40507.  Prior to the Auction, copies of the Competing Offer(s) shall be distributed to the Stalking Horse Bidder, all Competing Bidders that have submitted timely Competing Offers and the Committee's legal counsel. The Auction may be extended to the extent the Competing Offer Deadline is moved or rescheduled, provided that the Auction occurs before the Sale Hearing.

(f)     The Auction shall be governed by the following rules and procedures (the "Auction Procedures"):

(1)     The Auction of the Assets will begin with an opening overbid (the "Opening Overbid") at least equal to (i) the proposed purchase price of the Initial Approved Offer, plus (ii) an incremental overbid of

$1,000, plus (iii) the Termination Fee of $5,000 if the Initial Approved Offer is the Stalking Horse Agreement or an opening total overbid of $16,000 plus payments of the Cure Costs as defined in the Stalking Horse Agreement. Bids after the Opening Overbid ("Overbids") shall be in an amount not less than $1,000 in excess of the immediate prior Overbid.

(2)    The final and highest Overbid at the end of the Auction as determined by the Debtors, in consultation with the Committee, becomes the "Final Approved Offer", and the bidder making the Final Approved Offer becomes the "Successful Bidder". The Final Approved Offer shall be filed with the Court and presented to the Court for consideration and approval at the Sale Hearing.

(3)    The Debtors shall have the right to reschedule the applicable dates and times herein if necessary to accommodate the bidders and to adopt such other ministerial procedures or rules for the Auction Procedures that, in their judgment and with input from the Committee, will supplement and better promote the goals of the Auction Procedures. At the Auction, the Debtors may announce any such supplemental procedural rules for conducting the Auction.

(g)    After the Auction, the Court will conduct a hearing on the motion to sell Assets (the "Sale Hearing No. 5") to consider approval of the Final Approved Offer. If the Debtors did not timely receive a Competing Offer, then the Court will hold the Sale Hearing No. 5 to consider the approval of the Stalking Horse Agreement without the Debtors having conducted the Auction.

(h)    Subsequent to the auction but before the Sale Hearing No. 5, the Debtors shall file their Report of Auction, recommending to the Court the highest and best Final Approved Offer for approval. The Debtors shall only be deemed to have accepted a Final Approved Offer when it has been approved by the Court after the Sale Hearing No. 5. <u>The Sale Hearing Date shall be 9:00 a.m. in the United States Bankruptcy Courtroom, Second Floor, 100 East Vine Street, Lexington, Kentucky 40507 on November 20, 2009.</u>

(i)    Promptly following the conclusion of the Sale Hearing No. 5, Debtors' Counsel shall return the Deposit provided by any Competing Bidder who is not the Successful Bidder, except for the next highest bidder, whose Deposit is retained until Closing occurs as described in the next Section. In the event that the Successful Bidder fails to consummate such transaction in breach of any of the terms of the Final Approved Offer, the Deposit shall be forfeited to and retained by the Debtors.

(j)      In the event that the Successful Bidder fails to close the Sale, the Debtors are authorized to close with the Stalking Horse Bidder (to the extent it was not the Successful Bidder), or the next highest bidder if not the Stalking Horse Bidder, at that entity's sole discretion, within ten (10) days after receiving written notice from Debtors of the failure to close, with such closing being under the same terms and conditions as the next highest bid.

(k)      The Debtors shall provide copies of a notice of auction containing these Bidding Procedures and any relevant document(s) relating thereto to: (1) parties on any current master service list, (2) persons identified by the Debtors, the Debtors', secured creditors or the Committee as persons other than the Stalking Horse Bidder that may have an interest in acquiring the Assets, and (3) any other entity making a written request to the Debtors prior to the Competing Offer Deadline.

## APPLICABLE AUTHORITY

### The Bidding Procedures Are Fair and Reasonable Under the Debtors' Business Judgment

13.     Bidding procedures are practices generally accepted by bankruptcy courts to govern the sale of assets from a debtor's bankruptcy estate. *See Corporate Assets, Inc. v. Paloian*, 368 F.3d 761 (7th Cir. 2004); *In re Integrated Resources*, 147 B.R. 650 (Bankr. S.D.N.Y. 1992); *In re Hupp Industries, Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992); *In re 995 Fifth Avenue*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989). Bidding procedures have been recognized to encourage potential purchasers to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of its assets, despite the inherent risks and uncertainties associated with the Chapter 11 process. The establishment of such procedures is within the discretion of the Bankruptcy Court. *See Matter of Gould*, 977 F.2d 1038 (7th Cir. 1992).

14.     The Bidding Procedures here reflect the exercise of the Debtors' business judgment with respect to what is both commercially reasonable and necessary as an incentive to advance the Sale process, and to motivate potential Competing Bidders to spend the time and resources necessary to participate in that process.

15. The Bidding Procedures are reasonable and will assist the Debtors in obtaining the highest and best offer available for the Assets. The Debtors believe that the Bidding Procedures are reasonable considering (a) the Assets are not being used for traditional business operations because the Debtors have shutdown; and (b) they create a process that is well known in bankruptcy cases in this jurisdiction and other jurisdictions where Competing Bidders may reside.

16. The Debtors believe that the Bidding Procedures are in the best interests of the estates because they provide an efficient and effective mechanism for marketing and liquidating the Assets. The Debtors also believe that they will be unable to effectively market and sell the Assets without Court approval of the Bidding Procedures.

## **Termination Fee and Bid Protections**

17. As discussed below, the Termination Fee and Overbids (collectively "Bid Protections") under the Bid Procedures should be approved because they are necessary to attract and compensate bidders whose bids will be subject to higher or better offers that will benefit the estates.

