## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF KENTUCKY
### ASHLAND DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | |
| APPALACHIAN FUELS, LLC, et al. | ) | Case No.  09-10343 |
| | ) | Chapter 11 |
| Debtors | ) | |
| | ) | Jointly Administered[1] |

### SALE ORDER NO. 4

### (Bent Mountain – Bevins Branch)

### GREENTHORN, LLC
### (A) APPROVINGASSET PURCHASE AGREEMENT, (B) AUTHORIZING SALE OF DESIGNATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND OTHER ENCUMBRANCES, AND (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN AGREEMENTS

The Court having conducted a hearing upon Debtors' Sale Motion No. 4 (Doc. No. 501) ("Sale Motion") of Appalachian Fuels, LLC et al. (the "Debtors") for an Order, pursuant to Sections 105, 363 and 365 of Title 11 of the United States Code ("Code") and Bankruptcy Rules 2002 and 6004, and 6006 and the Local Rules of Bankruptcy Procedure on September 25, 2009, approving (i) the sale of certain of the Debtors' assets free and clear of all liens, claims, encumbrances and interests, (ii) the assumption of certain leases and executory contracts, and (iii) the assignment of certain leases and executory contracts previously assumed or assumed by the terms of this Order.  The Sale Motion seeks, inter alia, entry of an order pursuant to Sections

---

[1]     The case being jointly administered with Appalachian Fuels, LLC, Case No. 09-10343 include Appalachian Holding Company, Inc., Case No. 09-10372, Appalachian Premium Fuels, LLC, Case No. 09-10373, Appalachian Environmental, LLC, Case No. 09-10374, Kanawha Development Corporation, Case No. 09-10375, Appalachian Coal Holdings, Inc., Case No. 09-10405 and Southern Eagle Energy, LLC, Case No. 09-10406.

105(a), 362, 363 and 365 of the Code, (a) approving the Asset Purchase Agreement, dated September 1, 2009, by and between the Debtors and New London Tobacco Market, Inc., as assigned by The New London Tobacco Market, Inc. to Greenthorn, LLC by Assignment and Assumption of Purchase Agreement dated as of October 30, 2009 (the "Stalking Horse") which resulted in the entry of the bidding procedures order entered on October 5, 2009 (Doc. No. 582) approving an auction on October 22, 2009 (The auction was held accordingly, and pursuant to the Report of Auction on Sale No. 4 (Doc. No. 659), of the Qualified Bidders, the highest bidder was New London Tobacco Market, Inc. ("Buyer"); so now the Debtors ask this Court to approve the Buyer as the purchaser of the assets.);  (b) to approve the Asset Purchase Agreement of the Buyer dated October 21, 2009 in substantially the form attached hereto as Exhibit A, and as otherwise amended as provided herein (including all exhibits, schedules, Related Agreements, and other agreements executed in connection therewith, the "APA"),[2] (c) authorizing the sale to the Buyer of certain assets specified in the Agreement with no conditions precedent as identified in the APA (the "Purchased Assets"), and (d) authorizing the assumption by the relevant Debtors and the assignment to the Buyer of certain executory contracts and unexpired leases of the Debtors specified in the Agreement (the "Assumed Agreements"); and the Sale Motion having been served upon (i) the Office of the United States Trustee for the Eastern District of Kentucky; (ii) counsel for the Official Committee of Unsecured Creditors; (iii) those parties requesting notice in these chapter 11 cases; (iv) counsel to the Buyer; (v) all persons or entities with a lien on, or security interest in, any of the Purchased Assets known to the Debtors; (vi) the counterparty to each of the Assumed Contracts; (vii) all taxing authorities having jurisdiction

---

[2]    Capitalized terms not defined herein shall have the meaning set forth in the APA, the terms of which are incorporated herein by reference.

over any of the Purchased Assets, including the Internal Revenue Service; (viii) all entities that have previously expressed serious interest in acquiring the Purchased Assets; (ix) the United States Environmental Protection Agency; (x) the Kentucky Department of Environmental Protection; (xi) all entities on Master Service List No. 1; and (xii) all other parties as identified herein or the APA; and it appearing that proper and adequate notice of the Motion, has been given and that no other or further notice is required; and after due deliberation thereon; and good and sufficient cause appearing therefor; and

The Court has reviewed and taken judicial notice of all filed pleadings, objections, orders, and other matters filed with the Court or produced at the hearing on the Sale Motion (the "Sale Hearing"), and having heard all evidence proffered or adduced, objections and representations and argument of counsel in connection with the Sale Hearing, and being sufficiently advised, and for good cause appearing therefore; therefore,

IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and vice versa.

B.    Unless otherwise specified in this Order, capitalized terms shall have the same meaning as set forth in the APA.

C.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§157 and 1334.

D.    Venue of this proceeding is proper pursuant to 28 U.S.C.§1409(a).

E.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. §§157(b)(2)(A) and (N).  The statutory predicates for the relief granted herein are Sections 105, 363 and 365 of the Code, and Bankruptcy Rules 2002, 6004 and 9014.

F.     Proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided in accordance with all applicable law, including without limitation, Section 102(1) of the Code and Bankruptcy Rules 2002, 6004, 6006 and 9014, and no other or further notice of the Sale Motion, the Sale Hearing, or the entry of this Order (the "Sale Order") is or shall be required.

G.     A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, and the rights of third parties to submit higher or otherwise better offers for the Purchased Assets, has been afforded to all interested persons and entities.

H.     The Debtor has established adequate business justification and compelling circumstances to authorize and permit the Debtors to sell the Purchased Assets to the Buyer.

I.     On October 21, 2009, the APA was entered into between the Debtors and Buyer and the same was filed with the Court as an attachment to this Order. The Purchase Price and the other consideration set forth in the APA is fair and reasonable and constitutes fair consideration and reasonably equivalent value under the Code and applicable federal, state and local law, and it is therefore in the best interests of the Debtors, its creditors and estates that the Court enter this Sale Order authorizing the relief sought in the Sale Motion.

J.     Subject only to the issuance of this Sale Order, (i) the Debtors have full corporate power and authority to execute and deliver the APA, the Related Agreements, and all other agreements, instruments or documents executed in connection therewith or contemplated thereby, including, but not limited to, the orders as referenced in Paragraph 7.2(h) of the APA

4

(collectively, the "Ancillary Documents") and the sale of the Purchased Assets to the Buyer by the Debtors and all previous actions of the Debtors and the Chief Liquidating Officer, in furtherance of the sale transaction (including, but not limited to, the execution of the APA and the Ancillary Documents) shall be deemed to have been duly and validly authorized by all necessary corporate action of the Debtors; and (ii) the Debtors have all the corporate power and authority necessary to consummate the transactions contemplated by the APA and the Ancillary Documents. No consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate such transactions.

K.      The Debtors have presented good and sufficient business justification to support (i) the sale of the Purchased Assets pursuant to Section 363 of the Code and (ii) the  assumption and assignment of the Assumed Agreements pursuant to Section 365 of the Code, including, without limitation, good and sufficient evidence to establish that:  (a) each non-debtor party to an Assumed Agreement is adequately assured of future performance by the Buyer under the Assumed Agreement and (b) any arrearages of rent due and owing under an Assumed Agreement as of the Closing (as defined below) shall be cured by the Debtors with the Buyer reimbursing the Debtors for cure amounts as identified in the APA.

L.      As a condition to the purchase of the Purchased Assets by the Buyer, the Buyer requires that the Purchased Assets be sold free and clear of all liens, claims, interests and encumbrances except as expressly set forth in the APA, and that the Buyer has no liability for any liabilities of the Debtors except those specified in the APA.  The Buyer will not enter into and consummate the sale, thus adversely affecting the Debtors' estates, if the sale to the Buyer is not free and clear of all liens, claims, interests and encumbrances or if the Buyer would be liable for liabilities of the Debtors other than those it specifically assumed under the APA.

M.     The sale of the Purchased Assets is being consummated in good faith.  The APA and the Ancillary Documents were proposed, negotiated and entered into by the Buyer in good faith after the Auction Sale, from arms'-length bargaining positions and without fraud or collusion.  The Buyer is not an "insider" or "affiliate" of the Debtors (as such terms are defined in the Code), nor has it engaged in any conduct which would prevent the application of Section 363(m) of the Code or would allow for the application of Section 363(n) of the Code to the transactions referenced herein.  Further, since the Petition Date, the Debtors have been permitted to (a) solicit or to encourage the submission of inquiries, proposals or offers by third parties to purchase all or any part of the Purchased Assets and (b) perform any and all other acts related thereto, including, without limitation, supplying, information relating to the Purchased Assets of the Debtors to prospective buyers. The Buyer, thus, is a good faith purchaser under Section 363(m) of the Code and in accordance with applicable law and, as such, is entitled to the protections afforded thereby. In the absence of a stay pending appeal of this Order, if any, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Code in closing the transactions contemplated by the APA and the Ancillary Documents at any time after the entry of this Sale Order.

