## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## ASHLAND DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| **In re:** | ) | |
| | ) | |
| **APPALACHIAN FUELS, LLC, et al.** | ) | **Case No.  09-10343** |
| | ) | **Chapter 11** |
| **Debtor.** | ) | |
| | ) | **Jointly Administered[1]** |

### AGREED SALE ORDER NO. 3
### DANTE TO A.T. MASSEY COAL COMPANY
### (A) APPROVINGASSET PURCHASE AGREEMENT, (B) AUTHORIZING SALE OF DESIGNATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND OTHER ENCUMBRANCES, AND (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN AGREEMENTS

The Debtors having conducted an auction of the Debtors' assets pursuant to Debtors' Sale Motion No. 3 (Doc. No. 495) ("Sale Motion") and the Sales Procedure Order on Debtor's Sale Motion No. 3 (Doc. No. 565) on October 20, 2009 and October 21, 2009 ("Auction") of the Dante Mining Complex located in Barbour County, West Virginia.  A.T. Massey Coal Company was the successful upset bidder ("Buyer").

Under the Sale Motion, the Debtor sought to establish bid procedures and protections for the sale (the "Sale") of assets described in Agreement attached thereto ("Stalking Horse APA"). The Stalking Horse APA was a framework for a sale process under which Wolf Run Mining Company ("Wolf Run") was designated as the stalking horse bidder under the Auction and the bid protections afforded Wolf Run a $50,000 break-up fee in the event a Competing Bidder was

---

[1]    The case being jointly administered with Appalachian Fuels, LLC, Case No. 09-10343 include Appalachian Holding Company, Inc., Case No. 09-10372, Appalachian Premium Fuels, LLC, Case No. 09-10373, Appalachian Environmental, LLC, Case No. 09-10374, Kanawha Development Corporation, Case No. 09-10375, Appalachian Coal Holdings, Inc., Case No. 09-10405 and Southern Eagle Energy, LLC, Case No. 09-10406.

the successful bidder at auction and consummated a Sale.

Specifically, the Sale Motion and accompanying Stalking Horse APA sought to transfer, to the successful bidder at auction, the following assets:

(a) certain leased real property listed or identified on Schedule 2.1(a) of the Stalking Horse APA (the "Leases").

(b)    all prepaid royalties and deposits that relate to the Leases; and

(d)    all maps, reserve studies, engineering reports, and other records relating to the Leases, in each case whether in hard copy or electronic form.

Buyer was the successful bidder at Auction which included the assets as set forth above in addition to a transfer of certain permits related to the Dante Mining complex.  The Debtors have executed an Agreement with Buyer dated November 9, 2009 (the "APA"), subject to approval by the Bankruptcy Court., and such Agreement has been modified from the Stalking Horse APA to incorporate the results of the Auction.

Under the authority granted by the Sale Procedures Order, the Debtor seeks, pursuant to Sections 105, 363 and 365 of Title 11 of the United States Code ("Code") and Bankruptcy Rules 2002 and 6004, and 6006 and the Local Rules of Bankruptcy Procedure, inter alia, entry of an order pursuant to Sections 105(a), 362, 363 and 365 of the Code, (a) approving the APA by and between the Debtors and Buyer in substantially the form attached hereto as <u>Exhibit A</u>, and as otherwise amended as provided herein (including all exhibits, schedules, Related Agreements, and other agreements executed in connection therewith, the "APA"),[2] (b) authorizing the sale to the Buyer of certain assets specified in the Agreement (the "<u>Purchased Assets</u>"), and (c)

_____

[2] Capitalized terms not defined herein shall have the meaning set forth in the APA, the terms of which are incorporated herein by reference.

authorizing the assumption by the relevant Debtors and the assignment to the Buyer of certain executory contracts and unexpired leases of the Debtors specified in the Agreement (the "Assignment of Leases"); and the Sale Motion having been served upon (i) the Office of the United States Trustee for the Eastern District of Kentucky; (ii) counsel for the Official Committee of Unsecured Creditors; (iii) those parties requesting notice in these chapter 11 cases; (iv) counsel to the Buyer; (v) all persons or entities with a lien on, or security interest in, any of the Purchased Assets known to the Debtors; (vi) all known counterparties to each of the Assigned Leases; (vii) all taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (viii) all entities that have previously expressed serious interest in acquiring the Purchased Assets; (ix) the United States Environmental Protection Agency; (x) the West Virginia Department of Environmental Protection; (xi) all entities on Master Service List No. 1; (xii) Attorney General in the State of West Virginia; and (xii) all other parties as identified herein or the APA, and it appearing that proper and adequate notice of the Motion, including, but not limited to the published notice as more particularly set forth in Doc. No. 596, has been given and that no other or further notice is required; and after due deliberation thereon; and good and sufficient cause appearing therefore.

The Court has reviewed and taken judicial notice of all filed pleadings, objections, orders, and other matters filed with the Court with respect to the Sale Motion, including the Debtor's Report of Auction on Sale No. 3 (Dante) filed October 27, 2009, Doc. No. 667, and being sufficiently advised, and for good cause appearing therefore,

IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and vice versa.

B.    Unless otherwise specified in this Order, capitalized terms shall have the same meaning as set forth in the APA.

C.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§157 and 1334.

D.    Venue of this proceeding is proper pursuant to 28 U.S.C.§1409(a).

E.    Determination of the Sale Motion is a core proceeding under 28 U.S.C. §§157(b)(2)(A) and (N).  The statutory predicates for the relief granted herein are Sections 105, 363 and 365 of the Code, and Bankruptcy Rules 2002, 6004 and 9014.

F.    Proper, timely, adequate and sufficient notice of the Sale Motion and the Auction has been provided in accordance with all applicable law, including without limitation, Section 102(1) of the Code and Bankruptcy Rules 2002, 6004, 6006 and 9014, and no other or further notice of the Sale Motion, the Auction, or the entry of this Order (the "Sale Order") is or shall be required.

G.    A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, and the rights of third parties to submit higher or otherwise better offers for the Purchased Assets, has been afforded to all interested persons and entities.

H.    The Debtor has established adequate business justification and compelling circumstances to authorize and permit the Debtors to sell the Purchased Assets to the Buyer.

I.    On November 9, 2009, the APA was entered into between the Debtors as more particularly provided in the APA and Buyer. The Purchase Price and the other consideration set

forth in the APA is fair and reasonable and constitutes fair consideration and reasonably equivalent value under the Code and applicable federal, state and local law, and it is therefore in the best interests of the Debtors, its creditors and estates that the Court enter this Sale Order authorizing the relief sought in the Sale Motion.

J.       Subject only to the issuance of this Sale Order and satisfaction of any conditions precedent as contained in  Article 7 of the APA, (i) the Debtors have full corporate power and authority to execute and deliver the APA, the Related Agreements, and all other agreements, instruments or documents executed in connection therewith or contemplated thereby, and the sale of the Purchased Assets to the Buyer by the Debtors and all previous actions of the Debtors and the Chief Liquidating Officer, in furtherance of the sale transaction (including, but not limited to, the execution of the APA and Related Agreements) shall be deemed to have been duly and validly authorized by all necessary corporate action of the Debtors, and (ii) the Debtors have all the corporate power and authority necessary to consummate the transactions contemplated by the APA. No consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate such transactions.

K.       The Debtors have presented good and sufficient business justification to support (i) the sale of the Purchased Assets pursuant to Section 363 of the Code and (ii) the  assumption and assignment of the Assignment of Leases pursuant to Section 365 of the Code, including, without limitation, good and sufficient evidence to establish that:  (a) each non-debtor party to such agreements is adequately assured of future performance by the Buyer and (b) any arrearages of rent due and owing under an Assignment of Leases as of the Closing (as defined below) or any other cure amount due and owing for reinstatement, minimum royalties, or otherwise, shall be cured by the Debtors within ten (10) days of Closing.

L.      As a condition to the purchase of the Purchased Assets by the Buyer, the Buyer requires that the Purchased Assets be sold free and clear of all liens, claims, interests and encumbrances except as expressly set forth in the APA, and that the Buyer has no liability for any liabilities of the Debtors except those specified in the APA.  The Buyer will not enter into and consummate the sale, thus adversely affecting the Debtors' estates, if the sale to the Buyer is not free and clear of all liens, claims, interests and encumbrances or if the Buyer would be liable for liabilities of the Debtors other than those it specifically assumed under the APA.

M.      The sale of the Purchased Assets is being consummated in good faith.  The APA and the Related Agreements were proposed, negotiated and entered into by the Buyer in good faith, from arms'-length bargaining positions and without fraud or collusion.  The Buyer is not an "insider" or "affiliate" of the Debtors (as such terms are defined in the Code), nor has it engaged in any conduct which would prevent the application of Section 363(m) of the Code or would allow for the application of Section 363(n) of the Code to the transactions referenced herein.  Further, since the Petition Date, the Debtors have been permitted to (a) solicit or to encourage the submission of inquiries, proposals or offers by third parties to purchase all or any part of the Purchased Assets and (b) perform any and all other acts related thereto, including, without limitation, supplying, information relating to the Purchased Assets of the Debtors to prospective buyers. The Buyer, thus, is a good faith purchaser under Section 363(m) of the Code and in accordance with applicable law and, as such, is entitled to the protections afforded thereby. In the absence of a stay pending appeal of this Order, if any, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Code in closing the transactions contemplated by the APA and the Related Agreements at any time after the entry of this Sale Order.

N.      With respect to any and all entities asserting any options, pledges, security interests, Claims, equities, reservations, third party rights, voting trusts or similar arrangements, Liens, charges or other encumbrances or restrictions on or conditions to transfer or assignment of any kind (including, without limitation to the generality of the foregoing, restrictions or conditions on or to the transfer, assignment or renewal of licenses, permits registrations and authorizations or approvals of or with respect to governmental units and instrumentalities), whether direct or indirect, absolute or contingent, matured or unmatured, liquidated or unliquidated on or against the Purchased Assets (collectively, "Encumbrances"), either (i) such entity has consented to the sale and transfer, license and assignment, as applicable, free and clear of its Encumbrance, with such Encumbrance to attach to the proceeds of such sale and transfer, license and assignment, as applicable, respectively, (ii) applicable nonbankruptcy law permits sale of the assets free and clear of such Encumbrance, (iii) such Encumbrance is in bona fide dispute, or (iv) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Encumbrance, so that the conditions of Section 363(f) of the Code have been met.