18. Historically, bankruptcy courts have approved break-up fees and other bidding incentives under the "business judgment rule," which proscribes judicial second-guessing of the actions of debtors taken in good faith and in the exercise of their honest judgment. *See, e.g., In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.*, Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").[2]

---

2. *See also In re Anchor Glass Container Corporation*, Case No. 96-01434 (PJW) (Bankr. D. Del. 1996)

19.     In particular, courts have recognized the value of bid protections as a reasonable and necessary expense associated with the sale of significant assets in bankruptcy.  *See In re Anchor Glass Container Corporation*, 650, 657-58 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (establishing three basic factors for determining whether to permit such fees in bankruptcy: "whether (1) relationship of parties who negotiated break-up fee is tainted by self-dealing or manipulation; (2) whether fee hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to purchase price").

20.     Other courts have applied another test to review break-up fee provisions.  In *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit opted to evaluate a break-up fee arrangement under the rubric of what it tentatively opined was the "most likely source of authority" for break-up fees – section 503 of the Bankruptcy Code.  *Id.* at 532. According to the Third Circuit, break-up fees must be shown to be "actually necessary to preserve the value of the estate" or to "provide some benefit to the estate."  *Id.* at 535, 536.

21.     The Debtors believe that the requested Bid Protections are appropriate under either the "business judgment rule" or "benefits the bankruptcy estate" standards applied in the aforementioned cases because: (1) the relationship between the Debtors and the Stalking Horse Bidder will not be tainted with self-dealing or manipulation, and the Bid Protections are the product of an arms-length negotiations and consideration; (2) the Bid Protections will not hamper or create a "chilling effect" on bidding as it is an insignificant sum in relation to the potential value of the Assets; and (3) the Termination Fee and Overbid amounts are reasonable.

22.     A potential Stalking Horse Bidder will not submit an offer without the requested Bid Protections.  The Bidding Procedures will thus induce "a bid that otherwise would not have been

---

(authorizing termination fee); *In re FoxMeyer Corp.*, Case No. 96-01329 (HSB) (Bankr. D. Del. 1996) (same); *In re Bidding Procedures Sale Motion 5*     8

made and without which bidding would [be] limited." *O'Brien*, 181 F.3d, at 537.  Similarly, if there is a Stalking Horse Agreement, it will provide a minimum bid on which other potential bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth." *Id*.  Finally, the mere existence of the Bidding Procedures permits the Debtors to insist that competing bids be materially higher or otherwise better than either the offer in the Stalking Horse Agreement or a Initial Approved Offer.

23.    The Termination Fee is fair and reasonable in amount, particularly in view of the effort required of a potential purchaser, and the risk to the Stalking Horse Bidder of being used as a "stalking horse."   Here, the amount of the Termination Fee is $5,000 from the Debtors.   This Termination Fee is within the range of standard, widely-accepted procedures and inducements frequently offered to stalking horse bidders in transactions of this type.   Also, the Termination Fee is set at an amount that will cover the Stalking Horse Bidder's actual costs, and will not result in a windfall to the Stalking Horse.

## **CONCLUSION**

24.    The Debtors have filed this Motion in good faith and only as a result of determining, after a full exploration of all of their prospects, that they cannot effectuate a greater return on the Assets than what would be accomplished by the Bidding Procedures.   Accordingly, based on the authority and reasoning outlined herein, the Debtors submit that approval of the Bidding Procedures and Bid Protections will enhance the Sale process for the benefit of all creditors and parties in interest.

---

*Lomas Financial Corp*., Case No. 95-01235 (PJW) (Bankr. D. Del. 1995) (same).

WHEREFORE, the Debtors respectfully request that this Court (i) enter an order approving the Bidding Procedures and Bid Protections; and (ii) grant the Debtors such other and further relief as is just and appropriate under the circumstances.

## OPPORTUNITY NOTICE FOR OBJECTION AND DEMAND FOR A HEARING

Notice is hereby given that the foregoing Motion shall not be ruled on by the Court for fifteen (15) days after entry and if any party has an objection, then that objection must be filed in this Court within fifteen (15) days from this Motion date, and noticed by the objector for hearing to be heard by the Court on November 20, 2009, at 9:00 a.m. on shortened notice at the United States Bankruptcy Court, Eastern District of Kentucky, 100 East Vine Street, Second Floor Courtroom, Lexington, Kentucky; otherwise if no objection is filed within this fifteen (15) day period, the Court may at its discretion enter the tendered order approving the auction bidding procedures and fixing the Sale Hearing date on Sale Order No. 5.

Respectfully submitted,
**BUNCH & BROCK**

BY:    /s/ *W. Thomas Bunch*
     **W. THOMAS BUNCH**
     271 West Short Street
     805 Security  Trust Building
     PO Box 2086
     Lexington, Kentucky 40588

COUNSEL FOR DEBTORS

## CERTIFICATE OF SERVICE

This is to certify that on October 27, 2009, a true and correct copy of the foregoing was served electronically by the Clerk of the Bankruptcy Court in the method established under CM/ECF Administrative Procedures Manual and the Local Court Standing Order dated July 25, 2002, and by e-mail upon the Master Service List No. 1 (Doc. No. 235).

/s/ *W. Thomas Bunch*
COUNSEL TO DEBTOR

EXHIBIT A

## ASSET PURCHASE AGREEMENT

This is an Asset Purchase Agreement (the "Agreement"), dated as of October 21, 2009, between (i) Revelation Energy, LLC, a Kentucky limited liability company (the "Buyer"), and (ii) Appalachian Fuels, LLC, a Kentucky limited liability company (the "Seller").

## RECITALS

A.      On July 2, 2009 (the "Petition Date"), the Seller commenced a case for reorganization, Case No. 09-10343 (the "Bankruptcy Case"), under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Kentucky, Ashland Division (the "Bankruptcy Court") by converting the case for reorganization under Chapter 7 of the Bankruptcy Code filed by creditors of the Seller on June 11, 2009.