N.     With respect to any and all entities asserting any options, pledges, security interests, Claims, equities, reservations, third party rights, voting trusts or similar arrangements, Liens, charges or other encumbrances or restrictions on or conditions to transfer or assignment of any kind (including, without limitation to the generality of the foregoing, restrictions or conditions on or to the transfer, assignment or renewal of licenses, permits registrations and authorizations or approvals of or with respect to governmental units and instrumentalities), whether direct or indirect, absolute or contingent, matured or unmatured, liquidated or

unliquidated on or against the Purchased Assets (collectively, "Encumbrances"), either (i) such entity has consented to the sale and transfer, license and assignment, as applicable, free and clear of its Encumbrance, with such Encumbrance to attach to the proceeds of such sale and transfer, license and assignment, as applicable, respectively, (ii) applicable nonbankruptcy law permits sale of the assets free and clear of such Encumbrance, or (iii) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Encumbrance, so that the conditions of Section 363(f) of the Code have been met.

O.    The Debtors have good and marketable title to the Purchased Assets, and such Purchased Assets are property of the Debtors' estate under Section 541 of the Code. The sale and transfer of the Purchased Assets contemplated by the APA (i) are or will be legal, valid and effective transfers of property of the Debtors' estates to the Buyer, and (ii) vest or will vest the Buyer with all right, title and interest in and to the Purchased Assets free and clear of all liens, claims, interests and encumbrances under Sections 363(f) and 105 of the Code.

P.    Except as expressly set forth in the APA, the Buyer shall have no liability for any obligation of, or Claim against, the Debtors related to the Purchased Assets by reason of the transfer of the Purchased Assets to the Buyer. The Buyer shall not be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets or otherwise, to: (1) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the Assumed Agreements from and after the Closing); or (2) have, *defacto* or otherwise, merged with or into the Debtors. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the APA. The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby if the sale of the Purchased Assets to the Buyer or its assignee, the assumption,

assignment and sale of the Assumed Agreements to the Buyer or its assignee, and the assumption

of the Assumed Liabilities by the Buyer or its assignee were not, except as otherwise provided in

the APA with respect to Assumed Liabilities and Permitted Liens, free and clear of all

Encumbrances of any kind or nature whatsoever, or if the Buyer would, or in the future could

(except and only to the extent expressly provided in the Agreement), be liable for any of such

Encumbrances or other liabilities (such other liabilities or obligations being referred to

collectively as the "Successor Liabilities"), including, but not limited to, Encumbrances or

Successor Liabilities in respect of the following (the following being referred to collectively as

the "Successor Liability Documents, Statutes and Claims"): (1) any employment, collective

bargaining agreement  or other labor agreements, including, without limitation those with the

International Union, United Mine Workers of America; (2) all deeds of trust and security

interests; (3) any pension, welfare, compensation or other employee benefit plans, agreements,

practices and programs, including, without limitation, any pension plan of any Debtor; (4) any

other employee, worker's compensation, occupational disease or unemployment or temporary

disability related Claim, including, without limitation, Claims that might otherwise arise under or

pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair

Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation

Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining

Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age

Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of

1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Jones Act, (k) the

Longshoremen's and Harbor Workers' Compensation Act, (l) the Coal Industry Retiree Health

Benefit Act of 1992, (m) state anti-discrimination laws (n) state unemployment compensation

laws or any other similar state laws, or (o) any other state or federal benefits or claims relating to any employment with the Debtors or any predecessors; (5) any products liability or similar Claims, whether pursuant to any state or federal laws or otherwise, including, without limitation, asbestos-related Claims; (6) reclamation, environmental or other Claims or Liens arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.,* the Clean Water Act, 33 U.S.C. §§ 1251, *et seq*., the Federal Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq*., or similar federal and state statutes, but not including the liabilities to be assumed by Buyer pursuant to the agreement referenced in Section 7.2(g) with the Kentucky Department of Environmental Protection; (7) any bulk sales or similar law; (8) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (9) any theories of successor liability. Buyer is assuming only those liabilities defined in Section 2.3 of the APA as Assumed Liabilities and has expressly excluded assumption of the Excluded Liabilities defined in Section 2.7 of the APA, including but not limited to, Hazardous Materials. To the extent of any amendment or enactment of rules, regulations or laws governing the Permits that would retroactively create a claim or liability as a result of the prior acts or omissions of the Debtors, any such claim or liability shall be deemed an Excluded Liability as to the Buyer pursuant to Section 2.7 of the APA.

Q.    All of the provisions of this Sale Order are nonseverable and mutually dependent.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1.      The Sale Motion is approved on the terms set forth herein.

2.      Any capitalized term in this Sale Order not otherwise defined herein shall have the meaning ascribed to it in the APA and/or Sale Motion.

3.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled are overruled on their merits.  Those parties who did not object or who withdrew their objections are deemed to have consented to the entry of this Sale Order pursuant to Section 363(f)(2) of the Code.

4.      The terms and conditions of the APA, and the Schedules attached thereto, as well as the Ancillary Documents and the transactions contemplated thereby are hereby approved in all respects.  The execution of the APA and the Ancillary Documents by James H. Frazier, III as the Debtor's Chief Liquidating Officer is hereby authorized and approved. Pursuant to the provisions of Sections 105 and 363 of the Code, the Debtors are hereby authorized and directed to sell the Purchased Assets to the Buyer, free and clear of all liens, claims, interests and encumbrances (including without limitation Encumbrances, Successor Liabilities, Liens and Claims) pursuant to, and in accordance with, the terms and conditions of the APA, the Ancillary Documents and this Sale Order.  The APA shall not be subject to rejection. To the extent that the terms of this Sale Order conflict with the APA or any Ancillary Documents, this Sale Order shall control.

5.      The Debtors, their representatives, and the Chief Liquidating Officer are authorized and directed to execute and deliver, and empowered and directed fully to perform under, consummate and implement the APA and the Ancillary Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Ancillary Documents, and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and

conferring to the Buyer, or reducing to the Buyer's possession, any or all of the Purchased Assets, or as otherwise may be necessary or appropriate to the performance of the obligations as contemplated by the APA and the Ancillary Documents.  All previous actions taken by the Debtors, their representatives, and attorneys, and Chief Liquidating Officer in connection with the APA, the Ancillary Documents and the transactions contemplated thereby are deemed approved.

6.    Upon the Closing Date (the "Closing") and pursuant to Sections 105(a) and 363(f) of the Code, except as otherwise expressly set forth in the APA, the Purchased Assets shall be transferred to the Buyer subject only to the Assumed Liabilities.  With the exception of the Assumed Liabilities, the transfer of the Purchased Assets shall be free and clear of (a) all Encumbrances, Successor Liabilities, deeds of trust, security interests, conditional sale or other title retention agreements, rights of first refusal, options, pledges, liens (including but not limited to any and all "liens" as defined in Code § 101(37)), taxes, tax liens, mechanic's liens, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any; and (b) all debts arising in any way in connection with any acts or omissions of the Debtors, any claims (including, without limitation, any and all "claims" as defined in Section 101(5) of the Code) against the Debtors and obligations (including but not limited to obligations (i) under the Employee Retirement Income Security Act, the Comprehensive Omnibus Budget Reconciliation Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act (or any comparable state law), Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.,* the Clean Water Act, 33  U.S.C. §§ 1251, *et seq.,* the Federal Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq.,* or any other federal or state laws (including al state and federal environmental laws), or (ii)

arising from the cessation of the Debtors' operations, dismissal of employees, or termination of employment or collective bargaining or other labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs), demands, guaranties, options, licenses, rights, contractual commitments, restrictions, interests and matters of or against the Debtors of any kind and nature, whether arising prior to or subsequent to the commencement of this case, whether matured or unmatured, liquidated or unliquidated, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise, including without limitation, any claim based upon successor liability (whether statutory or otherwise) and those claims of the kind specified in Sections 502(g), 502(h) and 502(i) of the Code or (c) other interest which any person or entity has or asserts with respect to the Purchased Assets (collectively, "Liens and Claims").  The Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors under or by reason of any theory at law or equity.

7.     The Buyer does not constitute a successor to the Debtors because, among other reasons:

(i)     Except as otherwise set forth in the APA, the Buyer is not expressly or impliedly agreeing to assume any of the Debtors' liabilities;

(ii)    The transactions contemplated by the APA do not amount to a consolidation, merger or a *de facto* merger of the Debtors and the Buyer;

(iii)   The Buyer is not merely a continuation of the Debtors; and

(iv)    The transactions contemplated by the APA are not being entered into fraudulently or in order to escape liability from the Debtors' debts.

8.      Upon Closing, all Liens and Claims against the Purchased Assets shall, without the necessity of further action on the part of the Buyer, the Debtors or any creditor, be deemed released and discharged and shall attach to the proceeds of the sale paid by Buyer, in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets. Upon Closing, the creditors of the Debtors are authorized and directed to execute such documents and take all other actions as may be necessary to document the release of their Liens and Claims against the Purchased Assets, if any, as such Liens and Claims may have been recorded or may otherwise exist.