O.      The Debtors have good and marketable title to the Purchased Assets, and such Purchased Assets are property of the Debtors' estates under Section 541 of the Code.  The sale and transfer of the Purchased Assets contemplated by the APA (i) are or will be legal, valid and effective transfers of property of the Debtors' estates to the Buyer, and (ii) vest or will vest the Buyer with all right, title and interest in and to the Purchased Assets free and clear of all liens, claims, interests and encumbrances under Sections 363(f) and 105 of the Code.

P.      Except as expressly set forth in Section 2.2 of the APA, the Buyer shall have no liability for any obligation of, or Claim against, the Debtors related to the Purchased Assets by

reason of the transfer of the Purchased Assets to the Buyer. The Buyer shall not be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets or otherwise, to: (1) be a successor to the Debtors (other than with respect to the assumed liabilities and any obligations arising under the Assignment of Leases from and after the Closing ("Assumed Liabilities"); or (2) have, *defacto* or otherwise, merged with or into the Debtors. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the APA. The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby if the sale of the Purchased Assets to the Buyer or its assignee, the assumption, assignment and sale of the Assignment of Leases to the Buyer or its assignee, and the assumption of the Assumed Liabilities by the Buyer or its assignee were not, except as otherwise provided in the APA with respect to Assumed Liabilities and Permitted Liens, free and clear of all Encumbrances of any kind or nature whatsoever, or if the Buyer would, or in the future could (except and only to the extent expressly provided in Section 2.2 of the APA), be liable for any of such Encumbrances or other liabilities (such other liabilities or obligations being referred to collectively as the "Successor Liabilities"), including, but not limited to, Encumbrances or Successor Liabilities in respect of the following (the following being referred to collectively as the "Successor Liability Documents, Statutes and Claims"): (1) any employment, collective bargaining agreement  or other labor agreements, including, without limitation those with the International Union, United Mine Workers of America; (2) all deeds of trust and security interests; (3) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (4) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related Claim, including, without limitation, Claims that might otherwise

arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Jones Act, (k) the Longshoremen's and Harbor Workers' Compensation Act, (l) the Coal Industry Retiree Health Benefit Act of 1992, (m) state anti-discrimination laws (n) state unemployment compensation laws or any other similar state laws, or (o) any other state or federal benefits or claims relating to any employment with the Debtors or any predecessors; (5) any products liability or similar Claims, whether pursuant to any state or federal laws or otherwise, including, without limitation, asbestos-related Claims; (6) reclamation, environmental or other Claims or Liens arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.,* the Clean Water Act, 33 U.S.C. §§ 1251, *et seq*., the Federal Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq*., or similar federal and state statutes; (7) any bulk sales or similar law; (8) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (9) any theories of successor liability. Buyer is assuming only those liabilities defined in Section 2.2 of the APA as Assumed Liabilities and has expressly excluded assumption of the Excluded Liabilities defined in Section 2.3 of the APA, including but not limited to liabilities or obligations arising under any Environmental Law that

accrue or result from any conditions, events or activities occurring or existing on or before the

Closing Date with respect to the Leases.   To the extent of any amendment or enactment of rules,

regulations or laws governing the Permits that would retroactively create a claim or liability as a

result of the prior acts or omissions of the Debtors, any such claim or liability shall be deemed an

Excluded Liability as to the Buyer pursuant to Section 2.3 of the APA.

Q.    All of the provisions of this Sale Order are nonseverable and mutually dependent.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS

FOLLOWS:

1.    The Sale Motion is approved on the terms set forth herein.

2.    Any capitalized term in this Sale Order not otherwise defined herein shall have

the meaning ascribed to it in the APA.

3.    All objections to the Sale Motion or the relief requested therein that have not been

withdrawn, waived, or settled are overruled on their merits.  Those parties who did not object or

who withdrew their objections are deemed to have consented to the entry of this Sale Order

pursuant to Section 363(f)(2) of the Code.

4.    The terms and conditions of the APA, and the Schedules attached thereto, as well

as the Related Agreements and the transactions contemplated thereby are hereby approved in all

respects.  The execution of the APA and the Related Agreements by James H. Frazier, III as the

Debtor's Chief Liquidating Officer is hereby authorized and approved. Pursuant to the provisions

of Sections 105 and 363 of the Code, the Debtors are hereby authorized and directed to sell the

Purchased Assets to the Buyer, free and clear of all liens, claims, interests and encumbrances

(including without limitation Encumbrances, Successor Liabilities, Liens and Claims) pursuant

to, and in accordance with, the terms and conditions of the APA, the Related Agreements and

this Sale Order.  The APA shall not be subject to rejection. To the extent that the terms of this

Sale Order conflict with the APA or any Related Agreements, this Sale Order shall control.

5.    The Debtors, their representatives, and the Chief Liquidating Officer are

authorized and directed to execute and deliver, and empowered and directed fully to perform

under, consummate and implement the APA and the Related Agreements, together with all

additional instruments and documents that may be reasonably necessary or desirable to

implement the APA and the Related Agreements, and to take all further actions as may be

requested by the Buyer for the purpose of assigning, transferring, granting, conveying and

conferring to the Buyer, or reducing to the Buyer's possession, any or all of the Purchased

Assets, or as otherwise may be necessary or appropriate to the performance of the obligations as

contemplated by the APA and the Related Agreements.  All previous actions taken by the

Debtors, their representatives, and attorneys, and Chief Liquidating Officer in connection with

the APA, the Related Agreements and the transactions contemplated thereby are deemed

approved.

6.    Upon the Closing Date (the "Closing") and pursuant to Sections 105(a) and 363(f)

of the Code, except as otherwise expressly set forth in the APA, the Purchased Assets shall be

transferred to the Buyer subject only to the Assumed Liabilities.  With the exception of the

Assumed Liabilities, the transfer of the Purchased Assets shall be free and clear of (a) all

Encumbrances, Successor Liabilities, deeds of trust, security interests, conditional sale or other

title retention agreements, rights of first refusal, options, pledges, liens (including but not limited

to any and all "liens" as defined in Code § 101(37)), taxes, tax liens, mechanic's liens,

judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if

any; and (b) all debts arising in any way in connection with any acts or omissions of the Debtors,

any claims (including, without limitation, any and all "claims" as defined in Section 101(5) of the Code) against the Debtors and obligations (including but not limited to obligations (i) under the Employee Retirement Income Security Act, the Comprehensive Omnibus Budget Reconciliation Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act (or any comparable state law), Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.,* the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.,* the Federal Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq.,* or any other federal or state laws (including al state and federal environmental laws), or (ii) arising from the cessation of the Debtors' operations, dismissal of employees, or termination of employment or collective bargaining or other labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs), demands, guaranties, options, licenses, rights, contractual commitments, restrictions, interests and matters of or against the Debtors of any kind and nature, whether arising prior to or subsequent to the commencement of this case, whether matured or unmatured, liquidated or unliquidated, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise, including without limitation, any claim based upon successor liability (whether statutory or otherwise) and those claims of the kind specified in Sections 502(g), 502(h) and 502(i) of the Code or (c) other interest which any person or entity has or asserts with respect to the Purchased Assets (collectively, "Liens and Claims").  The Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors under or by reason of any theory at law or equity.

7.      The Termination Fee, or the break-up fee, as described in the Stalking Horse APA for Wolf Run encouraged the bidding, enhanced the purchase price by the required $50,000, thus provided benefit to the Debtors and is a justifiable expense herein.  Wolf Run shall therefore have twenty (20) days from the date of the entry of this Sale Order to file evidence of its entitlement to an amount of such Termination Fee not to exceed $50,000.

8.      The Buyer does not constitute a successor to the Debtors because, among other reasons:

(i)      Except as otherwise set forth in the APA, the Buyer is not expressly or impliedly agreeing to assume any of the Debtors' liabilities;

(ii)     The transactions contemplated by the APA do not amount to a consolidation, merger or a *de facto* merger of the Debtors and the Buyer;

(iii)    The Buyer is not merely a continuation of the Debtors; and

(iv)     The transactions contemplated by the APA are not being entered into fraudulently or in order to escape liability from the Debtors' debts.

9.      Upon Closing, all Liens and Claims against the Purchased Assets shall, without the necessity of further action on the part of the Buyer, the Debtors or any creditor, be deemed released and discharged and shall attach to the proceeds of the sale paid by Buyer, in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets. Upon Closing, the creditors of the Debtors are authorized and directed to execute such documents and take all other actions as may be necessary to document the release of their Liens and Claims against the Purchased Assets, if any, as such Liens and Claims may have been recorded or may otherwise exist.

10.    If any person or entity that has filed financing statements or other documents or agreements evidencing an interest in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and execution by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens and Claims, the Debtors and/or the Buyer are hereby authorized and directed to execute and file such statements, instruments, releases and other documents, including, but not limited to, a copy of this Sale Order on behalf of such person or entity.

11.    All persons and entities holding Liens and Claims of any kind and nature against the Debtor or with respect to the Purchased Assets are hereby barred, restrained and enjoined from taking any actions inconsistent with the terms of this Order and  from asserting such Liens and Claims against the Purchased Assets or the Buyer, its successors, designees, assigns, affiliates, shareholders, members, officers, representatives, agents, directors or trustees.

12.    All persons and entities which are presently, or as of the Closing Date may be, in possession of some or all of the Purchased Assets hereby are directed to surrender possession of said Purchased Assets to the Buyer on the Closing Date.

13.    Upon Closing the Assignment of Leases shall be deemed assumed and assigned to the Buyer or any wholly owned subsidiary of Buyer who is designated by Buyer as of the date of the Closing, as provided by the Related Agreements and will remain valid and binding and in full force and effect in accordance with their respective terms for the benefit of the Buyer or its designee, notwithstanding any provision in any of the leases comprising the Assignment of Leases (including those described in Sections 365(b)(2) and (f)(1) and (3) of the Code), or applicable law that prohibits, restricts or conditions such assignment or transfer or terminates or modifies or permits a party other than the Debtors to terminate or modify such Assignment of

Leases on account of such assignment or transfer, including, without limitation, all preferential

rights or rights of first refusal of any kind or nature whatsoever, pursuant to Section 365(f) of the

Code; provided that such prohibition, restriction or condition of assignment or transfer shall be

negated only with respect to transfers and assignments effected pursuant to the APA and the Sale

Order, and that such prohibitions, restrictions and conditions of assignment shall otherwise

remain in full force and effect and a part of the contract or lease so assigned or transferred.