B.      The Seller is a debtor-in-possession pursuant to the Bankruptcy Case and is operating its business and managing its properties pursuant to section 1108 of the Bankruptcy Code.

C.      The Seller is engaged in the business of mining coal and activities directly or indirectly relating thereto.

D.      The Seller has determined that it is in the best interest of the Seller and its bankruptcy estate to sell to the Buyer all right, title and interest of the Seller in and to the Purchased Assets (defined below), for consideration and upon the terms and conditions hereinafter set forth.

E.      The Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities (defined below) from the Seller, and the Seller desires to sell, convey, assign and transfer to the Buyer, the Purchased Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

F.      The Purchased Assets are assets of the Seller, which are to be purchased and assumed by the Buyer, free and clear of all Liens, Claims and encumbrances, except as otherwise provided herein, pursuant to a final, non-appealable order of the Bankruptcy Court approving such sale pursuant to sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Order"), which order will include (i) the authorization for the assumption by the Seller and assignment to the Buyer of certain unexpired executory leases and Liabilities thereunder under section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code, and (ii) a breakup fee for the Buyer in the amount of $5,000 in the event that the Seller consummates a transaction substantially similar to the transaction contemplated by this Agreement with another party, provided this Agreement has not been terminated pursuant to Sections 8.1 (a), (b), or (c).

NOW THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth herein and of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Buyer agree as follows:

## ARTICLE 1 - <u>DEFINITIONS</u>

1.1     Definitions.  As used herein, the following terms have the meanings set forth below:

"Accounts Receivable" means all accounts receivable and the right to payment from customers of the Seller and the full benefit of all security for such accounts or debts including all accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers.

"Affiliate" means, with respect to a specific Person, any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.  The term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract or otherwise.

"Assignment of Leases" means an Assignment of Leases substantially in the form attached hereto as <u>Exhibit A</u>.

"Assumption of Liabilities" means an Assumption of Liabilities substantially in the form attached hereto as <u>Exhibit B</u>.

"Bill of Sale" means the Bill of Sale between the Buyer and the Seller, substantially in the form attached hereto as <u>Exhibit C</u>.

"Business Days" means any day other than a Saturday, Sunday or other day on which national or state banking associations are required or permitted by law to be closed in Kentucky.

"Claim" means any written action, suit, Proceeding, hearing, investigation, litigation, charge, complaint, claim, or demand.

"Cure Costs" means the amount to be paid by Buyer to Seller for the cure of any monetary default under any and all Leases pursuant to Section 365 of the Bankruptcy Code and to allow such Leases to be assumed by Seller and assigned to Buyer in accordance with the provisions of Sections 365 and 1123 of the Bankruptcy Code.

"Environmental Law" means any applicable federal, state or local law, statute, rule, regulation or ordinance relating to the regulation, pollution, preservation or protection of human health, safety, the environment, or natural resources or to emissions, discharges, Releases or threatened Releases of pollutants, contaminants, Hazardous Materials or wastes into the environment (including ambient air, soil surface water, ground water, wetlands, land or

2

subsurface strata), including, but not limited to, common law claims such as nuisance, negligence and trespass.

"Environmental Permit" means any permit, approval, certificate, registration, license or other authorization required under any Environmental Law.

"Governmental Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

"Hannco Liabilities" means all liabilities arising from or relating to Kentucky Surface Mining Permit Numbers 813-0258, 813-0259, 813-0261, 860-0339, 860-0350, and 860-0359, commonly referred to as the "Hannco" area (but excluding the area referred to as "Rowdy"), the total amount of bond for which is $3,380,600.

"Hazardous Materials" means (a) petroleum or petroleum products, fractions, derivatives or additives, natural or synthetic gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls and radon gas; (b) any substances defined as or included in the definition of "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "extremely hazardous substances," "restricted hazardous wastes," "toxic substances," toxic chemicals or "toxic pollutants," "contaminants" or "pollutants" or words of similar import under any Environmental Law; (c) radioactive materials, substances and waste, and radiation; and (d) any other substance exposure to which is regulated under any Environmental Law.

"Indebtedness" of any Person means any obligations of such Person, whether or not contingent, (a) for borrowed money, (b) evidenced by notes, bonds, indentures or similar instruments, (c) for the deferred purchase price of goods and services, other than trade payables incurred in the ordinary course of business, (d) under capital leases, and (e) in the nature of guarantees of the obligations described in clauses (a) through (d) above of any other Person.

"Intellectual Property" means all domestic patents and patent rights, trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service name and service name rights, brand names, inventions, processes, formulae, copyrights, business and product names, logos, slogans, trade secrets, industrial models, designs, computer programs, business telephones, facsimile and e-mail addresses, websites and technology, and software (including all source codes) and related documentation, drawings, know-how, methods, processes, technology, engineering specifications, procedures, bills of material, trade secrets, all pending applications for and registrations of patents, trademarks, service marks and copyrights and any other intangible property used in or associated with the conduct of the Seller's business and the ownership of the Purchased Assets, including all of the Seller's rights to any such property which is owned by and licensed from others and any goodwill associated with any of the above.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of the United States, any foreign country or any

3

domestic or foreign state, county, city or other political subdivision or of any Governmental Authority and includes, without limitation, all Environmental Laws.

"Liabilities" means all Indebtedness, obligations, claims and other liabilities of a Person, whether absolute, accrued, contingent, fixed or otherwise or whether due or to become due.

"Liens" means any mortgage, pledge, assessment, security interest, lease, judgment lien, tax lien, mechanic's lien, materialman's lien, other lien, adverse Claim, levy, charge, Option, right of first refusal, charge, debenture, indenture, deed of trust, right-of-way, restriction, encroachment, license, lease, security agreement, or other encumbrance of any kind, and other restrictions or limitations on the use or ownership of real or personal property or irregularities in title thereto or any conditional sale contract, title retention contract or other contract to give any of the foregoing.