9.      If any person or entity that has filed financing statements or other documents or agreements evidencing an interest in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and execution by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens and Claims, the Debtors and/or the Buyer are hereby authorized and directed to execute and file such statements, instruments, releases and other documents, including, but not limited to, a copy of this Sale Order on behalf of such person or entity.

10.      All persons and entities holding Liens and Claims of any kind and nature against the Debtor or with respect to the Purchased Assets are hereby barred, restrained and enjoined from taking any actions inconsistent with the terms of this Order and  from asserting such Liens and Claims against the Purchased Assets or the Buyer, its successors, designees, assigns, affiliates, shareholders, members, officers, representatives, agents, directors or trustees.

11.      All persons and entities which are presently, or as of the Closing Date may be, in possession of some or all of the Purchased Assets hereby are directed to surrender possession of said Purchased Assets to the Buyer on the Closing Date.

12.     All of the Leases constituting non-residential leases of real property that have not been terminated pre-petition or previously  assumed under order of the Court are hereby deemed assumed by the Debtors. The Debtors shall retain the right to assign such leases of non-residential real estate as provided by this Order or further order of the Court.

13.     Upon Closing the Assumed Agreements shall be deemed assumed and assigned to the Buyer or any wholly owned subsidiary of Buyer who is designated by Buyer as of the date of the Closing, as provided by the Ancillary Documents and will remain valid and binding and in full force and effect in accordance with their respective terms for the benefit of the Buyer or its designee, notwithstanding any provision in any of the Assumed Agreements (including those described in Sections 365(b)(2) and (f)(1) and (3) of the Code), or applicable law that prohibits, restricts or conditions such assignment or transfer or terminates or modifies or permits a party other than the Debtors to terminate or modify such Assumed Agreements on account of such assignment or transfer, including, without limitation, all preferential rights or rights of first refusal of any kind or nature whatsoever, pursuant to Section 365(f) of the Code; provided that such prohibition, restriction or condition of assignment or transfer shall be negated only with respect to transfers and assignments effected pursuant to the APA and the Sale Order, and that such prohibitions, restrictions and conditions of assignment shall otherwise remain in full force and effect and a part of the contract or lease so assigned or transferred. At Closing, the Debtors shall pay from the Purchase Price all cure amounts due for pre-closing defaults under any of the Assumed Agreements ("Cure Amounts"), if any, to the non-debtor parties to the Assumed Agreements except to the extent the same remains subject to an unresolved objection (the "Unresolved Cure Amounts"), which objections shall be resolved in accordance with further order of the Court.  Except for the Unresolved Cure Amounts, by issuance of this Sale Order, the

Cure Amounts as set forth in the attachment to this Order, are, and shall be deemed to be, the total amount necessary to cure any monetary defaults in connection with the assumption of the Assumed Agreements, and therefore, (i) the Cure Amounts shall be controlling and the non-debtor parties shall forever be barred and estopped from asserting or claiming against the Debtors, and their representatives and Chief Liquidating Officer, or the Buyer and its officers, directors, and shareholders, that any default exists or any additional amounts are due for the period prior to the Closing, and (ii) the non-debtor parties to the Assumed Agreements are, and shall be deemed to be, adequately assured of future performance under the Assumed Agreements, within the meaning of Section 365(b)(1)(C) of the Code and other applicable law. There shall be no rent accelerations, assignment fees, increases (including advertising or royalty rates) or any other fees charged to the Buyer as a result of the assumption, assignment and sale of the Assumed Agreements. The validity of the assumption, assignment and sale to the Buyer shall not be affected by any dispute between the Debtors or their affiliates and another party to the Assumed Agreements regarding the payment of any amount, including any Cure Amount under the Code.

14.    This Sale Order (i) is and, upon Closing and payment of the Purchase Price, shall be, effective as a determination that all Liens and Claims existing on the Purchased Assets before the Closing have been unconditionally released, discharged and terminated, and that the conveyances described in this Order have been effected, and (ii) is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register or otherwise record or release any documents, including, but limited to, this Sale Order, or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

15.     The Buyer shall not be or deemed to be, as a result of any action taken in connection with the APA or any Ancillary Document, responsible for any liability, debt, commitment, responsibility, or claim of any nature whatsoever, whether known or unknown, existing as of the date hereof or hereafter, arising of or against the Debtors, including, without limitation, claims for payment of any benefit accruing to the Debtors, except to the extent expressly provided in the APA, including, but not limited to, Excluded Liabilities as defined in the APA, which incorporates any liability or claim arising from any amendment or enactment of rules, regulations or laws governing the Permits that would retroactively create a claim or liability as a result of the prior acts or omissions of the Debtors.

16.     This Court retains jurisdiction to: (a) enforce and implement the terms and provisions of the APA and the Ancillary Documents, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection herewith; (b) compel delivery of the Purchased Assets to the Buyer; (c) resolve any disputes arising under or related to the APA or any Ancillary Documents between or among the parties to the APA or the Ancillary Documents; (d) enforce the assumption and assignment of the Assumed Agreements; (e) enforce the payment of Cure Amounts; (f) to resolve the Unresolved Cure Amounts; (g) resolve any dispute regarding amounts due to any lienholder or creditor in connection with the Sale or the terms of this Sale Order; and (h) interpret, implement and enforce the provisions of this Sale Order.

17.    To the extent permitted by applicable law, the Transfer Instruments identified in the APA, and the various instruments for assignment or transfer of the Purchased Assets under the terms of the APA are hereby deemed instruments of transfer in connection with a plan or reorganization or liquidating plan to be filed with the Court such that the transactions set forth are not subject to any transfer tax, sales tax or similar tax, as set forth in 11 U.S.C. § 1146(a). A copy of this Order shall be appended to any deed or other recorded instrument in connection with the APA. The Clerks of all applicable Counties are hereby directed to allow the recording and transfer of title of real estate without the imposition of transfer or sale taxes.

18.    Any Governmental Authority whose approval, consent or comment is necessary for the transfer of the Permits to the Buyer are hereby directed that they shall transfer such Permits as provided by the procedures established by applicable law and subject to the terms herein and not withhold, delay or condition such transfer of the Permits upon the payment of any fines, penalties, or taxes due to any person or Governmental Authority by the Debtors or any representative, officer, related party, affiliate or the Chief Liquidating Officer to the Debtors. Any lawful fines, penalties and taxes shall be payable from the Purchase Price as may be directed by the Court or agreed upon by Buyer and the Debtors.

19.    Nothing contained in any plan of reorganization (or liquidation) confirmed in this case or the order confirming any plan of reorganization (or liquidation), nor any order entered in this case subsequent to the entry of this Sale Order (including any order dismissing the case or converting it to a Chapter 7 liquidation) shall conflict with or derogate from the provisions of the APA or any Ancillary Document, any document or instrument executed in connection therewith, or the terms of this Sale Order.

20.    The Debtors are hereby authorized and directed to make all payments required to be made pursuant to the APA and to make such other payments that are necessary to implement the Closing.

21.    The Buyer is a good faith purchaser within the meaning of section 363(m) of the Code and, as such, is entitled to the full protections of Section 363(m) of the Code. Buyer has proceeded in good faith in all respects in connection with this proceeding in that:

(i)    Buyer recognized that that Debtor was free to deal with any other party interested in acquiring the Purchased Assets;

(ii)    All payments to be made by Buyer in connection with the transaction have been disclosed; and

(iii)    Buyer has not violated Section 363(n) of the Code by any action or inaction.

22.    In the absence of a stay of this Sale Order, if the Buyer elects to close under the APA at any time after entry of this Sale Order but before it becomes a Final Order, then, with respect to the APA and the Ancillary Documents, the Buyer shall be entitled to the protection of Section 363(m) of the Code if this Sale Order or an authorization contained herein subsequently is reversed or modified on appeal.

23.    As provided in Bankruptcy Rule 7062, this Sale Order shall be effective and enforceable immediately upon entry, and as provided in Bankruptcy Rules 6004(g) and 6006(d), this Sale Order shall not be stayed during the 10-day period after its entry unless a separate stay of this Sale Order is entered by a court of competent jurisdiction.

24.    The terms and provisions of the APA and the Ancillary Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to

implement the APA and also together with the terms and provisions of this Sale Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and creditors, and the Buyer, and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all persons asserting a claim against or interest in the Debtors' estates or any of the Purchased Assets to be sold to the Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee, custodian, examiner with expanded powers or responsible officer (each a "Responsible Person") for the Debtors under any chapter or section of the Code, as to which Responsible Person such terms and provisions likewise shall be binding in all respects.  The APA, the Ancillary Documents and the transactions contemplated thereby shall be specifically performable by and enforceable against and binding upon and shall not be subject to rejection or avoidance by the Debtors or any chapter 7 or chapter 11 trustee for the Debtors or their estates or any other person or entity on behalf of any Debtor.