Within 10 days of Closing, the Debtors shall pay from the Purchase Price all cure amounts due

for pre-closing defaults under any of the Assignment of Leases ("Cure Amounts"),  to the non-

debtor parties to the Assignment of Leases except to the extent the same remains subject to an

unresolved objection (the "Unresolved Cure Amounts"), which objections shall be resolved in

accordance with further order of the Court.   Except for the Unresolved Cure Amounts, by

issuance of this Sale Order, the Cure Amounts as set forth in the attachment to the APA, are, and

shall be deemed to be, the total amount necessary to cure any monetary defaults in connection

with the assumption of the Assignment of Leases, and therefore, (i) the Cure Amounts shall be

controlling and the non-debtor parties shall forever be barred and estopped from asserting or

claiming against the Debtors, and their representatives and Chief Liquidating Officer, or the

Buyer and its officers, directors, and shareholders, that any default exists or any additional

amounts are due for the period prior to the Closing, and (ii) the non-debtor parties to the

Assignment of Leases are, and shall be deemed to be, adequately assured of future performance

under the Assignment of Leases, within the meaning of Section 365(b)(1)(C) of the Code and

other applicable law. There shall be no rent accelerations, assignment fees, increases (including

advertising or royalty rates) or any other fees charged to the Buyer as a result of the assumption,

assignment and sale of the Assignment of Leases. The validity of the assumption, assignment

and sale to the Buyer shall not be affected by any dispute between the Debtors or their affiliates and another party to the Assignment of Leases regarding the payment of any amount, including any Cure Amount under the Code.

14.     This Sale Order (i) is and, upon Closing and payment of the Purchase Price, shall be, effective as a determination that all Liens and Claims existing on the Purchased Assets before the Closing have been unconditionally released, discharged and terminated, and that the conveyances described in this Order have been effected, and (ii) is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents, including, but limited to, this Sale Order, or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

15.     The Buyer shall not be or deemed to be, as a result of any action taken in connection with the APA or any Related Agreement, responsible for any liability, debt, commitment, responsibility, or claim of any nature whatsoever, whether known or unknown, existing as of the date hereof or hereafter, arising of or against the Debtors, including, without limitation, claims for payment of any benefit accruing to the Debtors, except to the extent expressly provided in the APA, including, but not limited to, Excluded Liabilities as defined in Section 2.3 of the APA, which incorporates any liability or claim arising from any amendment or enactment of rules, regulations or laws governing the Permits that would retroactively create a claim or liability as a result of the prior acts or omissions of the Debtors.

16.     This Court retains jurisdiction to: (a) enforce and implement the terms and provisions of the APA and the Related Agreements, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection herewith; (b) compel delivery of the Purchased Assets to the Buyer; (c) resolve any disputes arising under or related to the APA or any Related Agreements between or among the parties to the APA or the Related Agreements; (d) enforce the assumption and assignment of the Assignment of Leases; (e) enforce the payment of Cure Amounts; (f) to resolve the Unresolved Cure Amounts; (g) resolve any dispute regarding amounts due to any lienholder or creditor in connection with the Sale or the terms of this Sale Order; and (h) interpret, implement and enforce the provisions of this Sale Order.

17.     To the extent permitted by applicable law, the transfer instruments identified in the APA, and the various instruments for assignment or transfer of the Purchased Assets under the terms of the APA are hereby deemed instruments of transfer in connection with a plan or reorganization or liquidating plan to be filed with the Court such that the transactions set forth are not subject to any transfer tax, sales tax or similar tax, as set forth in 11 U.S.C. § 1146(a). A copy of this Order shall be appended to any deed or other recorded instrument in connection with the APA. The Clerks of all applicable Counties are hereby directed to allow the recording and transfer of title of real estate without the imposition of transfer or sale taxes.

18.     Any Governmental Authority whose approval, consent or comment is necessary for the transfer of the Permits to the Buyer are hereby directed that they shall transfer such Permits as provided by the procedures established by applicable law and subject to the terms herein and not withhold, delay or condition such transfer of the Permits upon the payment of any fines,  penalties, or taxes due to any person or Governmental Authority by the Debtors or any

representative, officer, related party, affiliate or the Chief Liquidating Officer to the Debtors. Any lawful fines, penalties and taxes shall be payable from the Purchase Price as may be directed by the Court or agreed upon by Buyer and the Debtors.

19.     Nothing contained in any plan of reorganization (or liquidation) confirmed in this case or the order confirming any plan of reorganization (or liquidation), nor any order entered in this case subsequent to the entry of this Sale Order (including any order dismissing the case or converting it to a Chapter 7 liquidation) shall conflict with or derogate from the provisions of the APA or any Related Agreement, any document or instrument executed in connection therewith, or the terms of this Sale Order.

20.     The Debtors are hereby authorized and directed to make all payments required to be made pursuant to the APA.

21.     The Buyer is a good faith purchaser within the meaning of section 363(m) of the Code and, as such, is entitled to the full protections of Section 363(m) of the Code. Buyer has proceeded in good faith in all respects in connection with this proceeding in that:

(i)     Buyer recognized that that Debtor was free to deal with any other party interested in acquiring the Purchased Assets;

(ii)    All payments to be made by Buyer in connection with the transaction have been disclosed; and

(iii)   Buyer has not violated Section 363(n) of the Code by any action or inaction.

22.     In the absence of a stay of this Sale Order, if the Buyer elects to close under the APA at any time after entry of this Sale Order but before it becomes a Final Order, then, with respect to the APA and the Related Agreements, the Buyer shall be entitled to the protection of

Section 363(m) of the Code if this Sale Order or an authorization contained herein subsequently is reversed or modified on appeal.

23.    As provided in Bankruptcy Rule 7062, this Sale Order shall be effective and enforceable immediately upon entry, and as provided in Bankruptcy Rules 6004(g) and 6006(d), this Sale Order shall not be stayed during the 10-day period after its entry unless a separate stay of this Sale Order is entered by a court of competent jurisdiction.

24.    The terms and provisions of the APA and the Related Agreements, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and also together with the terms and provisions of this Sale Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and creditors, and the Buyer, and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all persons asserting a claim against or interest in the Debtors' estates or any of the Purchased Assets to be sold to the Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee, custodian, examiner with expanded powers or responsible officer (each a "Responsible Person") for the Debtors under any chapter or section of the Code, as to which Responsible Person such terms and provisions likewise shall be binding in all respects.  The APA, the Related Agreements and the transactions contemplated thereby shall be specifically performable by and enforceable against and binding upon and shall not be subject to rejection or avoidance by the Debtors or any chapter 7 or chapter 11 trustee for the Debtors or their estates or any other person or entity on behalf of any Debtor.

25.    The failure to specifically include any particular provision of the APA or any Related Agreement in this Sale Order shall not diminish or impair the efficacy of such provisions, it being understood that the APA and the Related Agreements in their entirety are

being approved.  All provisions of this Sale Order, the APA and the Related Agreements are nonseverable and mutually dependent.

26.    The APA and any Related Agreement may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not materially and adversely affect the rights of the Debtors or the rights provided to creditors and parties in interest under the terms of this Order.

27.    The Debtor shall file a Report of Closing subsequent to the closing of the APA.


AGREED TO AND TO BE ENTERED:


**BUNCH & BROCK**

By:      /s/  W. Thomas Bunch
     **W. THOMAS BUNCH**
     805 Security Trust Building
     271 West Short Street
     Lexington, Kentucky 40507
     (859) 254-5522
     (859) 233-1434 FAX

ATTORNEYS FOR DEBTORS


**LEWIS GLASSER CASEY & ROLLINS, PLLC**

By:     /s/ Ann R. Starcher
     **ANN R. STARCHER**
     PO Box 1749
     Charleston, West Virginia 25326
     (304) 345-2000

ATTORNEY FOR A.T. MASSEY COAL COMPANY

**WISE DELCOTTO PLLC**

By:      /s/ Tracey N. Wise
      **TRACEY N. WISE**
      **LAURA DAY DELCOTTO**
      200 North Upper street
      Lexington, Kentucky 40507
      (859) 231-5800

ATTORNEYS FOR UNSECURED CREDITORS COMMITTEE

COPIES TO:

W. Thomas Bunch    via ECF
Ann R. Starcher    via ECF
Tracey N. Wise    via ECF
Master Service List No. 1 (Doc. No. 235)

Morgan H. Lyons
Hilda S. Lyons                Charles E. and Julia Compton
402 Locust Avenue         Crafton Coal Company
Philippi, WV 26416        PO Box 1050
                            Bridgeport, WV 26330
Badger Coal Company
PO Box 456                    Lucille Chesser
Philippi, WV 26416        c/o Morgan Lyons
                            402 Locust Avenue
Mike Ross, Inc.           Philippi, WV 26416
PO Box 173
Coalton, WV 26257        Dante Coal Company
                            Drawer 1560
Mike Ross, Inc.           Richlands, Virginia 24641
Box 219
Coalton, WV 26257        Josephine Simpson (successor to
                            Willa Kemper Smith, deceased)
Charles E. and Julia Compton    212 North Walnut AV
1275 Stout Street        Philippi, WV 26416
Bridgeport, WV 26330

Pursuant to Local Rule 9022-1(c), counsel for the Debtors shall cause a copy of this Order to be served on each of the parties designated to receive this Order pursuant to Local Rule 9022-1(a) and shall file with the Court a certificate of service of the Order upon such parties within ten (10) days hereof.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
***Joseph M. Scott, Jr.***
**Bankruptcy Judge**
**Dated: Thursday, November 12, 2009
(jms)**

## AGREEMENT

This Agreement (the "Agreement") is dated as of November 9, 2009, between (i) A. T. MASSEY COAL COMPANY, INC., a Virginia corporation (the "Buyer"), and (ii) APPALACHIAN FUELS, LLC, a Kentucky limited liability company, APPALACHIAN RESOURCES, LLC, a Kentucky limited liability company, APPALACHIAN ENVIRONMENTAL, LLC, a Kentucky limited liability company, and KANAWHA DEVELOPMENT CORPORATION, a West Virginia corporation (collectively referred to in the singular as the "Seller").

## RECITALS

A.      Each Seller is a debtor and debtor in possession in a bankruptcy case jointly administered under case no. 09-10343 (the "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court").

B.      Seller is engaged in the business of mining coal and activities directly or indirectly relating thereto,

C.      Seller has determined that it is in the best interest of Seller and its bankruptcy estate to sell and assign to Buyer all right, title and interest of Seller in and to the Purchased Assets, for the consideration, and upon the terms and conditions, hereinafter set forth.