"Loss" means any loss, Claim, damage, liability or expense (including reasonable attorneys' fees).

"Material Adverse Effect" means (a) an adverse effect on the validity or enforceability of this Agreement or any of the Related Agreements in any material respect, (b) an adverse effect on the condition (financial or other), business, assets, results of operations, ability to conduct business or properties of the Seller or the Buyer (as applicable), or the Purchased Assets, taken as a whole, in any material respect, or (c) an impairment of the ability of the Seller or the Buyer (as applicable) to fulfill its obligations under this Agreement or any of the Related Agreements in any material respect.

"Order" means any writ, judgment, decree, injunction, or similar order of any Governmental Authority, in each such case whether preliminary or final.

"Permitted Lien" means any Lien (a) which is assumed or consented to by the Buyer herein (including, without limitation, Liens included in the Assumed Liabilities), (b) created by the Buyer, or (c) easements, rights-of-way, restrictions or minor defects or irregularities in title incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, easements, licenses or restrictions on the use of any real property or minor imperfections in title thereto.

"Person" means any natural person, corporation, limited liability company, general partnership, limited partnership, proprietorship, other business organization, entity, trust, union, association or Governmental Authority.

"Proceeding" means any action, suit, proceeding, arbitration, investigation or audit, whether or not by any Governmental Authority.

"Related Agreements" means the (a) the Assignment of Leases, (b) the Assumption of Liabilities, (b) the Bill of Sale, and (c) any other agreement, certificate or similar document to be executed by any party hereto in connection with this Agreement.

4

"Release" means any release, issuance, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any property, including the movement of Hazardous Materials through the air, soil, surface water, ground water or property other than as specifically authorized by and in compliance with all Environmental Laws and Environmental Permits.

"Taxes" means any and all taxes, fees, levies, duties, tariffs, import and other charges, imposed by any taxing authority, together with any related interest, penalties or other additions to tax, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profit, environmental, custom duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

"Tax Returns" means all federal, state, local, provincial and foreign returns, declarations, claims for refunds, forms, statements, reports, schedules, and information returns or statements, and any amendments thereof (including, without limitation, any related or supporting information or Schedule attached thereto) required to be filed with any Taxing authority in connection with any Tax or Taxes.

    1.2    <u>Rules of Interpretation</u>.

    (a)    The singular includes the plural and the plural includes the singular.

    (b)    The word "or" is not exclusive.

    (c)    A reference to a Person includes its permitted successors and permitted assigns.

    (d)    The words "include," "includes" and "including" are not limiting.

    (e)    A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated.  Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.

    (f)    References to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.

    (g)    The words "hereof," "thereof," "herein," "therein," "hereunder" and "thereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

5

(h)   References to "days" shall mean calendar days, unless the term "Business Days" shall be used.

(i)   This Agreement is the result of negotiations among, and has been reviewed by, the parties hereto.  Accordingly, this Agreement shall be deemed to be the product of all parties, and no ambiguity shall be construed in favor of or against any party

## ARTICLE 2 - PURCHASE AND SALE OF ASSETS

2.1   Purchase and Sale of Assets.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, transfer and convey to the Buyer, and the Buyer shall purchase, acquire and accept from the Seller, all of the Seller's right, title, and interest in and to the following assets other than the Excluded Assets, free and clear of all Liens except Permitted Liens, pursuant to sections 363 and 365 of the Bankruptcy Code, including, without limitation, the following (the "Purchased Assets"):

(a)   the Seller's following permit: Kentucky Surface Mining Permit Number 898-0788 (the "Permit"), to the extent transfer is permitted by Law;

(b)   all Intellectual Property owned or licensed by the Seller or titled in any Affiliate of the Seller for use in relation to the Permit;

(c)   all rights and interests of the Seller in, to and under the real property leases and subleases to which the Seller is a party and which are covered by the Permit (the "Leases"); and

(d)   all stockpiled coal inventory and pit inventory, located on the real property covered by the Permit, as of the Closing, subject to any applicable royalty payments due to lessors of such property.

At the Closing, the Purchased Assets will be delivered free and clear of all Liens other than Permitted Liens.  The Purchased Assets will otherwise be transferred on an AS IS, WHERE IS basis and with all faults.

2.2   Excluded Assets.  Notwithstanding any provision of Section 2.1, the Seller shall retain all of its right, title and interest in the following assets (collectively, the "Excluded Assets") and the definition of Purchased Assets shall not include any of the following:

(a)   All Accounts Receivable and notes receivable of the Seller as of the Closing Date;

(b)   All cash and cash equivalents of the Seller as of the Closing Date;

(c)   All performance bonds for reclamation or otherwise, surety bonds or escrow agreements and any payment or prepayments made with respect to, or certificates of deposit or other sums or amounts or assets posted by the Seller to secure any of the foregoing for reclamation or otherwise;

6

(d)    Any and all rights, Claims, credits, allowances, rebates, refunds, causes of action, or rights of set-off of the Seller or any Affiliate of the Seller, known or unknown, pending or threatened, including but not limited to all causes of action arising under sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Law, including but not limited to fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code), Claims arising out of or relating in any way to the Bankruptcy Case, or any of the transactions contemplated thereby or entered into as a consequence thereof, including any claims (as defined in section 101(5) of the Bankruptcy Code) filed, scheduled or otherwise arising in the Bankruptcy Case;

(e)    Any and all prepaid items;

(f)    All insurance policies and any rights or Claims arising from such policies;

(g)    All Tax refunds, rebates, overpayments and other rights (including, without limitation, rights to indemnification) and Claims of the Seller in respect of or relating to Tax or other liabilities not assumed by the Buyer or in respect of or relating to any other Excluded Assets;

(h)    All books, records, files or other documentation and written materials relating to any Excluded Assets;

(i)    All shares of capital stock of the Seller, all capital stock or equity of any other Person, and all corporate seals, corporate records, minute books, charter documents, record books, stock transfer books, original tax, accounting and financial records, and such other files, books and records as pertain to any of the Excluded Assets or to the organization, existence or capitalization of the Seller or of any other Person;

(j)    All assets, if any, in the Seller's executive or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or accident insurance or other employee benefit plans, and all contracts and other agreements and documents relating to all such plans; and

(k)    All coal inventory that has been properly loaded and/or is in transit.