25.    The failure to specifically include any particular provision of the APA or any Ancillary Document in this Sale Order shall not diminish or impair the efficacy of such provisions, it being understood that the APA and the Ancillary Documents in their entirety are being approved.  All provisions of this Sale Order, the APA and the Ancillary Documents are nonseverable and mutually dependent.

26.    The APA and any Ancillary Document may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not materially and adversely affect the rights of the Debtors or the rights provided to creditors and parties in interest under the terms of this Order.

27.     The Termination Fee, or the break-up fee, as described in the APA for Trimet Coal, LLC ("Trimet") encouraged the bidding, enhanced the purchase price by the required $100,000, thus provided benefit to the Debtors and is a justifiable expense herein.  Trimet shall therefore have twenty (20) days from the date of the entry of this Sale Order No. 4 to file evidence of their entitlement to an amount of such Termination Fee not to exceed $50,000.


AGREED TO AND TO BE ENTERED:


**BUNCH & BROCK**

By:      /s/ W. Thomas Bunch
        **W. THOMAS BUNCH**
        805 Security Trust Building
        271 West Short Street
        Lexington, Kentucky 40507
        (859) 254-5522
        (859) 233-1434 FAX


ATTORNEYS FOR DEBTORS



**LONG, RAGSDALE & WATERS, P.C.**

By:      /s/ R. Culver Schmid
        **R. CULVER SCHMID**
        Suite S-700
        1111 Northshore Drive
        Knoxville, Tennessee 37919
        (865)  584-4040


ATTORNEYS FOR GREENTHORN, LLC

HAVE SEEN:

**WISE DELCOTTO PLLC**

By:   /s/ Tracey N. Wise
    **TRACEY N. WISE**
    **LAURA DAY DELCOTTO**
    200 North Upper street
    Lexington, Kentucky 40507
    (859) 231-5800

ATTORNEYS FOR UNSECURED CREDITORS COMMITTEE

COPIES TO:

W. Thomas Bunch      via ECF
Tracey N. Wise       via ECF
William G. Brownlow via e-mail
R. Culver Schmid     via e-mail
Master Service List No. 1 (Doc. No. 235)

Pursuant to Local Rule 9022-1(c), counsel for the Debtors shall cause a copy of this Order to be served on each of the parties designated to receive this Order pursuant to Local Rule 9022-1(a) and shall file with the Court a certificate of service of the Order upon such parties within ten (10) days hereof.

21

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
***Joseph M. Scott, Jr.***
**Bankruptcy Judge**
**Dated: Wednesday, November 04, 2009**
**(jms)**

<u>ASSET PURCHASE AGREEMENT</u>                                          **EXHIBIT A**

This is an Asset Purchase Agreement (the "Agreement"), dated as of October __, 2009, between (i) The New London Tobacco Market, Inc., a Kentucky corporation (the "Buyer"), and (ii) Appalachian Fuels, LLC, a Kentucky limited liability company (the "Seller").

<u>RECITALS</u>

A.     On July 2, 2009 (the "Petition Date"), the Seller commenced a case for reorganization, Case No. 09-10343 (the "Bankruptcy Case"), under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Kentucky, Ashland Division (the "Bankruptcy Court") by converting the case for reorganization under Chapter 7 of the Bankruptcy Code filed by creditors of the Seller on June 11, 2009.

B.     The Seller is a debtor-in-possession pursuant to the Bankruptcy Case and is operating its business and managing its properties pursuant to section 1108 of the Bankruptcy Code.

C.     The Seller is engaged in the business of mining coal and activities directly or indirectly relating thereto.

D.     The Seller has determined that it is in the best interest of the Seller and its bankruptcy estate to sell to the Buyer all right, title and interest of the Seller in and to the Purchased Assets (defined below), for consideration and upon the terms and conditions hereinafter set forth.

E.     The Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities (defined below) from the Seller, and the Seller desires to sell, convey, assign and transfer to the Buyer, the Purchased Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

F.     The Purchased Assets are assets of the Seller, which are to be purchased and assumed by the Buyer, free and clear of all Liens, Claims and encumbrances, except as otherwise provided herein, pursuant to a final, non-appealable order of the Bankruptcy Court approving such sale pursuant to sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Order"), which order will include (i) the authorization for the assumption by the Seller and assignment to the Buyer of certain unexpired executory leases and Liabilities thereunder under section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code, and (ii) a breakup fee for the Buyer in the amount of $100,000 in the event that the Seller consummates a transaction substantially similar to the transaction contemplated by this Agreement with another party, provided this Agreement has not been terminated pursuant to Sections 8.1 (a), (b), or (c).

NOW THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth herein and of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Buyer agree as follows:

## ARTICLE I – DEFINITIONS

1.1    Definitions. As used herein, the following terms have the meanings set forth below:

"Accounts Receivable" means all accounts receivable and the right to payment from customers of the Seller and the full benefit of all security for such accounts or debts including all accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers.

"Affiliate" means, with respect to a specific Person, any Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. The term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract or otherwise.

"Assignment of Leases" means an Assignment of Leases substantially in the form attached hereto as Exhibit A.

"Assumption of Liabilities" means an Assumption of Liabilities substantially in the form attached hereto as Exhibit B.

"Bill of Sale" means the Bill of Sale between the Buyer and the Seller, substantially in the form attached hereto as Exhibit C.

"Business Days" means any day other than a Saturday, Sunday or other day on which national or state banking associations are required or permitted by law to be closed in Kentucky.

"Claim" means any written action, suit, Proceeding, hearing, investigation, litigation, charge, complaint, claim, or demand.

"Cure Costs" means the amount to be paid by Buyer to Seller for the cure of any monetary default under any and all Leases pursuant to Section 365 of the Bankruptcy Code and to allow such Leases to be assumed by Seller and assigned to Buyer in accordance with the provisions of Sections 365 and 1123 of the Bankruptcy Code.

"Environmental Law" means any applicable federal, state or local law, statute, rule, regulation or ordinance relating to the regulation, pollution, preservation or protection of human health, safety, the environment, or natural resources or to emissions, discharges, Releases or threatened Releases of pollutants, contaminants, Hazardous Materials or wastes into the environment (including ambient air, soil surface water, ground water, wetlands, land or subsurface strata), including, but not limited to, common law claims such as nuisance, negligence and trespass.

LEXLibrary 408065v.1

"Environmental Permit" means any permit, approval, certificate, registration, license or other authorization required under any Environmental Law.

"Governmental Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

"Hazardous Materials" means (a) petroleum or petroleum products, fractions, derivatives or additives, natural or synthetic gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls and radon gas; (b) any substances defined as or included in the definition of "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "extremely hazardous substances," "restricted hazardous wastes," "toxic substances," toxic chemicals or "toxic pollutants," "contaminants" or "pollutants" or words of similar import under any Environmental Law; (c) radioactive materials, substances and waste, and radiation; and (d) any other substance exposure to which is regulated under any Environmental Law.

"Indebtedness" of any Person means any obligations of such Person, whether or not contingent, (a) for borrowed money, (b) evidenced by notes, bonds, indentures or similar instruments, (c) for the deferred purchase price of goods and services, other than trade payables incurred in the ordinary course of business, (d) under capital leases, and (e) in the nature of guarantees of the obligations described in clauses (a) through (d) above of any other Person.

"Intellectual Property" means all domestic patents and patent rights, trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service name and service name rights, brand names, inventions, processes, formulae, copyrights, business and product names, logos, slogans, trade secrets, industrial models, designs, computer programs, business telephones, facsimile and e-mail addresses, websites and technology, and software (including all source codes) and related documentation, drawings, know-how, methods, processes, technology, engineering specifications, procedures, bills of material, trade secrets, all pending applications for and registrations of patents, trademarks, service marks and copyrights and any other intangible property used in or associated with the conduct of the Seller's business and the ownership of the Purchased Assets, including all of the Seller's rights to any such property which is owned by and licensed from others and any goodwill associated with any of the above.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncement's having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority and includes, without limitation, all Environmental Laws.

"Liabilities" means all Indebtedness, obligations, claims and other liabilities of a Person, whether absolute, accrued, contingent, fixed or otherwise or whether due or to become due.

"Liens" means any mortgage, pledge, assessment, security interest, lease, judgment lien, tax lien, mechanic's lien, materialman's lien, other lien, adverse Claim, levy, charge, Option,

right of first refusal, charge, debenture, indenture, deed of trust, right-of-way, restriction, encroachment, license, lease, security agreement, or other encumbrance of any kind, and other restrictions or limitations on the use or ownership of real or personal property or irregularities in title thereto or any conditional sale contract, title retention contract or other contract to give any of the foregoing.

"Loss" means any loss, Claim, damage, liability or expense (including reasonable attorneys' fees).