NOW THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth herein and of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE 1 - DEFINITIONS

1.1 Definitions. Except as otherwise expressly defined in this Agreement, as used herein, the following terms have the meanings set forth below:

"Affiliate" means, with respect to a specific Person, any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. The term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract or otherwise.

"Assignment of Leases" means an Assignment of Leases substantially in the form attached hereto as Exhibit A.

"Bankruptcy Code" means 11 U.S.C. Sections 101, et seq.

"Business Days" means any day other than a Saturday, Sunday or other day on which national or state banking associations are required or permitted by law to be closed in Kentucky or West Virginia.

1

"Claim" means any action, suit, Proceeding, hearing, investigation, litigation, charge, complaint, claim, or demand.

"Cure Amounts" means the payment necessary to cure all monetary defaults under the Leases to allow the assumption and assignment of the Leases pursuant to this Agreement as described in Section 8.5(b)(xi). the known cure amounts at execution being those described on Exhibit C; provided, that, the Cure Amounts may not exceed the Purchase Price.

"Environmental Law" means any federal, state or local law, statute, rule, regulation, ordinance, and similar provision having the force and effect of law, all judicial or administrative orders or determinations and all common law, relating to or concerning pollution, preservation or protection of human health, safety, the environment, or natural resources, or the restoration of natural resources or the environment, including but not limited to any concerning the presence, use, control of, emission, discharge, Release or threatened Release of pollutants, contaminants, hazardous materials or wastes and all common law claims such as nuisance, negligence and trespass.

"Environmental Permit" means any permit, approval, certificate, registration, license or other authorization or consent required under any Environmental Law

"Governmental Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

"Hazardous Materials" means (a) petroleum or petroleum products, fractions, derivatives or additives, natural or synthetic gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls and radon gas; (b) any substances defined as or included in the definition of "hazardous wastes" "hazardous materials," "extremely hazardous wastes," "extremely hazardous substances" "restricted hazardous wastes," "toxic substances," "toxic chemicals" or "toxic pollutants," "contaminants" or "pollutants" or words of similar import under any Environmental Law; (c) radioactive materials, substances and waste, and radiation; and (d) any other substance exposure to which is regulated under any Environmental Law or with respect to which Liability or standards of conduct are imposed under any Environmental Law.

"Knowledge" or "Seller's knowledge" means the actual knowledge of James H. Frazier, III as the Chief Liquidating Officer, pursuant to an Agreed Final Order entered on July 24, 2008 by the Bankruptcy Court, after inquiry believed by him in good faith to be reasonable in the circumstances and, as applied to the Sellers, means such knowledge after such inquiry of the Sellers' principal operating and financial personnel.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority and includes, without limitation, all Environmental Laws.

"Leases" has the meaning given in Section 2.1(a).

"Liabilities" means all Indebtedness, obligations, claims and other liabilities of a Person, whether absolute, accrued, contingent, fixed or otherwise or whether due or to become due.

2

"Liens" means any mortgage, pledge, assessment, security interest, lease, judgment lien, tax lien, mechanic's lien, materialman's lien, other lien, adverse Claim, levy, charge, option, right of first refusal, charge, debenture, indenture, deed of trust, right-of-way, restriction, encroachment, license, lease, security agreement, or other encumbrance of any kind, and other restrictions or limitations on the use or ownership of real or personal property or irregularities in title thereto or any conditional sale contract, title retention contract or other contract to give any of the foregoing.

"Material Adverse Effect" means (a) an adverse effect on the validity or enforceability of this Agreement or any of the Related Agreements in any material respect, (b) an adverse effect on the condition (financial or other), business, assets, results of operations, ability to conduct business or properties of Seller or Buyer (as applicable), or the Purchased Assets, taken as a whole, in any material respect, or (c) an impairment of the ability of Seller or Buyer (as applicable) to fulfill its obligations under this Agreement or any of the Related Agreements in any material respect.

"Order" means any writ, judgment, decree, injunction, stay or similar order of any Governmental Authority or court of competent jurisdiction, including the Bankruptcy Court, or other administrative body with jurisdiction over any matters covered by this Agreement, in each such case whether preliminary or final.

"Outside Closing Date" has the meaning given in Section 9.1.

"Permits" has the meaning set forth in Section 2.1 (d).

"Permit Agreement" means the Permit Agreement substantially in the form attached hereto as Exhibit B.

"Permitted Lien" means any Lien (a) which is assumed or consented to by Buyer herein (including, without limitation, Liens included in the Assumed Liabilities), or (b) created by Buyer.

"Person" means any natural person, corporation, limited liability company, general partnership, limited partnership, proprietorship, other business organization, entity, trust, union, association or Governmental Authority.

"Proceeding" means any action, suit, proceeding, arbitration, investigation or audit, whether or not by any Governmental Authority.

"Purchase Price" has the meaning given in Section 3.3(a).

"Purchased Assets" has the meaning given in Section 2.1.

"Related Agreements" means the (a) the Assignment of Leases, (c) Permit Agreement and (d) any other agreement, certificate or similar document to be executed by any party hereto in connection with this Agreement.

"Related Person" has the meaning given in Section 6.2.

"Release" means any release, issuance, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any property, including the movement of Hazardous Materials through the air, soil, surface water, ground water or property other than as specifically authorized by and in compliance with all Environmental Laws.

3

"Ross Lease" means that certain Agreement of Lease between S. M. Kaemmerling and Badger Coal Company, dated April 25, 1955, as supplemented, amended and assigned, with Mike Ross, Inc. being the current lessor and Kanawha Development Corporation being the current lessee.

"Ross Litigation" has the meaning given in <u>Section 8.4(a)</u>.

"Sale Order" has the meaning given in <u>Section 8.5(b)</u>.

"Taxes" means any and all taxes, fees, levies, duties, tariffs, import and other charges, imposed by any taxing authority, together with any related interest, penalties or other additions to tax, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profit, environmental, custom duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

"Tax Return" means all federal, state, local, provincial and foreign returns, declarations, claims for refunds, forms, statements, reports, schedules, and information returns or statements, and any amendments thereof (including, without limitation, any related or supporting information or schedule attached thereto) required to be filed with any Taxing authority in connection with an Tax.

"Termination Fee Event" has the meaning given in <u>Section 9.2(b)</u>.

1.2    <u>Rules of Interpretation</u>,

(a)    The singular includes the plural and the plural includes the singular.

(b)    The word "or" is not exclusive.

(c)    A reference to a Person includes its permitted successors and permitted assigns.

(d)    The words "include," "includes" and "including" are not limiting.

(e)    A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated.  Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.

(f)    References to any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.

(g)    The words "hereof," "thereof," "herein," "therein," "hereunder" and "thereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

4

(h)    References to "days" shall mean calendar days, unless the term "Business Days" shall be used.

(i)    This Agreement is the result of negotiations among, and has been reviewed by, the parties hereto. Accordingly, this Agreement shall be deemed to be the product of all parties and no ambiguity shall be construed in favor of or against any party.

## ARTICLE 2 - PURCHASE AND SALE OF ASSETS

2.1    Purchase and Sale of Assets. Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of Seller's right, title, and interest in and to the following assets, free and clear of all Liens, except Permitted Liens, subject to approval of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code (the "Purchased Assets"):

(a) certain leased real property listed or identified on Schedule 2.1(a) as the same may relate to the Dante mining complex together with (A) any improvements erected or located thereon, (B) all land and interests in land, coal, coal reserves, mining, surface and mineral rights, including those within and under the boundaries of such scheduled real property or covered by the applicable Permits, (C) all prepaid royalties and deposits that relate thereto and (D) all other rights, privileges, easements and other appurtenances relating thereto (the "Leases").

(b) the permits, approvals, orders, authorizations, consents, licenses, certificates, franchises, exemptions of or filings or registrations with or issued by any Governmental Authority (and all pending applications therefor) as related to the Real Property and Purchased Assets and as listed or identified on Schedule 2.1(b), to the extent transfer is permitted by Law (the "Permits"); and

(c) all maps, reserve studies, engineering reports, and other records relating to the Leases, in each case whether in hard copy or electronic form.

2.2    Assumed Liabilities. At the Closing, Buyer will assume only the obligations of Seller under the Purchased Assets first arising after the Closing Date from or related to Buyer's ownership, possession or operation of the Purchased Assets, and no other Liabilities (the "Assumed Liabilities").

2.3    Excluded Liabilities. Notwithstanding anything to the contrary contained herein or any other agreement or instrument to the contrary, Buyer shall not assume, agree to pay or discharge or in any way be liable or responsible for, any Liabilities of Seller or any other Person except for the Assumed Liabilities. Without limiting the generality of the foregoing, Buyer shall not assume, and Seller, or any other Person, as the case may be, shall remain solely and exclusively liable and responsible for the following (the "Excluded Liabilities"):

(a) any Liabilities or obligations (whether absolute, contingent, or otherwise), including, without limitation, any such liabilities or obligations arising under any Environmental Law that accrue or result from any conditions, events or activities

5

occurring or existing on or before the Closing Date with respect to the Leases and the Premises;

(b)     any Liability or obligation of Seller for any Taxes of any kind accrued for, applicable to or arising from any period whether before, on or after the Closing Date;

(c)     any Liabilities or obligations which accrue with respect to the Excluded Assets, whether before, on or after the Closing Date; and

(d)     any Liability related to permits, approvals, orders, authorizations, consents, licenses, certificates, franchises, exemptions of, or filings or registrations with, or issued by any Governmental Authority other than those arising under the Permits, included in the Purchased Assets

2.4 <u>Transfer Taxes</u>. To the extent that the transactions proposed by this Agreement are not otherwise exempt under section 1146(c) of the Bankruptcy Code, Buyer shall be liable for all sales, use and other transfer Taxes and all filing and recording fees arising from or relating to the consummation of the transactions contemplated by this Agreement.

## ARTICLE 3 - <u>CLOSING AND DELIVERIES</u>

3.1     <u>Closing</u>. The parties shall hold a closing (the "Closing") on the third (3rd) Business Day after the conditions in <u>Article 7</u> have been satisfied or waived at 10:00 a.m. at a place mutually agreed to between the parties (the "Closing Date"). The transactions contemplated hereby shall take place pursuant to, and in accordance with, the protections afforded Buyer under section 363(m) of the Bankruptcy Code and the terms and conditions hereof.