2.3    Assumed Liabilities.

(a)    At the Closing the Buyer will assume only the following Liabilities and obligations of the Seller which are not paid or discharged at or before Closing (the "Assumed Liabilities"):

(i)    all Liabilities for and obligations of the Seller relating to the Purchased Assets arising after the Closing Date, including all Liabilities and obligations arising in connection with the Leases;

(ii)    all Liabilities under the Permit, and all Liabilities related to the Purchased Assets for reclamation prescribed by Law, contract or otherwise; and

7

          (iii)    all Hannco Liabilities; provided, however, that the Buyer is not becoming the permittee on the Hannco area pursuant to the Surface Mining Control and Reclamation Act of 1977 or any similar state law.

          (b)    The Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability or obligation of whatever nature, whether presently in existence or arising hereafter. All such other Liabilities and obligations shall be retained by and remain Liabilities and obligations of the Seller. The Buyer and the Seller agree that the Assumed Liabilities under Permit do not include any of the Seller's past due production royalty payments, minimum royalties, surface right payments, or wheelage fees, unless such constitute Cure Costs.

      2.4    <u>Non-Assignment of Assets</u>. This Agreement shall not constitute an agreement to assign or transfer any assets of the Seller, if, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted transfer or assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (or with respect thereto), would constitute a breach thereof or in any way negatively affect the rights of the Seller or the Buyer, as the assignee or transferee of such asset, as the case may be, thereunder. If, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, the Closing occurs and such authorization, consent, approval, license or permit is required for the transfer or assignment of any asset of the Seller at or before the Closing, but not obtained, the Seller will cooperate with the Buyer without further consideration (other than as provided in clause (b) of this Section 2.4) in any arrangement reasonably acceptable to the Buyer and the Seller, designed to both (a) provide the Buyer with the benefits of any such asset, and (b) cause the Buyer to bear all costs and obligations of or under any such asset. Any transfer or assignment to the Buyer of any asset that shall, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent, approval, authorization of, or granting of any license or permit by any third party for such assignment or transfer as aforesaid shall be made subject to such consent, approval, authorization, license or permit being obtained.

      2.5    <u>Amounts Held in Trust</u>. Any amounts received by the Buyer after the Closing with respect to any Excluded Asset shall be held by the Buyer in trust for the Seller until promptly paid to the Seller. Likewise, any amounts received by the Seller after the Closing with respect to any Purchased Asset shall be held by the Seller in trust for the Buyer until promptly paid to the Buyer.

      2.6    <u>Transfer Taxes</u>. To the extent that the transactions proposed by this Agreement are not otherwise exempt under section 1146(c) of the Bankruptcy Code, the Buyer shall be liable for all sales, use and other transfer Taxes and all filing and recording fees arising from or relating to the consummation of the transactions contemplated by this Agreement.

ARTICLE 3 - <u>CLOSING AND DELIVERIES</u>

      3.1    <u>Closing</u>. The parties shall hold a closing (the "Closing") as soon as reasonably possible after the Sale Order is entered by the Bankruptcy Court, but in no event later than October 31, 2009 (the "Closing Date"). The transactions contemplated hereby shall take place (despite a pending appeal if no stay thereof is in effect) pursuant to, and in accordance with, the

8

protections afforded the Buyer under section 363(m) of the Bankruptcy Code) pursuant to the terms and conditions hereof.

3.2    Seller's Deliveries.  The sale, transfer, assignment and delivery by the Seller of the Purchased Assets to the Buyer, as herein provided, shall be effected on the Closing Date by the Seller's execution and delivery of the Related Agreements to which it is a party, and other instruments of transfer and conveyance reasonably satisfactory in form and substance to counsel for the Buyer and the Seller.

3.3    Buyer's Deliveries.  At the Closing:

(a)    The Buyer shall wire transfer an amount equal to $10,000, plus the Cure Costs (together with assumption of the Hannco Liabilities, the "Purchase Price") to, or at the direction of, the Seller, in accordance with a funds memorandum provided to the Buyer by the Seller, in immediately available funds to the account or accounts specified by the Seller; and

(b)    The Buyer shall execute and deliver to the Seller the Related Agreements to which it is a party and such other agreements as are reasonably satisfactory in form and substance to counsel for the Buyer and the Seller.

ARTICLE 4 - REPRESENTATIONS AND WARRANTIES OF THE BUYER

In order to induce the Seller to enter into this Agreement, the Buyer makes the representations and warranties set forth below, which are true, correct and complete on the date hereof and shall be true, correct and complete as of the Closing:

4.1    Organization.  The Buyer is duly organized and validly existing under the Laws of the Commonwealth of Kentucky, and is authorized to do business in every jurisdiction in which the failure to be so qualified could result in a Material Adverse Effect.  The Buyer has all requisite limited liability company power and authority to own its properties and assets and to consummate the transactions contemplated hereby.