"Material Adverse Effect" means (a) an adverse effect on the validity or enforceability of this Agreement or any of the Related Agreements in any material respect, (b) an adverse effect on the condition (financial or other), business, assets, results of operations, ability to conduct business or properties of the Seller or the Buyer (as applicable), or the Purchased Assets, taken as a whole, in any material respect, or (c) an impairment of the ability of the Seller or the Buyer (as applicable) to fulfill its obligations under this Agreement or any of the Related Agreements in any material respect.

"Order" means any writ, judgment, demo, injunction, or similar order of any Governmental Authority, in each such case whether preliminary or final.

"Permitted Lien" means any Lien (a) which is assumed or consented to by the Buyer herein (including, without limitation, Liens included in the Assumed Liabilities), (b) created by the Buyer, or (c) easements, rights-of-way, restrictions or minor defects or irregularities in title incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, easements, licenses or restrictions on the use of any real property or minor imperfections in title thereto.

"Person" means any natural person, corporation, limited liability company, general partnership, limited partnership, proprietorship, other business organization, entity, trust, union, association or Governmental Authority.

"Proceeding" means any action, suit, proceeding, arbitration, investigation or audit, whether or not by any Governmental Authority.

"Related Agreements" means the (a) the Assignment of Leases, (b) the Assumption of Liabilities, (c) the Bill of Sale, and (d) any other agreement, certificate or similar document to be executed by any party hereto in connection with this Agreement.

"Release" means any release, issuance, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any property, including the movement of Hazardous Materials through the air, soil, surface water, ground water or property other than as specifically authorized by and in compliance with all Environmental Laws and Environmental Permits.

"Taxes" means any and all taxes, fees, levies, duties, tariffs, import and other charges, imposed by any taxing authority, together with any related interest, penalties or other additions to

tax, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profit, environmental, custom duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

"Tax Returns" means all federal, state, local, provincial and foreign returns, declarations, claims for refunds, forms, statements, reports, schedules, and information returns or statements, and any amendments thereof (including, without limitation, any related or supporting information or Schedule attached thereto) required to be filed with any Taxing authority in connection with any Tax or Taxes.

1.2      Rules of Interpretation.

(a)      The singular includes the plural and the plural includes the singular.

(b)      The word "or" is not exclusive.

(c)      A reference to a Person includes its permitted successors and permitted assigns.

(d)      The words "include," "includes" and "including" are not limiting.

(e)      A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated. Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.

(f)      References to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.

(g)      The words "hereof," "thereof" "herein," "therein," "hereunder" and "thereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

(h)      References to "days" shall mean calendar days, unless the term "Business Days" shall be used.

(i)      This Agreement is the result of negotiations among, and has been reviewed by, the parties hereto. Accordingly, this Agreement shall be deemed to be the product of all parties, and no ambiguity shall be construed in favor of or against any party.

ARTICLE 2 - PURCHASE AND SALE OF ASSETS

2.1      Purchase and Sale of Assets. Upon the terms and subject to the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, transfer and convey to the Buyer, and the Buyer shall purchase, acquire and accept from the Seller, all of the Seller's right, title, and interest in and to the following assets other than the Excluded Assets, free and clear of all Liens

except Permitted Liens, pursuant to sections 363 and 365 of the Bankruptcy Code, including, without limitation, the following (the 'Purchased Assets"):

(a)    all of the Seller's following permits: Kentucky Surface Mining Permit Numbers 898-0785, 898-0786, 898-0698, and 898-0787 (the "Permits"), to the extent transfer is permitted by Law;

(b)    all Intellectual Property owned or licensed by the Seller or titled in any Affiliate of the Seller for use in relation to the Permits;

(c)    all rights and interests of the Seller in, to and under the real property leases and subleases to which the Seller is a party and which are identified on Schedule 2.1(c) (the "Leases"); and

(d)    all stockpiled coal inventory and pit inventory, located on the real property covered by the Permits, as of the Closing, subject to any applicable royalty payments due to lessors of such property.

At the Closing, the Purchased Assets will be delivered free and clear of all Liens other than Permitted Liens. The Purchased Assets will otherwise be transferred on an AS IS, WHERE IS basis and with all faults.

2.2    Excluded Assets. Notwithstanding any provision of Section 2.1, the Seller shall retain all of its right, title and interest in the following assets (collectively, the "Excluded Assets") and the definition of Purchased Assets shall not include any of the following:

(a)    All Accounts Receivable and notes receivable of the Seller as of the Closing Date;

(b)    All cash and cash equivalents of the Seller as of the Closing Date;

(c)    All performance bonds for reclamation or otherwise, surety bonds or escrow agreements and any payment or prepayments made with respect to, or certificates of deposit or other sums or amounts or assets posted by the Seller to secure any of the foregoing for reclamation or otherwise;

(d)    Any and all rights, Claims, credits, allowances, rebates, refunds, causes of action, or rights of set-off of the Seller or any Affiliate of the Seller, known or unknown, pending or threatened, including but not limited to all causes of action arising under sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Law, including but not limited to fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code), Claims arising out of or relating in any way to the Bankruptcy Case, or any of the transactions contemplated thereby or entered into as a consequence thereof, including any claims (as defined in section 101(5) of the Bankruptcy Code) filed, scheduled or otherwise arising in the Bankruptcy Case;

(e)    Any and all prepaid items;

(f)    All insurance policies and any rights or Claims arising from such policies;

(g)    All Tax refunds, rebates, overpayments and other rights (including, without limitation, rights to indemnification) and Claims of the Seller in respect of or relating to Tax or other liabilities not assumed by the Buyer or in respect of or relating to any other Excluded Assets;

(h)    All books, records, files or other documentation and written materials relating to any Excluded Assets;

(i)    All shares of capital stock of the Seller, all capital stock or equity of any other Person, and all corporate seals, corporate records, minute books, charter documents, record books, stock transfer books, original tax, accounting and financial records, and such other files, books and records as pertain to any of the Excluded Assets or to the organization, existence or capitalization of the Seller or of any other Person;

(j)    All assets, if any, in the Seller's executive or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or accident insurance or other employee benefit plans, and all contracts and other agreements and documents relating to all such plans; and

(k)    All coal inventory that has been properly loaded and/or is in transit.

2.3    <u>Assumed Liabilities</u>.

(a)    At the Closing the Buyer will assume only the following Liabilities and obligations of the Seller which are not paid or discharged at or before Closing (the "Assumed Liabilities"):

(i)    all Liabilities for and obligations of the Seller relating to the Purchased Assets arising after the Closing Date, including all Liabilities and obligations arising in connection with the Leases;

(ii)    all Liabilities under the Permits, and all Liabilities related to the Purchased Assets for reclamation prescribed by Law, contract or otherwise.

(b)    The Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability or obligation of whatever nature, whether presently in existence or arising hereafter. All such other Liabilities and obligations shall be retained by and remain Liabilities and obligations of the Seller. The Buyer and the Seller agree that the Assumed Liabilities under Permits do not include any of the Seller's past due production royalty payments, minimum royalties, surface right payments, or wheelage fees, unless such constitute Cure Costs.

2.4    <u>Non-Assignment of Assets</u>. This Agreement shall not constitute an agreement to assign or transfer any assets of the Seller, if, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted transfer or assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (or with respect thereto), would constitute a breach thereof or in any way negatively affect the rights of the Seller or the Buyer, as the assignee or transferee of such asset, as the case may be, thereunder. If notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, the Closing occurs and such authorization, consent, approval, license or permit is required for the transfer or assignment of any asset of the Seller at or before the Closing, but not obtained, the Seller will cooperate with the Buyer without further consideration (other than as provided in clause (b) of this Section 2.4) in any arrangement reasonably acceptable to the Buyer and the Seller, designed to both (a) provide the Buyer with the benefits of any such asset, and (b) cause the Buyer to bear all costs and obligations of or under any such asset. Any transfer or assignment to the Buyer of any asset that shall, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent, approval, authorization of, or granting of any license or permit by any third party for such assignment or transfer as aforesaid shall be made subject to such consent, approval, authorization, license or permit being obtained.

2.5      Amounts Held In Trust. Any amounts received by the Buyer after the Closing with respect to any Excluded Asset shall be held by the Buyer in trust for the Seller until promptly paid to the Seller. Likewise, any amounts received by the Seller after the Closing with respect to any Purchased Asset shall be held by the Seller in trust for the Buyer until promptly paid to the Buyer.

2.6      Transfer Taxes. To the extent that the transactions proposed by this Agreement are not otherwise exempt under section 1146(c) of the Bankruptcy Code, the Buyer shall be liable for all sales, use and other transfer Taxes and all filing and recording fees arising from or relating to the consummation of the transactions contemplated by this Agreement.

## ARTICLE 3 – CLOSING AND DELIVERIES

3.1      Closing. The parties shall hold a closing (the "Closing") as soon as reasonably possible after the Sale Order is entered by the Bankruptcy Court, but in no event later than October 31, 2009 (the "Closing Date"). The transactions contemplated hereby shall take place (despite a pending appeal if no stay thereof is in effect) pursuant to, and in accordance with, the protections afforded the Buyer under section 363(m) of the Bankruptcy Code) pursuant to the terms and conditions hereof.