3.2     <u>Seller's Deliveries</u>. The sale, transfer, assignment and delivery by Seller of the Purchased Assets to Buyer, as herein provided, shall be effected on the Closing Date by Seller's execution and delivery of the Related Agreements to which it is a party, and other instruments of transfer and conveyance reasonably satisfactory in form and substance to counsel for Buyer and Seller.

3.3     <u>Buyer's Deliveries</u>. At the Closing:

(a)     The aggregate consideration for the Purchased Assets paid by Buyer to Seller shall be Six Million One Hundred Thousand Dollars ($6,100,000.00) (the "Purchase Price"). The Purchase Price, less the Cure Amounts, shall be paid to Seller on the Closing Date.

(b)     Seller shall pay the Cure Amounts and provide written evidence of the same to Buyer out of the Purchase Price on the Closing Date.

(c)     Buyer shall execute and deliver to Seller the Related Agreements to which it is a party and such other agreements as are reasonably satisfactory in form and substance to counsel for Buyer and Seller.

## ARTICLE 4 - <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

In order to induce Seller to enter into this Agreement, Buyer makes the representations and warranties set forth below, which are true, correct and complete on the date hereof and shall be true, correct and complete as of the Closing:

6

4.1 Organization. Buyer is duly organized and validly existing under the Laws of the State of Virginia, and is authorized to do business in every jurisdiction in which the failure to be so qualified could result in a Material Adverse Effect. Buyer has all requisite corporate power and authority to own its properties and assets and to consummate the transactions contemplated hereby.

4.2    Authorization and Validity. Buyer has all requisite corporate power and authority to enter into this Agreement and the Related Agreements to which it is a party. The execution and delivery of this Agreement and the Related Agreements to which it is a party and the performance of the obligations hereunder and thereunder have been duly authorized by all necessary corporate action by Buyer. This Agreement and the Related Agreements, to which Buyer is a party has been, or will be, duly executed by Buyer and constitute its valid and binding obligation, enforceable against it in accordance with their terms.

4.3    Consents and Approvals. No consent, approval or action of, filing with or notice to, any Governmental Authority or any other Person, on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements to which Buyer is a party or the consummation of the transactions contemplated hereby or thereby.

4.4 Adequate Assurances Regarding Executory Contracts. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(i)(c) and 365(f) of the Bankruptcy Code with respect to the Leases.

4.5    Financial Advisors. Neither Buyer nor any Person on Buyer's behalf has agreed to pay any brokerage fee, finder's fee or commission which could reasonably be expected to become the obligation of Seller with respect to the transactions contemplated by this Agreement.

4.6    Financial Ability to Perform. Buyer has available to it funds sufficient to enable Buyer to deliver the Purchase Price to Seller as contemplated by this Agreement at the Closing and perform its obligations hereunder.

ARTICLE 5 - REPRESENTATION AND WARRANTIES OF SELLER

In order to induce Buyer to enter into this Agreement, each Seller jointly and severally makes the representations and warranties set forth below which are true, correct and complete on the date hereof and shall be true, correct and complete as of the Closing:

5.1    Organization. Based on Seller's knowledge, each Seller is duly organized and validly existing under the Laws of its state of incorporation or organization, and is authorized to do business in every jurisdiction in which the failure to be so qualified could result in a Material Adverse Effect. Each Seller has all requisite corporate or. limited liability company power and authority to own its properties and assets and to consummate the transactions contemplated hereby, subject to (a) the Bankruptcy Court's entry of the Sale Order and (b) the receipt of the consents, waivers, authorizations and approvals set forth in Section 5.2.

5.2 Consents and Approvals. Based on Seller's knowledge, Schedule 5.2 sets forth a true and complete list of each material consent, waiver, authorization or approval of any Governmental Authority (other than the Bankruptcy Court's entry of the Sale Order) or of

7

any other Person that is required in connection with the execution, delivery and performance of this Agreement and the Related Agreements.

5.3    Compliance with Law. Based on Seller's knowledge, Seller is in material compliance with all Laws in respect of the ownership and operation of the Purchased Assets and has not received written notice of any violation of any Law, nor is Seller in default with respect to any Order, applicable to the Purchased Assets, other than violations or defaults that have been abated or which would not reasonably be expected to result in a Material Adverse Effect.

5.4    Litigation. Based on Seller's knowledge, except for the Bankruptcy Case and the Ross Litigation, there are no Claims, actions, suits, Proceedings or investigations related to the Purchased Assets pending or, to Seller's knowledge, threatened, before any federal or state court or Governmental Authority brought by or against Seller. Further, there are no facts or circumstances known to any Seller that could reasonably be expected to give rise to any Claim, action, suit, Proceeding or investigation that would be required to be disclosed pursuant to this Section. There are no material Orders outstanding against Seller with respect to the Purchased Assets.

5.5    Environmental Matters. Based on Seller's knowledge, each Seller that is transferring any Real Property or Permit pursuant to this Agreement represent and warrant that, with respect to any such Seller's Purchased Assets:

(a)    Such Seller is in compliance in all material respects with all Environmental Laws.

(b)    Without limiting the generality of the foregoing, such Seller has obtained and maintains in effect all Environmental Permits required for the occupation of the Purchased Assets or operation of the Purchased Assets and is in compliance in all material respects with all such Environmental Permits. No such Environmental Permit is subject to renewal, amendment or modification other than in the ordinary course of such Seller's operation of the Purchased Assets, and there are no pending, or to the best of such Seller's knowledge, any threatened actions to revoke or terminate any such Environmental Permits.

(c)    Since the Petition Date, such Seller has not received any written notice, communication or other information, whether from a Governmental Authority, citizens group, Employee or otherwise, that alleges a material violation of or material Liability under any Environmental Law with respect to such Seller's Purchased Assets.

(d)    No material Release of Hazardous Materials has occurred on or beneath the Real Property owned, leased or occupied by such Seller based upon rules, regulations and laws in existence as of the date of this Agreement and no Hazardous Materials are present based upon rules, regulations and laws in existence as of the date of this Agreement in any material amounts at any such Real Property, except for inventories of Hazardous Materials to be used, and wastes generated there from, in the ordinary course of business of such Seller (which inventories and wastes, if any, were and are stored or disposed of in accordance with applicable Environmental Laws).

8

(e)    To the best of such Seller's knowledge, since January 1, 2004 no such Seller or its respective predecessors or Affiliates has treated, stored, transported, disposed of arranged for or permitted the disposal of handled or released any Hazardous Materials or owned or operated any Purchased Asset or facility so as to give rise to any material Liability under any Environmental Law, other than any Black Lung Liabilities or any Liabilities arising under the Surface Mining Control and Reclamation Act of 1977, as amended, or any similar federal or state mine reclamation law.

5.6    Leased Real Property.

(a)    To Seller's knowledge and except as disclosed on Schedule 5.6, (i) Seller has delivered to Buyer correct and complete copies of the Leases, (ii) Seller has not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the Leases, and (iii) Seller has made available to Buyer copies of all engineering studies, environmental impact reports or assessments, coal reserves and coal quality studies and other reports and studies that are in its possession or control relating to the Premises.

(b)    To Seller's knowledge, none of the real property that is the subject of the Leases or the improvements conveyed by Seller or the use thereof contravenes or violates any building, zoning, administrative, occupational safety and health or other applicable Laws in any material respect. Seller has not received notice of, and has no knowledge of any Proceedings pending or, to the knowledge of Seller, threatened regarding the ownership, use or possession of the real property that is the subject of the Leases, including subsidence claims, condemnation, expropriation or similar Claims.

(c)    To Seller's knowledge, Seller is not a party to any lease, assignment or similar arrangement under which Seller is a lessor or assignor with respect to any of the real property that is the subject of the Leases other than to an Affiliate or under which any portion of such real property is made available for use by an other party other than an Affiliate (collectively, "Affiliate Arrangements").

5.7    Permits. Based on Seller's knowledge, each Seller's permits and licenses set forth on Schedule 2.1(b) are binding, valid and in full force and effect and, except for any defaults, violations or failure to obtain permit-related waivers which (a) can reasonably be abated in the ordinary course of the Buyer's continuing operations under the Permits being acquired, or (b) would not otherwise prevent the transfer of any of the Permits to Buyer in accordance with the terms of this Agreement, such Seller (i) is not in default under or in violation of; and no condition exists that with notice or lapse of time or both would constitute a default under or a violation of, any such permit, and (ii) has obtained all such waivers. Except for any defaults, violations or failure to obtain waivers which (i) can reasonably be abated in the ordinary course of the Buyer's continuing operations under the Permits being acquired, or (ii) would not otherwise prevent the transfer of any of the Permits to Buyer in accordance with the terms of this Agreement, no Seller transferring any Permits is, or has received any notice that it is, in default (or with the giving of notice or lapse of time or both, would be in default) under any such permits or licenses, except for any such default or violation that has been abated.

5.8    Permitting. Based on Seller's knowledge, neither such Seller nor any Person that, together with its Affiliates, owns ten percent (10%) or more of the equity interests of such Seller has been subject to any bond forfeiture, permit suspension or revocation or similar effort or Proceeding instituted by any Governmental Authority that would prohibit

9

or materially adversely effect the transfer of such Seller's Permits to the Buyer; provided, however, that no Seller shall be deemed to have breached this Section if it is untrue as a result of any facts or circumstances relating to any holder of equity interests of any Seller, or parent of any Seller of which such Seller does not have knowledge

## ARTICLE 6 - REPRESENTATIONS AND WARRANTIES - GENERAL

6.1     Warranties Exclusive. Except as stated in Article 5, Buyer acknowledges that Seller has made no representations and/or warranties and that all other express or implied warranties are disclaimed.

6.2     As Is. Where Is. Without limiting the foregoing, Buyer acknowledges that the Purchased Assets are conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE PURCHASED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE PURCHASED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) EXCEPT AS EXPRESSLY PROVIDED HEREIN, ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS, OR (D) EXCEPT AS EXPRESSLY SET FORTH IN ARTICLES, THE CONDITION OF THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. "Related Person" means, with respect to a specific Person, any officer, director, employee, agent, shareholder, representative, successor or assign of such Person.

## ARTICLE 7 - CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

7.1     Conditions Precedent to Performance by Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by Seller in its sole discretion;

(a)     Representations, Warranties and Obligations of Buyer. All representations and warranties made by Buyer in Article 4 taken as a whole, shall be true and correct in all material respects on the date of this Agreement and on and as of the Closing Date (except to the extent that any such representation and warranty is made as of a specified date, in which case such representation and warranty shall continue to be made as of such specified date), and the covenants and agreements of Buyer to be performed on or before the Closing Date shall have been duly performed in all material respects in accordance with this Agreement, and Seller shall have received a certificate, dated the Closing Date and signed by an officer of Buyer, to that effect.