4.2    Authorization and Validity.  The Buyer has all requisite limited liability company power and authority to enter into this Agreement and the Related Agreements to which it is a party.  The execution and delivery of this Agreement and the Related Agreements to which it is a party and the performance of the obligations hereunder and thereunder have been duly authorized by all necessary limited liability company action by the Buyer.  This Agreement and the Related Agreements, to which the Buyer is a party has been, or will be, duly executed by the Buyer and constitute its valid and binding obligation, enforceable against it in accordance with their terms.  ·

4.3    Consents and Approvals.  No consent, approval or action of, filing with or notice to, any Governmental Authority or any other Person, on the part of the Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements to which the Buyer is a party or the consummation of the transactions contemplated hereby or thereby.

9

4.4    Financial Advisors.    Neither the Buyer nor any Person on the Buyer's behalf has agreed to pay any brokerage fee, finder's fee or commission which could reasonably be expected to become the obligation of the Seller with respect to the transactions contemplated by this Agreement.

4.5    Financial Ability to Perform.    The Buyer has available to it funds sufficient to enable the Buyer to deliver the Purchase Price to the Seller as contemplated by this Agreement at the Closing and perform its obligations hereunder.

4.6    Permitting.    The Buyer has not been subject to any bond forfeiture, permit suspension or revocation or similar effort or Proceeding instituted by any Governmental Authority.

4.7    Adequate Assurances Regarding Executory Contracts.    The Buyer is and will be capable of satisfying the conditions contained in Section 365(b)(i)(c) and 365(f) of the Bankruptcy Code with respect to the Leases.

## ARTICLE 5 – REPRESENTATION AND WARRANTIES

5.1    Warranties Exclusive.    The Buyer acknowledges that the Seller has made no representations and/or warranties and that all other express or implied warranties are disclaimed. Without limiting the foregoing the Buyer acknowledges that the Purchased Assets are conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING THE BUYER ACKNOWLEDGES THAT THE SELLER AND THE SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (I) ANY USE TO WHICH THE PURCHASED ASSETS MAY BE PUT, (II) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE PURCHASED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (III) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO THE BUYER OR ITS AFFILIATES OR RELATED PERSONS, OR (IV) THE CONDITION OF THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. "Related Person" means, with respect to a specific Person, any officer, director, employee, agent, shareholder, representative, successor or assign of such Person.

## ARTICLE 6 - CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

6.1    Conditions Precedent to Performance by the Seller.    The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by the Seller in its sole discretion:

(a)    Representations, Warranties and Obligations of the Buyer.    All representations and warranties made by the Buyer in Article 4 taken as a whole, shall be true and

10

correct in all material respects on the date of this Agreement and on and as of the Closing Date (except to the extent that any such representation and warranty is made as of a specified date, in which case such representation and warranty shall continue to be made as of such specified date), and the covenants and agreements of the Buyer to be performed on or before the Closing Date shall have been duly performed in all material respects in accordance with this Agreement, and the Seller shall have received a certificate, dated the Closing Date and signed by an officer of the Buyer, to that effect.

(b)    No Termination.  The Seller has determined, in its sole and absolute discretion, that it does not wish to terminate this Agreement in accordance with Section 8.1(d) hereof.

6.2    Conditions Precedent to Performance by the Buyer.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by the Buyer in its sole discretion:

(a)    Transfer Free of Liens.  The Purchased Assets shall be transferred to the Buyer free and clear of all Liens except for Permitted Liens.

6.3    Conditions to each Party's Obligations.  The respective obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver on or before the Closing of the following conditions:

(a)    Bankruptcy Court Approval of Procedures Order.  The entry of an order by the Bankruptcy Court approving the process to be used in connection with the sale of the Purchased Assets (the "Procedures Order").

(b)    Bankruptcy Court Approval of Sale Order.  The entry of the Sale Order by the Bankruptcy Court approving the sale of the Purchased Assets to the Buyer and the assumption and assignment of the Assumed Liabilities by the Buyer pursuant to the terms hereof, which shall not be opposed by the Buyer.

(c)    Injunctions.  There shall not be outstanding any Order prohibiting the consummation of the transactions contemplated by this Agreement and no action shall have been commenced which could reasonably be expected to prohibit the consummation of the transactions contemplated hereby.

(d)    No Change in Law.  There shall not have been any action taken or any statute enacted by any Governmental Authority which would render the parties unable to consummate the transactions contemplated hereby or make the transactions contemplated hereby illegal or prohibit the consummation of the transactions contemplated hereby.

## ARTICLE 7 - COVENANTS

7.1    Covenants of Seller.  The Seller covenants as follows:

11

(a)    <u>Access to Properties and Records; Confidentiality.</u>  The Seller shall afford to the Buyer, and to the accountants, counsel and representatives of the Buyer, reasonable access during normal business hours throughout the period before the Closing (or the earlier termination of this Agreement pursuant to Article 8) to all books and records of the Seller relating to the Purchased Assets and the Assumed Liabilities.  Upon reasonable prior notice, the Seller shall also afford the Buyer reasonable access, taking into account the Seller's resources and other commitments, during normal business hours, to all Purchased Assets throughout the period before the Closing.  During the period from the date hereof to the Closing Date, all information provided to the Buyer or its agents or representatives by or on behalf of the Seller or its agents or representatives (whether pursuant to this Section or otherwise) will be governed and protected by the confidentiality agreement executed by the Buyer.

(b)    <u>Further Assurances.</u>  At the request and the sole expense of the Buyer, at any time after the Closing Date, the Seller shall execute and deliver such documents as the Buyer or its counsel may reasonably request to effectuate the purposes of this Agreement.

7.2    <u>Covenants of Buyer.</u>  The Buyer covenants as follows:

(a)    <u>Financing.</u>  The Buyer covenants and agrees to do all things necessary to pay the Purchase Price.