3.2      Seller's Deliveries. The sale, transfer, assignment and delivery by the Seller of the Purchased Assets to the Buyer, as herein provided, shall be effected on the Closing Date by the Seller's execution and delivery of the Related Agreements to which it is a party, and other instruments of transfer and conveyance reasonably satisfactory in form and substance to counsel for the Buyer and the Seller.

3.3      Buyer's Deliveries. At the Closing:                    $310,000

         (a)      The Buyer shall wire transfer an amount equal to $500,000, plus the Cure Costs (the 'Purchase Price") to, or at the direction of, the Seller, in accordance with a funds memorandum provided to the Buyer by the Seller, in immediately available funds to the account or accounts specified by the Seller; and

         (b)      The Buyer 'shall execute and deliver to the Seller the Related Agreements to which it is a party and such other agreements as are reasonably satisfactory in form and substance to counsel for the Buyer and the Seller.

## ARTICLE 4 – REPRESENTATIONS AND WARRANTIES OF THE BUYER

         In order to induce the Seller to enter into this Agreement, the Buyer makes the representations and warranties set forth below, which are true, correct and complete on the date hereof and shall be true, correct and complete as of the Closing:

4.1      Organization. The Buyer is duly organized and validly existing under the Laws of the State of Kentucky and is authorized to do business in every jurisdiction in which the failure to be so qualified could result in a Material Adverse Effect: The Buyer has all requisite corporate power and authority to own its properties and assets and to consummate the transactions contemplated hereby.

4.2      Authorization and Validity. The Buyer has all requisite corporate power and authority to enter into this Agreement and the Related Agreements to which it is a party. The execution and delivery of this Agreement and the Related Agreements to which it is a party and the performance of the obligations hereunder and thereunder have been duly authorized by all necessary corporate

action by the Buyer. This Agreement and the Related Agreements, to which the Buyer is a party has been, or will be, duly executed by the Buyer and constitute its valid and binding obligation, enforceable against it in accordance with their terms.

4.3     Consents and Approvals. No consent, approval or action of, filing with or notice to, any Governmental Authority or any other Person, on the part of the Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements to which the Buyer is a party or the consummation of the transactions contemplated hereby or thereby.

4.4     Financial Advisors. Neither the Buyer nor any Person on the Buyer's behalf has agreed to pay any brokerage fee, finder's fee or commission which could reasonably be expected to become the obligation of the Seller with respect to the transactions contemplated by this Agreement.

4.5     Financial Ability to Perform. The Buyer has available to it funds sufficient to enable the Buyer to deliver the Purchase Price to the Seller as contemplated by this Agreement at the Closing and perform its obligations hereunder.

4.6     Permitting. The Buyer has not been subject to any bond forfeiture, permit suspension or revocation or similar effort or Proceeding instituted by any Governmental Authority.

4.7     Adequate Assurances Regarding Executory Contracts. The Buyer is and will be capable of satisfying the conditions contained in Section 365(b)(i)(c) and 365(f) of the Bankruptcy Code with respect to the Leases.

## ARTICLE 5— REPRESENTATION AND WARRANTIES

5.1     Warranties Exclusive. The Buyer acknowledges that the Seller has made no representations and/or warranties and that all other express or implied warranties are disclaimed. Without limiting the foregoing the Buyer acknowledges that the Purchased Assets are conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING THE BUYER ACKNOWLEDGES THAT THE SELLER AND THE SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (I) ANY USE TO WHICH THE PURCHASED ASSETS MAY BE PUT, (II) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE PURCHASED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (III) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO THE BUYER OR ITS AFFILIATES OR RELATED PERSONS, OR (IV) THE CONDITION OF THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. "Related Person" means, with respect to a specific Person, any officer, director, employee, agent, shareholder, representative, successor or assign of such Person.

## ARTICLE 6 – CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

6.1     Conditions Precedent to Performance by the Seller. The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by the

LEXLibrary 408065v.1

Seller in its sole discretion:

(a)    Representations, Warranties and Obligations of the Buyer. All representations and warranties made by the Buyer in Article 4 taken as a whole, shall be true and correct in all material respects on the date of this Agreement and on and as of the Closing Date (except to the extent that any such representation and warranty is made as of a specified date, in which case such representation and warranty shall continue to be made as of such specified date), and the covenants and agreements of the Buyer to be performed on or before the Closing Date shall have been duly performed in all material respects in accordance with this Agreement, and the Seller shall have received a certificate, dated the Closing Date and signed by an officer of the Buyer, to that effect.

(b)    No Termination. The Seller has determined, in its sole and absolute discretion, that it does not wish to terminate this Agreement in accordance with Section 8.1(d) hereof.

6.2    Conditions Precedent to Performance by the Buyer. The obligations of the Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by the Buyer in its sole discretion:

(a)    Transfer Free of Liens. The Purchased Assets shall be transferred to the Buyer free and clear of all Liens except for Permitted Liens.

(b)    New Leases. The Buyer shall have entered into lease agreements with Alma Land Company, Sig Sandy Company IP, Bevins Branch Resources, Inc., Vericoals, Inc. d/b/a NuKitt Coal Company, David Adams heirs, and Citation Coal Company for the lease of the real property covered by the Permits that is owned or leased by such parties.

(c)    Bonding. The Buyer shall have entered into an agreement with a surety for the provision of all bonds necessary in connection with the Permits.

6.3    Conditions to each Party's Obligations. The respective obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver on or before the Closing of the following conditions:

(a)    Bankruptcy Court Approval of Procedures Order. The entry of an order by the Bankruptcy Court approving the process to be used in connection with the sale of the Purchased Assets (the "Procedures Order").

(b)    Bankruptcy Court Approval of Sale Order. The entry of the Sale Order by the Bankruptcy Court approving the sale of the Purchased Assets to the Buyer and the assumption and assignment of the Assumed Liabilities by the Buyer pursuant to the terms hereof, which shall not be opposed by the Buyer.

(c)    Injunctions. There shall not be outstanding any Order prohibiting the consummation of the transactions contemplated by this Agreement and no action shall have been commenced which could reasonably be expected to prohibit the consummation of the transactions contemplated hereby.

(d)    No Change in Law. There shall not have been any action taken or any statute enacted by any Governmental Authority which would render the parties unable to consummate the transactions contemplated hereby or make the transactions contemplated hereby illegal or prohibit the consummation of the transactions contemplated hereby.

*W&G Continuing per page with Signatures*

ARTICLE 7 COVENANTS

7.1     Covenants of Seller. The Seller covenants as follows:

(a)     Access to Properties and Records; Confidentiality. The Seller shall afford to the Buyer, and to the accountants, counsel and representatives of the Buyer, reasonable access during normal business hours throughout the period before the Closing (or the earlier termination of this Agreement pursuant to Article 8) to all books and records of the Seller relating to the Purchased Assets and the Assumed Liabilities. Upon reasonable prior notice, the Seller shall also afford the Buyer reasonable access, taking into account the Seller's resources and other commitments, during normal business hours, to all Purchased Assets throughout the 'period before the Closing. During the period from the date hereof to the Closing Date, all information provided to the Buyer or its agents or representatives by or on behalf of the Seller or its agents or representatives (whether pursuant to this Section or otherwise) will be governed and protected by the confidentiality agreement executed by the Buyer.

(b)     Further Assurances. At the request and the sole expense of the Buyer, at any time after the Closing Date, the Seller shall execute and deliver such documents as the Buyer or its counsel may reasonably request to effectuate the purposes of this Agreement.

7.2     Covenants of Buyer. The Buyer covenants as follows:

(a)     Financing. The Buyer covenants and agrees to do all things necessary to pay the Purchase Price.

(b)     Access to Books and Records. The Buyer agrees to furnish or cause to be furnished to the Seller, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any inquiry from any Governmental Authority relating to Tax matters. The Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Purchased Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to the Buyer hereunder, or (ii) coming into existence after the Closing Date that relate to the Purchased Assets or the Assumed Liabilities before the Closing, for a period of at least six years from the Closing Date, and will give the Seller notice and an opportunity to retain any such records if the Buyer determines to destroy or dispose of any or all of them after such period. In addition, from and after the Closing, the Buyer agrees that it will provide access to the Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Purchased Assets or the Assumed Liabilities as the Seller may deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding or answer or (y) administer or complete any cases of the Seller under Chapter 11 of the Bankruptcy Code (and the Buyer shall give the Seller notice and an opportunity to retain any such records if the Buyer determines to destroy and dispose of any or all of them prior to the completion of such cases). Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Purchased Assets or the Assumed Liabilities.

(c)     Notification by the Buyer of Certain Matters. The Buyer agrees to notify the Seller in writing promptly upon the Buyer's or its authorized representatives' discovery of any

information prior to the Closing Date relating to the Seller or the operations by the Seller (including the financial condition, assets and properties) of the Seller's business which constitutes (or would constitute) or indicates (or would indicate) a breach of any representation, warranty or covenant of the Seller contained herein.