7.2     Conditions Precedent to Performance by Buyer. The obligation of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

10

(a)    Representations, Warranties and Obligations of Seller. All representations and warranties made by Seller in Article 5 taken as a whole, shall be true and correct in all material respects on the date of this Agreement and on and as of the Closing Date (except to the extent that any such representation and warranty is made as of a specified date, in which case such representation and warranty shall continue to be made as of such specified date), and the covenants and agreements of Seller to be performed on or before the Closing Date shall have been duly performed in all material respects in accordance with this Agreement, and Buyer shall have received a certificate, dated the Closing Date and signed by an officer of Seller, to that effect.

(b)    Transfer Free of Liens. The Purchased Assets shall be transferred to Buyer free and clear of all Liens and Liabilities, except for Permitted Liens and the Assumed Liabilities.

(c)    No Seller Material Adverse Effect. Except as specifically disclosed on the schedules to this Agreement, there shall not have occurred any Material Adverse Effect or any event or development which, individually or together with such other events, could reasonably be expected to result in a Material Adverse Effect

(d)    Consents and Approvals. All consents, approvals and actions of, filings with and notices to any Governmental Authority or other Person necessary to permit the Buyer and the Sellers to perform their obligations under this Agreement and the Related Agreements and to consummate the transactions contemplated hereby and thereby, including all Environmental Permits, other than such filings, consents, notices or approvals which are not required under any Law to be made or obtained on or before the Closing Date or, if not made or obtained before the Closing, would not reasonably be expected to (i) materially adversely affect the Buyer's use or operation of the Purchased Assets, taken as a whole, after the Closing, or (ii) result in a Seller Material Adverse Effect, shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the Buyer, shall not be subject to the satisfaction of any condition that has not been satisfied or waived, and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the consummation of the transactions contemplated by this Agreement and the Related Agreements shall have occurred.

7.3    Conditions to each Party's Obligations. The respective obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver on or before the Closing of the following conditions:

(a)    Bankruptcy Court Approval of Sale Order, The entry of the Sale Order by the Bankruptcy Court, which order is not subject to a stay pending appeal, approving the sale of the Purchased Assets pursuant to the terms hereof and in the manner set forth in Section 8.5. Seller shall provide all holders of Liens and Claims (including all landlords, mortgagees, creditors and shareholders, to the extent required by the Bankruptcy Code) on the Purchased Assets notice of Seller's bankruptcy case and the Bankruptcy Court's entry of the Sale Order approving the transactions contemplated by this Agreement, copies and proof of service of which, together with certified copies of the Sale Order, shall be delivered to Buyer and filed with the Bankruptcy Court on or before the Closing.

(b)    Injunctions. There shall not be outstanding any Order prohibiting the consummation of the transactions contemplated by this Agreement and no action shall

11

have been commenced which could reasonably be expected to prohibit the consummation of the transactions contemplated hereby.

(c) <u>No Change in Law</u>. There shall not have been any action taken or any statute enacted by any Governmental Authority which would render the parties unable to consummate the transactions contemplated hereby or make the transactions contemplated here by illegal or prohibit the consummation of the transactions contemplated hereby.

## ARTICLE 8 - COVENANTS

8.1    <u>Covenants of Seller</u>. Seller covenants as follows:

(a) <u>Access to Properties and Records: Confidentiality</u>. Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access during normal business hours throughout the period before the Closing (or the earlier termination of this Agreement pursuant to <u>Article 10</u>) to all books and records of Seller relating to the Purchased Assets and the Assumed Liabilities. Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account Seller's resources and other commitments, during normal business hours, to all Purchased Assets throughout the period before the Closing. During the period from the date hereof to the Closing Date, all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this Section or otherwise) will be governed and protected by the confidentiality agreement executed by Buyer.

(b) <u>Further Assurances</u>. At the request and the sole expense of Buyer, at any time after the Closing Date, Seller shall execute and deliver such documents as Buyer or its counsel may reasonably request to effectuate the purposes of this Agreement.

(c) <u>Affiliate Arrangements</u>. Seller will terminate any Affiliate arrangements prior to Closing.

(d) <u>Rejected Leases</u>. Without the express consent of Buyer, Seller agrees that it will not reject any Lease in any Bankruptcy Case following the date hereof unless this Agreement is terminated in accordance with its terms. Seller will withdraw the Leases from any pending motion to reject filed in the Bankruptcy Case.

8.2    <u>Covenants of Buyer</u>. Buyer covenants as follows:

(a) <u>Financing</u>. Buyer covenants and agrees to do all things necessary to pay the Purchase Price.

(b) <u>Access to Books and Records</u>. Buyer agrees to furnish or cause to be furnished to Seller, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any inquiry from any Governmental Authority relating to Tax matters. Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Purchased Assets or the Assumed Liabilities that are in existence on the

12

Closing Date and transferred to Buyer hereunder, or (ii) coming into existence after the Closing Date that relate to the Purchased Assets or the Assumed Liabilities before the Closing, for a period of at least six years from the Closing Date, and will give Seller notice and an opportunity to retain any such records if Buyer determines to destroy or dispose of any or all of them after such period. In addition, from and after the Closing, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Purchased Assets or the Assumed Liabilities as Seller may deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding or answer or (y) administer or complete any cases of Seller under Chapter 11 of the Bankruptcy Code (and Buyer shall give Seller notice and an opportunity to retain any such records if Buyer determines to destroy and dispose of any or all of them prior to the completion of such cases). Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Purchased Assets or the Assumed Liabilities.

(c)     Notification by Buyer of Certain Matters. Buyer agrees to notify Seller in writing promptly upon Buyer's or its authorized representatives' discovery of any information prior to the Closing Date relating to Seller or the operations by Seller of the business which constitutes (or would constitute) or indicates (or would indicate) a breach of any representation, warranty or covenant of Seller contained herein.

(d)     Adequate Assurances Regarding Leases. With respect to the Leases, Buyer shall provide adequate assurance of the future performance by Buyer.

8.3     Covenants of the Parties.

(a) Consents. The parties shall promptly apply for and diligently prosecute all applications for, and shall use commercially reasonable efforts promptly to obtain, such consents, authorizations and approvals from such Governmental Authorities and third parties as shall be necessary or appropriate to permit the consummation of the transactions contemplated by this Agreement, and shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions necessary to effect the consummation of the transactions contemplated by this Agreement. Notwithstanding anything to the contrary contained herein, the parties hereto agree that as a condition to obtaining the consent of any third party to any real property lease, personal property lease or any other agreement to permit the consummation of the transactions contemplated hereby, no party hereto shall have any obligation to (i) pay any remuneration to third parties in exchange for such party's consent or approval; (ii) file any lawsuit or take other legal action as against such third party with respect to any thereof; or (iii) make any amendment thereof or waive any rights thereunder if as a result of such amendment or waiver such real property lease, personal property lease or any other agreement would contain terms and conditions that are less favorable in any material respect than the terms and conditions of such coal supply contract, real property lease or personal property lease as in existence on the Closing Date. Each party will also use all reasonable efforts to take or cause to be taken all actions necessary, proper or advisable to comply with all legal requirements that may be imposed on it with respect to this Agreement and the transactions contemplated hereby, and, subject to the provisions hereof, to consummate the transactions contemplated by this Agreement as promptly as applicable.

13

(b)      Tax Exemption. Each party hereto agrees to use commercially reasonable efforts to caused the Sale Order to provide that the sale of the Purchased Assets shall be exempt from stamp or similar Taxes pursuant to 11 U.S.C. § 1146(c).

(c)      Cooperation. Whether before or after the Closing, Seller and Buyer shall cooperate with one another and provide commercially reasonable assistance as needed to the other to effect assignment of the Leases.

(d)      Indemnification. Buyer and Seller shall indemnify and hold harmless the other, its Affiliates, and their respective Related Persons from and against any and all Liabilities and Claims arising from or related to the other's breach of any representation, warranty or covenant contained herein or in any Related Agreement.

8.4    Ross Litigation.

(a)      The Ross Lease is the subject of litigation styled *Mike Ross, Inc. v. Appalachian Environmental, LLC*, being case no. 05-P-33 in the Circuit Court for Barbour County, WV as removed to the Bankruptcy Court and referenced as A.P. no. 09-1017 (the "Ross Litigation").

(b)      Upon entry of the Sale Order, or before, if agreed by Seller and Buyer, Buyer shall, at its cost and using its own counsel, have the right to pursue all Claims and defenses belonging to the Debtor arising before and after the date of this Agreement of any kind, character, type, nature and description, in law or in equity, if any, related to the Ross Lease and the Ross Litigation. Buyer shall have the right after Closing to compromise all or any part of the Ross Litigation, but Seller shall not, without the approval of Buyer, compromise the Ross Litigation at any time.