(b)    <u>Access to Books and Records.</u>  The Buyer agrees to furnish or cause to be furnished to the Seller, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any inquiry from any Governmental Authority relating to Tax matters.  The Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Purchased Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to the Buyer hereunder, or (ii) coming into existence after the Closing Date that relate to the Purchased Assets or the Assumed Liabilities before the Closing, for a period of at least six years from the Closing Date, and will give the Seller notice and an opportunity to retain any such records if the Buyer determines to destroy or dispose of any or all of them after such period.  In addition, from and after the Closing, the Buyer agrees that it will provide access to the Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Purchased Assets or the Assumed Liabilities as the Seller may deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding or answer or (y) administer or complete any cases of the Seller under Chapter 11 of the Bankruptcy Code (and the Buyer shall give the Seller notice and an opportunity to retain any such records if the Buyer determines to destroy and dispose of any or all of them prior to the completion of such cases).  Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Purchased Assets or the Assumed Liabilities.

12

(c) <u>Notification by the Buyer of Certain Matters</u>. The Buyer agrees to notify the Seller in writing promptly upon the Buyer's or its authorized representatives' discovery of any information prior to the Closing Date relating to the Seller or the operations by the Seller (including the financial condition, assets and properties) of the Seller's business which constitutes (or would constitute) or indicates (or would indicate) a breach of any representation, warranty or covenant of the Seller contained herein.

(d) <u>Permit Matters</u>. As soon as practicable after the Closing, the Buyer shall promptly prepare and file all documents and information necessary to obtain, and shall diligently pursue (i) to the extent transfer is permitted under applicable Law, the transfer to the Buyer of the Permit if not transferred to the Buyer on or prior to the Closing and (ii) the obtaining of any necessary replacements of the Permit. The Seller shall cooperate with the Buyer in all commercially reasonable ways to file and prosecute such applications, at the sole cost and expense of the Buyer. To the extent allowed by and in accordance with applicable Law, the Seller hereby grants to the Buyer the right, after the Closing, to conduct operations under the Permit until such time as the transfer or replacement, if applicable, of the Permit to the Buyer is complete, but in no event for longer than twelve (12) months after the Closing, subject to extension with the consent of the Seller, such extension not to be unreasonably withheld. The Buyer shall (A) comply with all conditions and requirements of, or pertaining to, the Permit that the Buyer operates under after the Closing, and (B) indemnify the Seller from and against any and all Losses incurred or suffered by the Seller as a result or consequence of this arrangement regarding the use of the Permit by the Buyer, other than and to the extent that any such Losses are incurred or suffered by the Seller as a direct result of the Seller's conduct or inaction prior to the Closing.

(e) <u>Obtaining Consents</u>. Whether before or after the Closing, the Seller and the Buyer shall cooperate with one another and provide commercially reasonable assistance as needed to the other to effect the assignment or transfer of the Permit.

(f) <u>Transfer of Permit to the Buyer</u>. At the Closing, the Buyer shall (a) file an application with the Kentucky Department for Natural Resources for the transfer of the Permit, and (b) provide the Seller with evidence satisfactory to the Seller, in the Seller's sole discretion, that the Buyer has obtained sufficient and adequate bonds for the Permit. Promptly after the Closing, but in no event later than 120 days after the Closing Date, the Buyer shall cause the existing bonds obtained by the Seller or its Affiliates in respect of the Permit to be terminated and released.

(g) <u>Indemnification</u>. The Buyer shall indemnify and hold harmless the Seller, its Affiliates, and their respective Related Persons from and against any and all Liabilities and Claims arising from or related to the Buyer's breach of any representation, warranty or covenant contained herein or in any Related Agreement.

(h) <u>Replacement of Bonds and Letters of Credit</u>. At the Closing, the Buyer shall cause all letters of credit, surety bonds, performance bonds and similar bonds posted by the Seller or its Affiliates with respect to the Purchased Assets, to be terminated and released.

13

(i)    <u>Adequate Assurances Regarding Executory Contracts and Required
Orders</u>.  With respect to each Lease, the Buyer shall provide adequate assurance of the future
performance of such Lease by the Buyer.  The Buyer agrees that it will promptly take all actions
as are reasonably requested by the Seller to assist in obtaining the Bankruptcy Court's entry of
the Sale Order, including, without limitation, furnishing affidavits, financial information or other
documents or information for filing with the Bankruptcy Court and making the Buyer's
employees and representatives available to testify before the Bankruptcy Court.

(j)    <u>Performance under Executory Contracts</u>.  The Buyer shall (i) from and
after the Closing Date assume all obligations and liabilities of the Seller under the Leases that
accrue from and after the Closing Date, (ii) from and after the Closing Date take all actions
necessary to satisfy its obligations and liabilities under the terms and conditions of each of the
Leases, and (iii) indemnify, defend and hold harmless the Seller, its Affiliates and all of their
respective Related Persons from and against any damages, losses, costs, expenses and other
liabilities arising out of a breach of this Section or any of the Buyer's other covenants contained
in this Agreement.

7.3    <u>Covenants of the Parties</u>.

(a)    <u>Consents</u>.  The parties shall promptly apply for and diligently prosecute all
applications for, and shall use commercially reasonable efforts promptly to obtain, such
consents, authorizations and approvals from such Governmental Authorities and third parties as
shall be necessary or appropriate to permit the consummation of the transactions contemplated
by this Agreement, and shall use commercially reasonable efforts to bring about the satisfaction
as soon as practicable of all the conditions necessary to effect the consummation of the
transactions contemplated by this Agreement. Notwithstanding anything to the contrary
contained herein, the parties hereto agree that as a condition to obtaining the consent of any third
party to any coal supply contract, real property lease, personal property lease or any other
agreement to permit the consummation of the transactions contemplated hereby, no party hereto
shall have any obligation to (i) pay any remuneration to third parties in exchange for such party's
consent or approval; (ii) file any lawsuit or take other legal action as against such third party with
respect to any thereof; or (iii) make any amendment thereof or waive any rights thereunder if as a
result of such amendment or waiver such coal supply contract, real property lease, personal
property lease or any other agreement would contain terms and conditions that are less favorable
in any material respect than the terms and conditions of such coal supply contract, real property
lease or personal property lease as in existence on the Closing Date.