(d)    Permit Matters. As soon as practicable after the Closing, the Buyer shall promptly prepare and file all documents and information necessary to obtain, and shall diligently pursue (i) to the extent transfer is permitted under applicable Law, the transfer to the Buyer of any Permits that were not transferred to the Buyer on or prior to the Closing and (ii) the obtaining of any necessary replacements of any Permits. The Seller shall cooperate with the Buyer in all commercially reasonable ways to file and prosecute such applications, at the sole cost and expense of the Buyer. To the extent allowed by and in accordance with applicable Law, the Seller hereby grants to the Buyer the right, after the Closing, to conduct operations under any of the Permits until such time as the transfer or replacement, if applicable, of the Permits to the Buyer is complete, but in no event for longer than twelve (12) months after the Closing, subject to extension with the consent of the Seller, such extension not to be unreasonably withheld. The Buyer shall (A) comply with all conditions and requirements of, or pertaining to, any such Permits that the Buyer operates under after the Closing, and (B) indemnify the Seller from and against any and all Losses incurred or suffered by the Seller as a result or consequence of this arrangement regarding the use of such Permits by the Buyer, other than and to the extent that any such Losses are incurred or suffered by the Seller as a direct result of the Seller's conduct or inaction prior to the Closing.

(e)    Obtaining Consents. Whether before or after the Closing, the Seller and the Buyer shall cooperate with one another and provide commercially reasonable assistance as needed to the other to effect the assignment or transfer of the Permits.

(f)    Transfer of Permits to the Buyer. At the Closing, the Buyer shall (a) file an application with the Kentucky Department for Natural Resources for the transfer of the Permits, and (b) provide the Seller with evidence satisfactory to the Seller, in the Seller's sole discretion, that the Buyer has obtained sufficient and adequate bonds for the Permits. Promptly after the Closing, but in no event later than 120 days after the Closing Date, the Buyer shall cause the existing bonds obtained by the Seller or its Affiliates in respect of the Permits to be terminated and released.

(g)    Indemnification. The Buyer shall indemnify and hold harmless the Seller, its Affiliates, and their respective Related Persons from and against any and all Liabilities and Claims arising from or related to the Buyer's breach of any representation, warranty or covenant contained herein or in any Related Agreement.

(h)    Replacement of Bonds and Letters of Credit. At the Closing, the Buyer shall cause all letters of credit, surety bonds, performance bonds and similar bonds posted by the Seller or its Affiliates with respect to the Purchased Assets, to be terminated and released.

(i)    Adequate Assurances Regarding Executory Contracts and Required Orders. With respect to each Lease, the Buyer shall provide adequate assurance of the future performance of such Lease by the Buyer. The Buyer agrees that it will promptly take all actions as are reasonably requested by the Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making the Buyer's employees and representatives available to testify before the Bankruptcy Court.

(j)    Performance under Executory Contracts. The Buyer shall (i) from and after the Closing Date assume all obligations and liabilities of the Seller under the Leases that

accrue from and after the Closing Date, (ii) from and after the Closing Date take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Leases, and (iii) indemnify, defend and hold harmless the Seller, its Affiliates and all of their respective Related Persons from and against any damages, losses, costs, expenses and other liabilities arising out of a breach of this Section or any of the Buyer's other covenants contained in this Agreement.

7.3    Covenants of the Parties.

(a)    Consents. The parties shall promptly apply for and diligently prosecute all applications for, and shall use commercially reasonable efforts promptly to obtain, such consents, authorizations and approvals from such Governmental Authorities and third parties as shall be necessary or appropriate to permit the consummation of the transactions contemplated by this Agreement, and shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions necessary to effect the consummation of the transactions contemplated by this Agreement. Notwithstanding anything to the contrary contained herein, the parties hereto agree that as a condition to obtaining the consent of any third party to any coal supply contract, real property lease, personal property lease or any other agreement to permit the consummation of the transactions contemplated hereby, no party hereto shall have any obligation to (i) pay any remuneration to third parties in exchange for such party's consent or approval; (ii) file any lawsuit or take other legal action as against such third party with respect to any thereof; or (iii) make any amendment thereof or waive any rights thereunder if as a result of such amendment or waiver such coal supply contract, real property lease, personal property lease or any other agreement would contain terms and conditions that are less favorable in any material respect than the terms and conditions of such coal supply contract, real property lease or personal property lease as in existence on the Closing Date.

(b)    Tax Exemption. Each party hereto agrees to use commercially reasonable efforts to cause the Sale Order to provide that the sale of the Purchased Assets shall be exempt from stamp or similar Taxes pursuant to 11 U.S.C. § 1146(c).

ARTICLE 8 - TERMINATION

8.1    Termination. This Agreement may be terminated:

(a)    By mutual consent of the Buyer and the Seller prior to the entry of the Procedures Order;

(b)    By either the Seller or the Buyer after October 31, 2009, or such later date to which the Closing has been extended pursuant to the terms hereof; if the Closing has not occurred by such date; provided, however, that as of such date the party terminating this Agreement is not in default under this Agreement;

(c)    Provided the terminating party is not otherwise in material default or breach of this Agreement, and has not failed or refused to close without justification hereunder, by either the Buyer or the Seller, without prejudice to other rights and remedies which the terminating party may have, if the other party shall (i) have materially failed to perform its covenants or agreements contained herein required to be performed on or prior to the Closing Date, or (ii) have materially breached any of its representations or warranties contained herein; provided, however, that in the case of clause (i) or (ii), the defaulting party shall have a period of ten (10) days following written notice from the non-defaulting party to cure any breach of this Agreement, if such breach is curable;

(d)    By the Seller if the transactions contemplated hereby are not approved by

provided, however, that in the case of clause (i) or (ii), the defaulting party shall have a period of ten (10) days following written notice from the non-defaulting party to cure any breach of this Agreement, if such breach is curable;

(d)     By the Seller if the transactions contemplated hereby are not approved by the Bankruptcy Court by October 31, 2009, or if the Seller determines in its sole and absolute discretion that it is in the Seller's best interests to consummate any transaction (or series of transactions) involving a sale of all or substantially all of the Purchased Assets to a purchaser or purchasers other than the Buyer. No such termination in accordance with this Section 8.1(d) shall constitute a breach by the Seller or entitle the Buyer to recover any damages whatsoever.

8.2     Effect of Termination; Remedies. In the event of termination pursuant to Section 8.1, this Agreement shall become null and void, and have no effect (other than Section 7.2(g) and Articles 8 and 9, which shall survive termination), with no Liability on the part of the Seller or the Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the Liability of a party for its own expenses pursuant to Section 9.1; and (ii) any Liability provided for in this section, provided, however that any such termination shall be without prejudice to the rights of any party hereto arising out of the material breach by any other party of any covenant or agreement contained in this Agreement.

## ARTICLE 9 - MISCELLANEOUS

9.1     Expenses. Whether or not the transactions contemplated hereby are consummated, the Seller and the Buyer shall bear their own expenses, including, without limitation, fees, disbursements and other costs of any brokers, finders, investment bankers, attorneys, accountants and other advisors, in connection with this Agreement and the transactions contemplated hereby.

9.2     Notices. All notices under this Agreement shall be given to the parties at the following addresses (i) by personal delivery; (ii) by registered or certified mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight or other express courier services:

(a)     If to the Buyer:     NEW LONDON TOBACCO MKT, INC
                             420 TOBACCO Rd.
                             LONDON, KY  40741

With a copy to:     WILLIAM S. BROWNLOW
                    P.O. BOY 11311
                    KNOXVILLE, TN.  37939

(b)     If to the Seller:

Attention: James H. Frazier
201 East Main Street, Suite 1000
Lexington, Kentucky 40507

All notices shall be effective and shall be deemed delivered (i) if by personal delivery, on the data of delivery if delivered during normal business hours of the recipient, and if not

9.3     Amendments. No supplement, modification or waiver of this Agreement shall be binding unless in writing and executed by each party hereto.

9.4     Waiver. At any time prior to the Closing, the Buyer or the Seller may (a) extend the time for the performance of any of the obligations or other acts of the other party hereto, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the obligations of the other party or any of the conditions to its own obligations contained herein to the extent permitted by law. Any agreement on the part of the Buyer, on the one hand, and the Seller, on the other hand, to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of the Buyer and the Seller. The failure of a party to exercise any right or remedy shall not be deemed or constitute a waiver of such right or remedy in the future. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other similar or dissimilar provision hereof; nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

9.5     Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.6     Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other .parties; provided, however, that the Buyer may assign this Agreement and its rights hereunder to an Affiliate, so long as such Affiliate is able to fully comply with the terms contained herein, and is able to make all representations, warranties, and covenants contained herein. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit 4 and be enforceable by the parties and their respective successors and assigns.

9.7     Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their successors and permitted assigns, and nothing in this Agreement, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement; provided, however, that the Seller's Affiliates and Related Persons of the Seller and the Seller's Affiliates shall be third-party beneficiaries of Section 7.2(g) hereof.