(c)      Seller agrees that Buyer may intervene in the Ross Litigation and assert the rights of Seller therein. Further, to the extent any Claim or defense may only be asserted by Seller itself or as a trustee in bankruptcy, Seller agrees that Buyer may assert and litigate such claims or defenses in its name, or a successor's name, and Seller shall, if necessary or required by the Bankruptcy Court, Bankruptcy Code and/or the Federal Rules of Bankruptcy Procedure, appoint Buyer to litigate such Claims or defenses and shall file or cause to be filed all papers necessary for such appointment,

8.5    Bankruptcy Action.

(a)      Seller shall file with the Bankruptcy Court a motion and a form of order or orders (the "Sale Order") pursuant to Section 363 and other applicable provisions of the Bankruptcy Code in form and substance acceptable to Buyer in its reasonable discretion (x) authorizing and approving the sale of the Purchased Assets to Buyer pursuant to this Agreement, (y) approving the terms of this Agreement, and (z) making the following findings:

(i)      the Bankruptcy Court has "core" jurisdiction over the Bankruptcy Case;

(ii)      due and proper notice of the sale of the Purchased Assets to Buyer has been given to all parties entitled thereto in accordance with all applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court;

14

(iii)    the Purchased Assets are property of Seller's estate, within the meaning of Section 541 of the Bankruptcy Code, and that upon entry of the Sale Order, Seller will have the power to convey the property to Buyer;

(iv)    for each Lien on the Purchased Assets that does not constitute a Permitted Encumbrance or an Assumed Liability, subsection of Section 363(f) of the Bankruptcy Code applies, and, upon consummation of the transactions contemplated by this Agreement, the Purchased Assets will be sold to Buyer free and clear of such Lien;

(v)    the Bankruptcy Court has authorized the assumption by the applicable Seller and the assignment to Buyer of the Leases, all in the manner and subject to the terms and conditions set forth in the Agreement and in the Sale Order;

(vi)    the Purchased Assets have been reasonably marketed, and the offer of Buyer is the best offer received by Seller's estate and, accordingly, it is in the best interest of Seller's estate and its creditors that the sale of the Purchased Assets to Buyer be approved;

(vii)    Buyer is acting in good faith, and is entitled to the protections of Buyer under Section 363(m) of the Bankruptcy Code, and reversal or modification of the Sale Order on appeal will not affect the validity of the sale of the Purchased Assets to Buyer;

(viii)    each objection to the sale of the Purchased Assets to Buyer has either been withdrawn with prejudice or is specifically overruled on the merits;

(ix)    any competitive bidding in connection with the sale of the Purchased Assets has been non-collusive and the sale of the Purchased Assets to Buyer may not be set aside under Section 363(n) of the Bankruptcy Code;

(x)    this Agreement is approved, and Seller is authorized and directed to enter into and perform it according to its terms;

(xi)    the Cure Amounts are correct and, if paid, there are no other payments or actions required to cure any defaults under the Leases;

(xii)    Buyer is capable of performing under the Leases as required by Sections 365(b)(i)(C) and 365(f) of the Bankruptcy Code;

(xiii)    the Bankruptcy Court retains jurisdiction to construe and enforce the Sale Order; and

(xiv)    such other findings and provisions as may be reasonably requested by Buyer.

(c)    If Seller is authorized to enter into an alternative transaction, the Sale Order shall provide that in the event that the alternative transaction does not close by the Outside Closing Date, Buyer shall have the sole option to close on the same terms and conditions as provided herein within ten (10) days after receiving written notice from Seller of the failure to close.

15

(d)    Seller and Buyer shall each use their reasonable best efforts, and shall cooperate, assist and consult with each other, to secure the Bankruptcy Court's approval of the Sale Order by such date as will reasonably allow the Closing to occur not later than the Outside Closing Date. Seller and Buyer shall consult with, and seek the advice of, one another regarding pleadings that any of them intend to file, or positions any of them intend to take, with the Bankruptcy Court in connection with or which might reasonably affect, the Bankruptcy Court's approval of the sale of the Purchased Assets. Neither Seller nor Buyer shall file any pleading or take any position that is inconsistent with obtaining the Bankruptcy Court's approval of any such order.

(e) If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to the Sale Order or other such order), Seller and Buyer shall cooperate in taking such steps diligently to prosecute such appeal, petition or motion and each of Seller and Buyer shall use its reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

8.6 Transition. Seller shall cooperate with Buyer and shall provide commercially reasonable assistance in effecting transfers of vendor accounts and services at the time of the Closing so as to avoid interruption or temporary cessation of operations as a result of change of ownership.

ARTICLE 9 - TERMINATION

9.1 Termination. This Agreement may be terminated:

(a)    By mutual consent of Buyer and Seller;

(b)    By Buyer after November 20, 2009 (the "Outside Closing Date"), or such later date to which the Closing has been extended by agreement of Buyer, if the Closing has not occurred by such date; provided, however, that as of such date Buyer is not in default under this Agreement;

(c)    Provided the terminating party is not otherwise in material default or breach of this Agreement, and has not failed or refused to close without justification hereunder, by either Buyer or Seller, without prejudice to other rights and remedies which the terminating party may have, if the other party shall (i) have materially failed to perform its covenants or agreements contained herein required to be performed on or prior to the Closing Date, or (ii) have materially breached any of its representations or warranties contained herein; provided, however, that in the case of clause (i) or (ii), the defaulting party shall have a period of ten (10) days following written notice from the non-defaulting party to cure any breach of this Agreement, if such breach is curable, but in no event later than the Outside Closing Date;

(d)    By either Seller or the Buyer if the Bankruptcy Court confirms a plan of reorganization for the debtors in the Bankruptcy Case that does not contemplate the transactions contemplated by this Agreement.

(e)    By Buyer, if the form of Sale Order is not, in form and substance, reasonably acceptable to Buyer or does not provide Buyer the protection afforded by Section 363(m) of the Bankruptcy Code;

16

(f)     By either Seller or Buyer if (A) any court of competent jurisdiction (other than the Bankruptcy Court) or other competent Governmental Authority has issued an order which has become final and nonappealable or (B) any Law (other than the Bankruptcy Code) is in effect, in either case restricting, restraining or altering in a material manner or enjoining or otherwise prohibiting or making illegal the effectuation of the transactions contemplated by this Agreement.

9.2     Effect of Termination: Remedies. In the event of termination pursuant to Section 9.1, this Agreement shall become null and void and have no effect (other than Articles 9 and 10, which shall survive termination), with no Liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the Liability of a party for its own expenses pursuant to Section 10.1, provided, however that any such termination shall be without prejudice to the rights of any party hereto arising out of the material breach by any other party of any covenant or agreement contained in this Agreement.

## ARTICLE 10-PERMITS

10.1    Permit Transfers. As soon as practicable after the Closing, the Buyer, with the cooperation of the Sellers, shall promptly prepare and file all documents and information necessary to obtain, and shall diligently pursue to the extent transfer is permitted under applicable Laws, the transfer to the Buyer of the Permits, including the Environmental Permits as identified in Schedule 2.1(b), and any others necessary to operate the Purchased Assets. The Sellers shall cooperate with the Buyer in all respects to file and prosecute such applications at the sole cost and expense of the Buyer.

10.2    Permit Maintenance. The Sellers will use commercially reasonable efforts to cause the Permits to be retained in the name of Sellers in order to allow the transfer of the Permits to Buyer.  Pending transfer of the Permits to the Buyer by Governmental Authorities, Buyer shall have the right to conduct operations under the Permits to the extent permitted by Law and Buyer agrees to indemnify and hold Sellers harmless from any and all claims arising from any activities conducted on or after the Closing Date on the Permits. In furtherance thereof and in conjunction with the transfer applications referenced above, Sellers shall execute all applications or documents, in the form required by applicable Law, necessary to allow Buyer to exercise its rights under this Section for any period prior to completion of the transfer of the Permits, including applications for temporary operator reassignment under the Permits.

10.3    Notices of Violation. If the Sellers receive a notice of violation under any Permit following the Closing Date, but before the transfer of the Permit, the Sellers will give Buyer prompt notice thereof. If such notice relates to operations conducted by Sellers prior to Closing Date, the Sellers shall cure such alleged violation.  If such notice relates to operations conducted after the Closing Date, Buyer and Sellers shall cooperate together (at Buyer's sole cost and expense) to cure the alleged violation. To the extent Buyer is responsible for curing a violation, and Sellers determine, in their reasonable discretion, that Buyer will not cause such violation to be cured in a timely fashion, the Sellers shall have the right to cure, or cause to be cured, such violation; provided, however, that Buyer

shall have the right to contest in good faith any such violation, and the Sellers shall not take any action to cure, or cause to be cured, such violation until the good faith contest of such violation by Buyer has been completed.

## ARTICLE 11 - MISCELLANEOUS

11.1 <u>Expenses.</u> Whether or not the transactions contemplated hereby are consummated, Seller and Buyer shall bear their own expenses, including, without limitation, fees, disbursements and other costs of any brokers, finders, investment bankers, attorneys, accountants and other advisors, in connection with this Agreement and the transactions contemplated hereby.

11.2 <u>Notices.</u> All notices under this Agreement shall be given to the parties at the following addresses (i) by personal delivery; (ii) by facsimile transmission; (iii) by registered or certified mail, postage prepaid, return receipt requested; or (iv) by nationally recognized overnight or other express courier services:

(a)    If to Buyer:
A. T. Massey Coal Company, Inc.
Attn: President
P.O. Box 26765
Richmond, VA  23261-6765

With a copy to:
Massey Energy Company
Attn:  General Counsel
315 70th St.
Charleston, WV  25304

Lewis, Glasser, Casey & Rollins, PLLC
Attn:  Ann R. Starcher
P.O. Box 1746
Charleston, WV  25326

(b)    If to Seller:
Appalachian Fuels, LLC
Appalachian Resources, LLC
Kanawha Development Corporation
Attn: James H. Frazier
Chief Liquidating Officer
McBrayer, McGinnis, Leslie & Kirkland
163 W Short St, Ste 300
Lexington, KY 40507-1378

With a copy to:

W. Thomas Bunch Sr.
Bunch & Brock
805 Security Trust Building
271 West Short Street
Lexington, Kentucky 40507

18

All notices shall be effective and shall be deemed delivered (i) if by personal delivery, on the date of delivery if delivered during normal business hours of the recipient, and if not delivered during such normal business hours, on the next business Day following delivery; (ii) if by facsimile transmission, on the next business Day following dispatch of such facsimile; (iii) if by national courier service for next business Day delivery, on the third ($3^{rd}$) business Day after dispatch thereof; and (iv) if by mail, on the next business Day after dispatch thereof. Any party hereto may change its address by notice to all parties hereto delivered in accordance with this Section 10.2.

11.3 <u>Amendments</u>. No supplement, modification or waiver of this Agreement shall be binding unless in writing and executed by each party hereto.

11.4 <u>Waiver</u>. At any time prior to the Closing, Buyer or Seller may (a) extend the time for the performance of any of the obligations or other acts of the other party hereto, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the obligations of the other party or any of the conditions to its own obligations contained herein to the extent permitted by law. Any agreement on the part of Buyer, on the one hand, and Seller, on the other hand, to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of Buyer and Seller. The failure of a party to exercise any right or remedy shall not be deemed or constitute a waiver of such right or remedy in the future. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other similar or dissimilar provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

11.5 <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11.6 <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties, provided, however, that Buyer shall be permitted and required to assign all of its rights and interests hereunder to any Person who purchases the equity interests or substantially all of the assets of the business from Buyer or any of its Affiliates. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective successors and assigns.

11.7 <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their successors and permitted assigns, and nothing in this Agreement, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement

11.8 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties hereto.

11.9 <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this

19

Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such which may be hereafter declared invalid, void or unenforceable. In such case, the parties hereto shall promptly meet and negotiate substitute provisions for those rendered or declared illegal or unenforceable so as to preserve as nearly as possible the contemplated economic effects of the transactions contemplated hereby.