(b)    <u>Tax Exemption</u>.  Each party hereto agrees to use commercially reasonable
efforts to cause the Sale Order to provide that the sale of the Purchased Assets shall be exempt
from stamp or similar Taxes pursuant to 11 U.S.C. § 1146(c).

ARTICLE 8 - TERMINATION

8.1    <u>Termination</u>.  This Agreement may be terminated:

(a)    By mutual consent of the Buyer and the Seller prior to the entry of the
Procedures Order;

14

(b)     By either the Seller or the Buyer after October 31, 2009, or such later date to which the Closing has been extended pursuant to the terms hereof, if the Closing has not occurred by such date; provided, however, that as of such date the party terminating this Agreement is not in default under this Agreement;

(c)     Provided the terminating party is not otherwise in material default or breach of this Agreement, and has not failed or refused to close without justification hereunder, by either the Buyer or the Seller, without prejudice to other rights and remedies which the terminating party may have, if the other party shall (i) have materially failed to perform its covenants or agreements contained herein required to be performed on or prior to the Closing Date, or (ii) have materially breached any of its representations or warranties contained herein; provided, however, that in the case of clause (i) or (ii), the defaulting party shall have a period of ten (10) days following written notice from the non-defaulting party to cure any breach of this Agreement, if such breach is curable;

(d)     By the Seller if the transactions contemplated hereby are not approved by the Bankruptcy Court by October 31, 2009, or if the Seller determines in its sole and absolute discretion that it is in the Seller's best interests to consummate any transaction (or series of transactions) involving a sale of all or substantially all of the Purchased Assets to a purchaser or purchasers other than the Buyer. No such termination in accordance with this Section 8.1(d) shall constitute a breach by the Seller or entitle the Buyer to recover any damages whatsoever.

8.2     Effect of Termination; Remedies.  In the event of termination pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than Section 7.2(g) and Articles 8 and 9, which shall survive termination), with no Liability on the part of the Seller or the Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the Liability of a party for its own expenses pursuant to Section 9.1; and (ii) any Liability provided for in this section, provided, however that any such termination shall be without prejudice to the rights of any party hereto arising out of the material breach by any other party of any covenant or agreement contained in this Agreement.

## ARTICLE 9 - MISCELLANEOUS

9.1     Expenses.   Whether or not the transactions contemplated hereby are consummated, the Seller and the Buyer shall bear their own expenses, including, without limitation, fees, disbursements and other costs of any brokers, finders, investment bankers, attorneys, accountants and other advisors, in connection with this Agreement and the transactions contemplated hereby.

9.2     Notices.  All notices under this Agreement shall be given to the parties at the following addresses (i) by personal delivery; (ii) by registered or certified mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight or other express courier services:

(a)     If to the Buyer:

Mr. Jeff Hoops
Revelation Energy, LLC
104 Brent Way
Hurricane, WV 20556

With a copy to:

D.B. Kazee, Esq.
Kazee Law Office
P.O. Box 700
Prestonsburg, KY 41643

(b)     If to the Seller:

Attention: James H. Frazier
201 East Main Street, Suite 1000
Lexington, Kentucky 40507

All notices shall be effective and shall be deemed delivered (i) if by personal delivery, on the date of delivery if delivered during normal business hours of the recipient, and if not delivered during such normal business hours, on the next Business Day following delivery; (ii) if by courier service, on the third (3rd) Business Day after dispatch thereof; and (iii) if by mail, on the fifth (5th) Business Day after dispatch thereof. Any party hereto may change its address by notice to all parties hereto delivered in accordance with this Section 9.2.

9.3     Amendments. No supplement, modification or waiver of this Agreement shall be binding unless in writing and executed by each party hereto.

9.4     Waiver. At any time prior to the Closing, the Buyer or the Seller may (a) extend the time for the performance of any of the obligations or other acts of the other party hereto, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the obligations of the other party or any of the conditions to its own obligations contained herein to the extent permitted by law. Any agreement on the part of the Buyer, on the one hand, and the Seller, on the other hand, to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of the Buyer and the Seller. The failure of a party to exercise any right or remedy shall not be deemed or constitute a waiver of such right or remedy in the future. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other similar or dissimilar provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

9.5     Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

16

9.6     Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties; provided, however, that the Buyer may assign this Agreement and its rights hereunder to an Affiliate, so long as such Affiliate is able to fully comply with the terms contained herein, and is able to make all representations, warranties, and covenants contained herein.  Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective successors and assigns.

9.7     Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their successors and permitted assigns, and nothing in this Agreement, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement; provided, however, that the Seller's Affiliates and Related Persons of the Seller and the Seller's Affiliates shall be third-party beneficiaries of Section 7.2(g) hereof.

9.8     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties hereto.

9.9     Entire Agreement.  This Agreement and the exhibits and schedules hereto and the Related Agreements constitute the entire agreement among the parties hereto and supersede all prior agreements and understandings oral or written, among the parties hereto with respect to the subject matter hereof and thereof.  There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of the Buyer and the Seller on the date first above written.

**BUYER:**                        REVELATION ENERGY, LLC

                                  By: _____
                                  Name: _____
                                  Title: _____


**SELLER:**                       APPALACHIAN FUELS, LLC

                                  By: _____
                                  Name: _____
                                  Title: _____

S-1

## EXHIBIT A

## ASSIGNMENT OF LEASES

## **EXHIBIT B**

### **ASSUMPTION OF LIABILITIES**

S-1

## **EXHIBIT C**

## **BILL OF SALE**