9.8     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties hereto.

9.9     Entire Agreement. This Agreement and the exhibits and schedules hereto and the Related Agreements constitute the entire agreement among the parties hereto and supersede all prior agreements and understandings oral or written, among the parties hereto with respect to the subject matter hereof and thereof. There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of the Buyer and the Seller on the date first above written.

BUYER:

THE NEW LONDON TOBACCO MARKET, INC.

By: _William G. Brownlow_

Name: NEW LONDON TOB·MKT.  WILLIAM G. BROWNLOW

Its: PRESIDENT

SELLER:

APPALACHIAN FUELS, LLC

By: _____

Name: _____

Its: _____

*work*

The foregoing is subject to acceptance in the Buyer's sole discretion before 2pm Eastern time on Friday, October 23, 2009, to be communicated by e-mail to wtb@bunchlaw.com.

LEXLibrary 408065v.1

## Schedule 2.1(c)

### Leases

| No. Document | Lessor | Lessee | Property | Date |
|---|---|---|---|---|
| Sublease | McCoy Blkhorn | App. Fuels | Orville Justice, et al (1998) | 3/5/05 |
| Sublease | McCoy Blkhorn | App. Fuels | Winifred Blackburn | 9/16/05 |
| Surface Lease | Harold & Barbara Hale | App. Fuels | 25 A. | 2/20/06 |
| Surface Lease | Leslie & Loretta McGuire | App. Fuels | 10 A. | 12/10/03 |
| Surface Lease & Ease. | Paul David Maynard & Karen Maynard | App. Fuels | Tract No. 2 | 5/26/04 |
| Surface Lease | Henry Thompson Heirs | App. Fuels | DB 324-540; DB 251-553 | 9/9/03 |
| Surface Lease Relocate .98 ml. Co. Rd 1300 | Pike Co. Fiscal Ct. | App. Fuels | DB 602-495 200 A. | 10/14/05 |
| Coal Lease | John S. & Nancy Bevins & Charles J. Baird | App. Fuels | DB 838, P331 DB 822, P678 DB 822, P681 | 6/01/06 |
| Surface Lease | Jeremy Nell Robinette & Lisa Robinette | App. Fuels | 60 A. DB 774, P593 DB 764, P601 | 5/17/04 |
| Surface Lease | Mazola Reed | App. Fuels | 10A. | 10/29/04 |
| Surface Lease | Donald Ray Hunt & Barbara Hunt | App. Fuels | 60A. | 5/17/04 |
| Surface Lease | Jery Wayne Robinette & Loretta Gaye Robinette | App. Fuels | 75 A. | 5/17/04 |

S-1

## EXHIBIT A

### ASSIGNMENT OF LEASES

S-1

## ASSIGNMENT OF LEASES

This Assignment of Leases (this "Agreement"), dated as of _____, 2009, is between    (i)    _____    ("Assignor"),    and    (ii) _____    ("Assignee").

### RECITALS

A.    This Agreement is entered into to effect the transactions contemplated by the Asset Purchase Agreement (the "Purchase Agreement") dated _____, 2009 to which Assignor and Assignee, are parties.    Capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

B.    Assignor is a party to the Leases.

C.    Assignor desires to assign to Assignee, and Assignee desires to assume, all of Assignor's right, title, and interest in and to the Leases.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment.  Assignor hereby assigns, transfers, and sets over unto Assignee all of its right, title, interest, duties, and obligations in, to, and under the Leases.

2.    Assumption.  Assignee hereby assumes all of Assignor's right, title, interest, duties and obligations in, to and under the Leases arising after the Closing Date and agrees to be bound by all of the terms and conditions of the Leases and agrees to pay, perform and discharge, all duties and obligations of Assignor under the Leases arising after the Closing Date.

3.    Conflict.  This Agreement is subject to all the terms and conditions of the Purchase Agreement.  No provision of this Agreement shall be deemed to enlarge, alter or amend the terms or provisions of the Purchase Agreement.  Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

4.    Governing Law.  This Agreement shall be governed by and construed according to the laws of the Commonwealth of Kentucky without regard to or application of its conflict of laws rules.

5.    Counterparts.  This Agreement may be executed in one or more counterparts (including by means of facsimile or e-mail signature pages) and all such counterparts taken together shall constitute one and the same Agreement.

6.    Severability.  If any provision of this Agreement or its application will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired.  If any court shall determine that any provision of this Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

7.    Entire Agreement.    All prior negotiations and agreements by and among the parties hereto with respect to the subject matter hereof are superseded by this Agreement, the Purchase Agreement and the Related Agreements, and there are no representations, warranties, understandings or agreements with respect to the subject matter hereof other than those expressly set forth in this Agreement, the Purchase Agreement and the Related Agreements.

8.    Headings.    Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any provision in it.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, the parties hereto have caused their authorized representatives to execute this Agreement as of the date first set forth above.

ASSIGNOR:

_____

By: _____

Its: _____


ASSIGNEE:

_____

By: _____

Its: _____

## EXHIBIT B

### ASSUMPTION OF LIABILITIES

## ASSUMPTION OF LIABILITIES

This Assumption of Liabilities (this "Agreement"), dated as of _____, 2009, is between (i) _____ (the "Seller"), and (ii) _____ (the "Buyer").

## RECITALS

A.    This Agreement is being entered into to effect the transactions contemplated by the Asset Purchase Agreement dated _____, 2009 (the "Purchase Agreement"), to which the Buyer and the Seller are parties. Capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

B.    The Buyer desires to acknowledge and assume all obligations, covenants and responsibilities of the Seller related to the Assumed Liabilities, pursuant to the terms and conditions of the Purchase Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Acknowledgement and Assumption. The Buyer hereby assumes and agrees to pay, perform and discharge, the Assumed Liabilities.

2.    Conflict. This Agreement is subject to all the terms and conditions of the Purchase Agreement. No provision of this Agreement shall be deemed to enlarge, alter or amend the terms or provisions of the Purchase Agreement. Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

3.    Governing Law. This Agreement shall be governed by and construed according to the laws of the Commonwealth of Kentucky without regard to or application of its conflict of laws rules.

4.    Counterparts. This Agreement may be executed in one or more counterparts (including by means of facsimile or e-mail signature pages) and all such counterparts taken together shall constitute one and the same Agreement.

5.    Entire Agreement. All prior negotiations and agreements by and among the parties hereto with respect to the subject matter hereof are superseded by this Agreement, the Purchase Agreement and the Related Agreements, and there are no representations, warranties, understandings or agreements with respect to the subject matter hereof other than those expressly set forth in this Agreement, the Purchase Agreement and the Related Agreements.

6.    Headings. Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any provision in it.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused their authorized representatives to execute this Agreement as of the date first set forth above.

SELLER:    _____

By: _____
Name: _____
Title: _____


BUYER:    _____

By: _____
Name: _____
Title: _____

S-1

## EXHIBIT C

## BILL OF SALE

S-1

## BILL OF SALE

This Bill of Sale (this "Bill of Sale"), dated as of _____, 2009, is between (i) _____ (the "Seller"), and (ii) _____ (the "Buyer").

This Bill of Sale is being entered into to effect the transactions contemplated by the Asset Purchase Agreement, dated as of _____, 2009 (the "Agreement"), between the Buyer and the Seller.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Definitions.  All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Agreement.

2.    Sale and Assignment.  Pursuant to the Agreement, the Seller does hereby unconditionally and irrevocably sell, grant, convey, transfer, assign and deliver to the Buyer as of the date hereof in accordance with and subject to the terms of the Agreement, all of its right, title and interest in, to and under all of the Purchased Assets, except those transferred pursuant to the other Related Agreements.

3.    Conflict.  This Agreement is subject to all the terms and conditions of the Agreement.  No provision of this Bill of Sale shall be deemed to enlarge, alter or amend the terms or provisions of the Agreement.  Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

4.    Binding Effect.  This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.    Counterparts.  This Bill of Sale may be executed in one or more counterparts (including by means of facsimile signature pages) and all such counterparts taken together shall constitute one and the same agreement.

6.    Governing Law.  This Bill of Sale shall be governed by and construed according to the laws of the Commonwealth of Kentucky, without regard to or application of its conflict of laws rules.

7.    Entire Agreement.  All prior negotiations and agreements by and among the parties hereto with respect to the subject matter hereof are superseded by this Bill of Sale, the Agreement, and the other Related Agreements, and there are no representations, warranties, understandings or agreements with respect to the subject matter hereof other than those expressly set forth in this Bill of Sale, the Agreement and the other Related Agreements.

8.    Headings.  Section headings are not to be considered part of this Bill of Sale, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Bill of Sale or any provision in it.

IN WITNESS WHEREOF, the parties hereto have caused their authorized representatives to execute this Bill of Sale as of the date first set forth above.

SELLER: _____

                                        By: _____
                                        Title: _____


BUYER: _____

                                        By: _____
                                        Title: _____

S-1