   11.10  <u>Entire Agreement</u>. This Agreement and the exhibits and schedules hereto and the Related Agreements constitute the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, among the parties hereto with respect to the subject matter hereof and thereof. There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby.

<div align="center">[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]</div>

<div align="center">20</div>

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of Buyer and Seller on the date first above written.

A. T. MASSEY COAL COMPANY, INC.

By: _____

Name: Michael D. Bauersachs

Title: Vice President

("Buyer")

APPALACHIAN FUELS, LLC

By: _____

Name: James H. Frazier III

Title: Chief Liquidating Officer

APPALACHIAN RESOURCES, LLC

By: _____

Name: James H. Frazier III

Title: Chief Liquidating Officer

KANAWHA DEVELOPMENT CORPORATION

By: _____

Name: James H. Frazier III

Title: Chief Liquidating Officer

APPALACHIAN ENVIRONMENTAL, LLC

By: _____

Name: _James H. Frazier III_

Title: _Chief Liquidating Officer_

(collectively, "Seller")

## SCHEDULE 2.1(a)

### ("Leases")

1. Lease dated October 17, 1978, by and between Morgan H. Lyons and Hilda S. Lyons and Badger Coal Company, as supplemented, amended and assigned.

2. Lease dated February 20, 1979, by and between Morgan H. Lyons and Hilda S. Lyons and Badger Coal Company, as supplemented, amended and assigned.

3. Agreement of Lease dated April 25, 1955, by and between S. M. Kaemmerling and Badger Coal Company, as supplemented, amended and assigned.

4. Lease dated August 2, 1978, by and between Chas. E. Compton and Julia C. Compton and Badger Coal Company, as supplemented, amended and assigned.

5. Lease dated August 2,1978, by and between Chas. E. Compton and Julia C. Compton and Badger Coal Company, as supplemented, amended and assigned.

6. Lease dated April 4, 1977, by and between Lucille C. Chesser and Badger Coal) Company, as supplemented, amended and assigned.

7. Lease dated September 21, 1966, with Willa Kemper Smith involving a 213 a. parcel, which interest is now in one or more of the Sellers.

## SCHEDULE 2.1(b)

("Permits")

Mining and NPDES  Permits issued by the West Virginia Department of Environmental
Protection held by Appalachian Fuels, LLC

D-163
EM-103
EM-110
O-102-83
P-713
R-649
WV0004421
WV0033073

## SCHEDULE 5.2

### ("Consents and Approvals")

**NONE**

## SCHEDULE 5.6

### ("Encumbered Leases")

**NONE**

## **EXHIBIT A**

(Assignment of Leases)

## ASSIGNMENT OF LEASES

This Assignment of Leases (this "Agreement") is made and effective as of _____, 2009, by and among (i) **APPALACHIAN FUELS, LLC**, a Kentucky limited liability company, **APPALACHIAN RESOURCES, LLC**, a Kentucky limited liability company, and **KANAWHA DEVELOPMENT CORPORATION**, a West Virginia corporation (the "Sellers"), and (ii)_____, a West Virginia corporation ("Buyer").

## RECITALS

A.    This Agreement is entered into to effect the transactions contemplated by that certain Agreement dated November 9, 2009, by and between Sellers and Buyer (the "Agreement"). Capitalized terms used herein but not otherwise defined shall have the meaning given to them in the Agreement.

B.    One or more of the Sellers is a party to the Leases described on <u>Schedule 1</u> attached hereto and incorporated herein by reference ("Leases").

C.    The Sellers desire to assign to the Buyer, and the Buyer desires to assume, all of the Sellers' right, title and interest in and to the Leases, pursuant to the terms of the Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Assignment</u>. The Sellers assign, transfer and set over unto Buyer all of Sellers' right, title, interest in, to and under the Leases.

2.    <u>Assumption</u>. The Buyer assumes all of Sellers' rights, title, interest, duties and obligations in, to and under the Leases and agrees to be bound by all of the terms and conditions of the Leases and agrees to pay, perform and discharge, all duties and obligations of the Sellers under the Leases that arise on or after the date hereof, subject to the conditions and limitations in the Agreement and the Sale Order.

3.    <u>Conflict</u>. This Agreement is subject to all the terms and conditions of the Agreement. No provision of this Agreement shall be deemed to enlarge, alter or amend the terms or provisions of the Agreement. Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Agreement and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

4.    <u>Governing Law</u>. This Agreement shall be governed by and construed according to the laws of the Commonwealth of Kentucky without regard to or application of its conflict of laws rules.

5.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts (including by means of facsimile or e-mail signature pages) and all such counterparts taken together shall constitute one and the same Agreement.

1

6.      Severability. If any provision of this Agreement or its application will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired. If any court shall determine that any provision of this Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

7.      Entire Agreement. All prior negotiations and agreements by and among the parties hereto with respect to the subject matter hereof are superseded by this Agreement and the Agreement, and there are no representations, warranties, understandings or agreements with respect to the subject matter hereof other than those expressly set forth in this Agreement, the Agreement and the related Agreements.

8.      Headings. Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any provision in it.

IN WITNESS WHEREOF, the parties hereto have caused their authorized representatives to execute this Agreement as of the date first set forth above.

SELLERS:                    APPALACHIAN FUELS, LLC

By:_____

Its: _____

APPALACHIAN RESOURCES, LLC

By: _____

Its: _____

KANAWHA DEVELOPMENT CORPORATION

By: _____

Its: _____

(collectively, the "Sellers")


BUYER:

By: _____

Its: _____

2

("Buyer")

STATE OF _____,

COUNTY OF _____, to-wit:

    Subscribed and sworn before me by _____, as _____,
on behalf of Appalachian Fuels, LLC on this ____ day of _____, 2009.

                                 _____
                                 Notary Public

                                 My commission expires: _____.

STATE OF _____,

COUNTY OF _____, to-wit:

    Subscribed and sworn before me by _____, as _____,
on behalf of Appalachian Resources, LLC on this ____ day of _____, 2009.

                                 _____
                                 Notary Public

                                 My commission expires: _____.

STATE OF _____,

COUNTY OF _____, to-wit:

    Subscribed and sworn before me by _____, as _____,
on behalf of Kanawha Development Corporation on this ____ day of _____, 2009.

                                 _____
                                 Notary Public

                                 My commission expires: _____.

3

STATE OF _____,

COUNTY OF _____, to-wit:

    Subscribed and sworn before me by _____, as _____,
on behalf of _____ on this _____ day of _____, 2009.

_____
Notary Public

My commission expires: _____.

## **Schedule 1**

(Leases)

# EXHIBIT B

## ("Permit Agreement")

## PERMIT AGREEMENT

THIS PERMIT AGREEMENT ("Permit Agreement") is entered into and effective as of the [__] day of November, 2009, by and between _____ (individually "Seller" and together "Sellers") and _____ ("Buyer"). Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement (hereinafter defined).

WHEREAS, Seller and A. T. Massey Coal Company, Inc., the parent company of Buyer, are parties to an Asset Purchase Agreement dated as of November 9, 2009 (the "Purchase Agreement"); and

WHEREAS, the execution and delivery of this Permit Agreement is contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, the parties hereto hereby agree as follows:

1.    Conveyance of Permits.  Sellers hereby convey, transfer and assign to Buyer, all of Sellers' right, title and interest in and to the Permits, except that such transfer is made only to the extent permitted by applicable law and is subject to the rights and obligations of the Buyer as hereinafter set forth.

2.    Acceptance of Permits.  Buyer hereby accepts the Permits upon the terms and conditions set forth in the Purchase Agreement, and any liabilities and obligations arising and accruing subsequent to the date hereof..

3.    Required Paperwork.  Buyer and Sellers hereby agree to promptly cooperate to file any and all necessary paperwork with the West Virginia Department of Environmental Protection and any other governmental agency having jurisdiction over the property covered by the Permits so that Buyer shall be qualified in all respects to hold and operate under the Permits.

4.    Transfer Period.  Sellers shall retain the Permits in its name for such period as may be necessary to allow Buyer to obtain transfer of the Permits from any applicable governmental agency, and to the extent permitted under applicable law, Buyer or its designees shall have the exclusive right to use each Permit.

5.    Further Assurances.  Buyer shall, from time to time after the delivery of this Permit Agreement, upon reasonable request to the Sellers, and without further consideration, require execution and delivery of such further documents or instruments as may be reasonably required to more effectively evidence and confirm the assignment of the Permits by Sellers as contemplated under the Purchase Agreement.  Sellers shall, from time to time after the delivery of this Permit Agreement, upon reasonable request to Buyer, and without further consideration, execute and deliver such further documents or instruments as may be reasonably required to more effectively evidence and confirm the

retention by Sellers of any Excluded Assets as contemplated under the Purchase Agreement.

6.    <u>Successors Bound</u>. This Permit Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successor and assigns.

7.    <u>Conflict with the Purchase Agreement</u>.    This Permit Agreement is controlled by the terms of the Purchase Agreement, including all of the representations, warranties, covenants, indemnities and agreements set forth in the Purchase Agreement. In the event of a conflict between the terms and conditions of this Permit Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

8.    <u>Governing Law</u>.    This Permit Agreement shall be governed by and construed in accordance with the laws of the State of West Virginia without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of West Virginia or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of West Virginia.

9.    <u>Notices</u>. Any notice, request or other document to be given hereunder to any party hereto shall be given in the manner specified in the Purchase Agreement. Any party hereto may change its address for receiving notices, requests and other documents by giving written notice of such change to the other parties hereto.

10.    <u>Amendments</u>. This Permit Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller and Buyer.

11.    <u>Counterparts</u>. This Permit Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Permit Agreement by facsimile machine or electronic mail (including PDF) shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. No party hereto shall raise the use of a facsimile machine or electronic mail (including PDF) to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic mail (including PDF) as a defense to the formation of a contract and each such party forever waives any such defense.

12.    <u>No Third Party Beneficiaries</u>. This Permit Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Permit Agreement.

*[The remainder of this page is left intentionally blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Permit Agreement to be duly executed as of the day and year first above written.

Sellers:

By: _____

Its: _____

Buyer:

By: _____

Its: _____

# EXHIBIT C

## ("Cure Amounts")

Mike Ross – 4 Years minimum rents ($5,000 X 4yrs=$20,000).

Compton leases (combined)  $54,600 and any amounts necessary to reinstate said lease as negotiated between the Seller and lessor. [1]

---

[1]  Seller and Lessor have agreed to a cure amount of $625,000 to reinstate the lease.