UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

IN RE:

APPALACHIAN FUELS, LLC, et. al.,[1]                    Case No. 09-10343

        Debtors                              Jointly Administered

                                       Chapter 11

---

## MEMORANDUM-OPINION

---

These jointly administered cases come before the Court[2] following the evidentiary hearing held June 23-25, 2014, regarding creditor West Virginia Department of Environmental Protection's ("WVDEP") Application for Administrative Expenses (the "WVDEP Application") and the objection thereto by the Liquidating Trustee of the App Fuels Creditor Trust (the "Trustee"). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), and the Court has jurisdiction under 28 U.S.C.

---

[1]Pursuant to Federal Rule of Bankruptcy Procedure 1015(b), the following cases were administratively consolidated and jointly administered: Appalachian Fuels, LLC (09-10343), Appalachian Holding Company, Inc. (09-10372), Appalachian Premium Fuels, LLC (09-10373), Appalachian Environmental LLC (09-10374), Kanawha Development Corporation (09-10375), Appalachian Coal Holdings, Inc. (09-10405) and Southern Eagle Energy, LLC (09-10406). For convenience, unless the context requires otherwise, the debtors in the foregoing cases shall be referred to herein collectively as "Debtor."

[2]These cases were originally assigned to U.S. Bankruptcy Judge Joseph Scott. Upon his retirement, they were reassigned on September 27, 2012, to Judge Thomas H. Fulton of the U.S. Bankruptcy Court for the Western District of Kentucky, sitting by designation, because the other bankruptcy judges of the U.S. Bankruptcy Court for the Eastern District of Kentucky had conflicts of interest.

§§ 1334 and 157.³  As more fully discussed below, and as specified in the accompanying Order entered this same date in accordance with Federal Rule of Bankruptcy Procedure 9021, the Court overrules the Trustee's objection and sustains the WVDEP Application.

## INTRODUCTION

These are coal mining cases.  As often happens in coal mining cases, the Court must navigate a morass of complex facts and circumstances, procedural history, and legal issues.  It is helpful, then, to begin not with the usual findings of fact, but with a discussion of the regulation of surface coal mining.  Fortunately, the United States Bankruptcy Appellate Panel of the Sixth Circuit (the "BAP") provided a succinct but thorough discussion of the regulatory environment in *In re Appalachian Fuels, LLC*, 493 B.R. 1 (6th Cir. BAP 2013).⁴  This Court adopts pertinent portions of the BAP's discussion, as follows:

### a. Surface Mining Control and Reclamation Act & West Virginia Surface Coal Mining and Reclamation Act

The Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. § 1201 et seq., was enacted by Congress in 1977 to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations" and to "assure that surface coal mining operations are so conducted as to protect the environment." 30 U.S.C. § 1202(a) & (d). "In general, reclamation under the SMCRA requires the surface of land be restored to its approximate original contour and water polluted by the mining operation be properly treated before leaving the mining site." *Cat Run Coal Co. v. Babbitt*, 932 F.Supp. 772, 774 n. 3 (S.D.W.Va.1996) (citations omitted).

The SMCRA requires any party wishing to engage in surface coal mining activities to obtain a surface coal mining permit. 30 U.S.C. §§ 1256, 1257. The permit application must contain the names and addresses of the applicant and the operator of the mining operation "if he is a person different from the applicant." 30 U.S.C. § 1257(b)(1). The

---

³If it is determined that this is not a core proceeding or that this Court does not have the constitutional authority to enter a final order, the Court submits this memorandum-opinion as proposed findings of fact and conclusions of law for review by the District Court in accordance with 28 U.S.C. § 157(c).

⁴As is more fully discussed below, the BAP's decision in *In re Appalachian Fuels* reversed and remanded this Court's previous decision concerning the WVDEP Application.

SMCRA defines "operator" as "any person, partnership, or corporation engaged in coal mining...." 30 U.S.C. § 1291(13).

Before a permit application can be approved, the applicant is required to obtain a performance bond to cover the costs of any necessary reclamation. 30 U.S.C. § 1259(a). If the applicant or operator is unable to cover the costs of reclamation after default, 30 C.F.R. § 800.50 provides that "any and all bonds deposited to complete reclamation" will be forfeited. If the forfeited amount of the bond is insufficient to cover the total costs of reclamation, the operator and permittees are liable for any shortfall. 30 C.F.R. § 800.50(d)(1); *Cat Run Coal Co.*, 932 F.Supp. at 780.

Pursuant to § 1253 of the SMCRA, a state may assume primary jurisdiction for regulation and enforcement of surface coal mining operations and reclamation obligations occurring on nonfederal lands within its borders. 30 U.S.C. § 1253(a). The state's "program need not be identical to the federal program, as long as its provisions are at least as stringent as those provided for in the federal act." *Canestraro v. Faerber*, 179 W.Va. 793, 374 S.E.2d 319, 320 (1988).

The Office of Surface Mining Reclamation and Enforcement (OSM) approved West Virginia's program to regulate the surface mining activities within its borders in 1981. Accordingly, West Virginia enacted the West Virginia Surface Coal Mining and Reclamation Act, W. Va.Code § 22–3–1 *et seq.* "The [WVSCMRA] sets out minimum performance standards that mirror those found in SMCRA, and the [Director of WVDEP] has exercised his statutorily granted power to promulgate State regulations that parallel those issued by the Secretary of the Interior pursuant to the federal [SMCRA]." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 289 (4th Cir.2001) (citing W. Va.Code R. § 38–2–1 *et seq.*). As recognized by the Fourth Circuit Court of Appeals in Bragg, the regulation of coal mining on non-federal lands within West Virginia's borders is, with certain exceptions, governed exclusively by the WVSCMRA, subject only to federal approval and oversight. *Id.*

Like the SMCRA, the WVSCMRA requires entities wishing to engage in surface coal mining to submit an application for a mining permit to WVDEP. W. Va.Code § 22–3–9. The applicant is required to include "(1) The names and addresses of: (A) The permit applicant; ... [and] (E) the operator, if different from the applicant...." W. Va.Code § 22–3–9(a)(1). The applicant is also required to submit a reclamation plan with its application and to post a performance bond to cover the cost of any future reclamation. W. Va.Code §§ 22–3–10 & 22–3–11. Pursuant to the WVSCMRA regulations, "[t]he operator or permittee" is liable for the any costs of reclamation over the amount of the forfeited bond. W. Va.Code R. § 38–2–12.4.d & e.

Although the WVSCMRA provides the primary framework for regulation of surface mining on non-federal lands within West Virginia's borders, the SMCRA still provides the blueprint for West Virginia's law. *See Bragg*, 248 F.3d at 289. Nowhere is this more visible

than in the WVSCMRA's definition of "operator." The WVSCMRA explicitly states that the term "operator"

> means any person who is granted or who should obtain a permit to engage in any activity covered by this article and any rule promulgated under this article and includes any person who engages in surface mining or surface mining and reclamation operations, or both. The term *shall also be construed in a manner consistent with the federal program pursuant to the federal Surface Mining Control and Reclamation Act of 1977, as amended.*

W. Va.Code § 22–3–3(o ) (emphasis added). The West Virginia Code of State Rules defines the term similarly:

> Operator means any person who is granted or who should obtain a permit to engage in any activity covered by the Act or this rule, or anyone who engages in surface mining and/or surface mining and reclamation operations. Further, the term *shall be construed in a manner consistent with the [SMCRA]* pursuant to Public Law 95–87.

W. Va.Code R. § 38–2–2.82 (emphasis added).

The concept of joint and several liability under both the SMCRA and the WVSCMRA is not distinct from direct liability. Rather, it is an expansion of direct liability to more than one entity. In the case of *P.B. Dirtmovers, Inc. v. United States*, 30 Fed.Cl. 474 (Fed.Cl.1994), the Court of Federal Claims elaborated on the concept of joint and several liability under the SMCRA:

> The Department of the Interior has consistently interpreted "operator" to include both mining contractors and mine land owners. *United States v. Manning Coal Corp.*, 977 F.2d 117, 121 (4th Cir.1992); see also 46 Fed.Reg. 60780 (Dec. 11, 1981); 42 Fed.Reg. 62713 (Dec. 13, 1977). Consistent with this policy and with congressional intent, the Department has declared mining contractors and landowners to be jointly and severally liable for reclamation fees. *Manning*, 977 F.2d at 121; 49 Fed.Reg. 31412 (Aug. 7, 1984) ("OSM will continue to pursue a policy of joint and several liability").
>
> The policy of joint and several liability is consistent with the language and purpose of SMCRA. *See, e.g., Manning*, 977 F.2d at 121.

*P.B. Dirtmovers*, 30 Fed.Cl. at 477–78; *see also SG Coal Co., Inc. v. Lujan*, 808 F.Supp. 1258, 1262 (W.D.Va.1992); *United States v. Spring Ridge Coal Co.*, 793 F.Supp. 124, 128–29 (N.D.W.Va.1992). As recognized by the court in *United States v. Manning Coal Corp.*, 977 F.2d 117 (4th Cir.1992):

> The essence of joint and several liability is that a creditor, including the government, may sue one or more of the parties to such liability separately, or all of them together

4

at his option. We believe, therefore, that the SMCRA allows the Department of the
Interior to pursue the mineral owner and the mining contractor in separate lawsuits.

*Id*. at 122 (internal citations omitted) (internal quotation marks omitted).

....

### c. Clean Water Act & West Virginia Water Pollution Control Act

The Water Pollution Prevention and Control Act of 1972, commonly referred
to as the Clean Water Act, 33 U.S.C. § 1251 et seq., "prohibits, among other things,
'the discharge of any pollutant by any person,' ... without a permit, into the
'navigable waters,' ...—which the Act defines as 'the waters of the United States.'
" *Sackett v. EPA*, —— U.S. ——, 132 S.Ct. 1367, 1369–70, 182 L.Ed.2d 367 (2012)
(citing 33 U.S.C. §§ 1311, 1344, 1362(7)). The Clean Water Act provides for the
issuance of permits that allow the discharge of certain pollutants into federal waters.
33 U.S.C. § 1342. "Any person who discharges or proposes to discharge pollutants"
is required to obtain an NPDES permit. 40 C.F.R. § 122.21(a).

Under the Clean Water Act, states may "issue [NPDES] permits for
discharges into the navigable waters within the jurisdiction of each state" and may
administer permitting programs which govern the issuance and enforcement of point
source discharges into non-federal waters. 33 U.S.C. § 1342(a)(5) & (b); 40 C.F.R.
§ 123.25. The Clean Water Act defines the term "point source" as "any discernible,
confined and discrete conveyance, including but not limited to any pipe, ditch,
channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated
animal feeding operation, or vessel or other floating craft, from which pollutants are
or may be discharged." 33 U.S.C. § 1362(14). Once the EPA approves the state
program, the state law becomes the primary mechanism for oversight of water
pollution laws and regulations in state waters. 33 U.S.C. § 1342(c)(1). Unlike the
SMCRA, however, "[u]nder the [Clean Water Act], state regulations are incorporated
'into the unitary federal enforcement scheme,' with federal provisions remaining in
effect." *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 723 F.Supp.2d 886,
902 (S.D.W.Va.2010) (quoting Bragg, 248 F.3d at 294). What results is a "system
of 'cooperative federalism' " in which the state statutes operate along side the federal
ones. *S. Ohio Coal Co. v. Office of Surface Mining, Reclamation & Enforcement*, 20
F.3d 1418, 1427 (6th Cir.1994) (citing 33 U.S.C. § 1342).

West Virginia obtained approval of its NPDES permit program, commonly
referred to as the West Virginia Water Pollution Control Act (WVWPCA), in May
1982. 47 Fed.Reg. 22,363 (May 24, 1982). The WVWPCA is set forth at West
Virginia Code § 22–11–1 et seq., and West Virginia Code of State Rules § 47–10–1
*et seq*. WVDEP is tasked with overseeing the WVWPCA. W. Va.Code § 22–11–4.
"Any person who violates any provision of any permit issued" pursuant to the
WVWPCA is liable for penalties. W. Va.Code § 22–11–22.

5

The Clean Water Act defines "person" as "an individual, corporation, partnership, association, State, municipality, commission or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5). There is no mention of an "owner" or "operator" in the Clean Water Act's definition. Although the Clean Water Act's definition of "person" does not specifically reference "owner" or "operator," other sections of the Clean Water Act do specifically make reference to such entities. Section 1318(a) of the Clean Water Act states that the EPA Administrator may "require the owner or operator of any point source" to establish and maintain discharge monitoring reports, to monitor point source discharges, and sample the discharges to check for pollution. 33 U.S.C. § 1318(a). The federal regulations which correspond to the Clean Water Act define the phrase "owner or operator" as "the owner or operator of any 'facility or activity' subject to regulation under the NPDES program." 40 C.F.R. § 122.2.

Although the WVWPCA is slightly more specific about who is liable for permit violations, it still identifies the liable party as a "person." Section 22–11–22 specifically provides that "[a]ny person who violates any provision of any permit issued" pursuant to the WVWPCA is liable for penalties. W. Va.Code § 22–11–22.

One appellate decision may be particularly instructive given the nature of the Clean Water Act claims at issue in this appeal. In *West Virginia Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159 (4th Cir.2010), the Fourth Circuit affirmed the trial court's ruling that WVDEP was required to obtain NPDES permits under the Clean Water Act for the state agency's own reclamation activities at abandoned coal mining sites. The Fourth Circuit reasoned, in part:

> The text of the [Clean Water Act], as well as the corresponding regulations issued by the Environmental Protection Agency, confirm that the permit requirements apply to anyone who discharges pollutants into the waters of the United States. Under the [Clean Water Act], it does not matter that a mining company may have created the conditions that call for reclamation. What matters is that an entity, private or public, is currently discharging pollutants into the waters of the United States. In fact, the statute contains no exceptions for state agencies engaging in reclamation efforts; to the contrary, it explicitly includes them within its scope.
>
> ....
>
> On its face, 33 U.S.C. § 1311(a) bans "the discharge of any pollutant by any person" regardless of whether that "person" was the root cause or merely the current superintendent of the discharge. In other words, the statute takes the water's point of view: water is indifferent about who initially polluted it so long as pollution continues to occur.

6

The EPA's regulatory interpretations of the statute confirm this point. The regulations make plain that it is the current operator of a mine site, rather than the initial owner, who must obtain a permit. *See* 40 C.F.R. § 122.21(b) ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."). This provision seems to confirm that where, as here, the mine owner generates pollution but then abandons the site, the subsequent operator is the party responsible for obtaining a permit.

*W. Va. Highlands Conservancy*, 625 F.3d at 161, 167. *See also Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133 (10th Cir.2005) (owner of property containing an inactive gold mine could be liable under the Clean Water Act for discharges of pollutants from an abandoned mine shaft, even though owner had never conducted any mining operations on the property).

*Id.* at 22-24, 26-28 (hereinafter the SMCRA, WVSCMRA, Clean Water Act and WVWPCA shall be referred to herein as the "Environmental Laws").

## **FINDINGS OF FACT**

In 2001, Larry Addington, Robert Addington, and Stephen Addington (the "Addingtons") formed Appalachian Fuels, LLC ("AppFuels"). The Addingtons created AppFuels to carry out coal mining activities in West Virginia and Kentucky.  In November 2003, AppFuels and its affiliated entities entered into a transaction with the Pittston Coal Company ("Pittston") to purchase certain companies held by Pittston.   As a result of this transaction, Appalachian Coal Holdings, Inc. ("AppCoal") was created and acquired 100% ownership in the Pittston-held company, Kanawha Development Corporation ("KDC").

AppFuels and AppCoal were members of a web of incorporated entities that were jointly administered in this bankruptcy proceeding.  At the center of the web was Appalachian Holding Co., Inc. ("AppHolding").   AppFuels and AppCoal were direct, wholly-owned subsidiaries of AppHolding.  AppFuels owned 100% of Appalachian Premium Fuels, LLC ("AppPremFuels") and

Appalachian Environmental, LLC ("AppEnviron").  AppCoal, as previously stated, owned 100%
of KDC.

After the Pittston transaction, KDC held three West Virginia mining permits, O-38-84, O-14-
81, and H-631, and one West Virginia National Pollution Discharge Elimination System
("WV/NPDES") permit, WV0056006, which was associated with the aforementioned mining
permits (collectively, these permits are referred to herein as the "KDC Permits").  WVDEP issued
these permits for use in the Alloy Mining Complex, a large mining facility located in West Virginia.

AppFuels continued using the KDC Permits as they had been used under Pittston.  There
were other permits used at the Alloy Mining Complex; the KDC Permits only represented a fraction
of the environmental oversight of the mining operations at the Alloy Mining Complex.

AppFuels and AppPremFuels operated the Alloy Mining Complex from 2003 through 2009.
AppFuels operated the surface mines.  AppPremFuels operated the subsurface mines.  AppFuels
employed, controlled, and provided oversight for the surface mines covered by the KDC Permits.
According to the credible testimony of Bernie Mason, former Chief Operating Officer of AppFuels,
"Everything was operated by Appalachian Fuels."  Transcript of Evidentiary Hearing on June 23,
2014, p. 24.  KDC had no employees, mining or reclamation equipment or any assets other than the
KDC Permits.  KDC did not enter into contracts or make payments and had no bank accounts or
other financial resources.  It had no independent management or decision-making authority.

Operating the mines and running the Alloy Mining facilities included oversight of
reclamation activities.  AppFuels monitored the reclamation and ensured permit compliance on the
KDC Permits.  There was no distinction between the mining operations of AppFuels and KDC.
AppFuels engineers were responsible for all monthly maintenance and water monitoring related to

8

the KDC Permits.  If contractors needed to be hired, they would be hired at AppFuels' expense.

AppFuels employees coordinated with the WVDEP concerning the KDC Permits when necessary.

In December 2008, AppFuels defaulted on lease payments due under a contract with Penn

Virginia Operating Company ("Penn Virginia") for property relating to the Alloy Mining Complex.

Because of their close working relationship, Penn Virginia did not provide formal notice of the

default until April 2009.  The default was evidence of the poor financial condition of AppFuels and

sparked discussions about liquidation and alternatives to liquidation within AppFuels.  In May 2009,

AppFuels and its affiliates agreed to an assignment for the benefit of creditors. James H. Frazier, III

("Frazier") was appointed assignee to marshal assets to preserve their value for liquidation for the

benefit of creditors.

Upon his appointment, Frazier took several actions to marshal assets.  Among other things,

he sought to employ certain AppFuels employees, including its chief operating officer and

employees responsible for its mining and reclamation operations and permit maintenance.  He also

retained a mine engineering consultant to deal with state and federal regulators and hired a forensic

accountant to prepare an accounting of Debtor assets.

On June 11, 2009, three creditors filed an involuntary bankruptcy petition against AppFuels

under 11 U.S.C. § 303.  Frazier filed an emergency motion for authority to remain in possession,

management and control of AppFuels' assets.  Among other things, Frazier sought to "continue to

move forward in commencing and completing reclamation projects...to mazimize value of the

mining permits for a potential purchaser" and "to resolve certain regulatory actions against

Appalachian Fuels, in cooperation with OSM, KYDNR, and WVDEP, including abatement of

cessation orders which, if not promptly resolve, will result in the loss of the support of Bonding

Companies, impairment of the value of mining permits, and the ability to transfer such permits,

which permits form a significant portion of the value of the Estate." Docket No. 7, p. 7. He also sought to hire, rehire, or continue to employ key AppFuels employees to manage the Debtors' businesses and assets and, specifically, to "engage in ongoing water testing, reclamation activities, and maintenance of underground mines, including venting and water pumping." Docket No. 7, pp. 7-8. He asserted that "[t]here is enough available value in the Estate to liquidate the property of the Estate as well as continue all reclamation activities and mine activities in order to maintain the full value of all properties for the benefit of creditors, if the liquidation proceeds promptly as scheduled." Docket No. 7, p.6. On June 19, 2009, the Court entered an interim agreed order appointing Frazier "Chief Liquidating Officer" of Debtor.

On June 26, 2009, Frazier moved to convert the AppFuels case to a case under Chapter 11 of the Bankruptcy Code and filed Chapter 11 petitions for four AppFuels affiliates. AppFuels' and its affiliates' bankruptcy cases were later administratively consolidated and jointly administered.[5]

On July 24, 2009, the Court entered an agreed final order appointing Frazier Chief Liquidating Officer ("CLO") for each of the Debtor entities. That order, among other things, directed him to manage the Debtor entities "in full compliance with all state and federal laws, as required by 28 U.S.C. § 959(b)." Among the powers granted Frazier as CLO was the authority to cause Debtor to comply with SMCRA and WVSCMRA and "cause the Debtors to perform all bonding and reclamation obligations so as to comply with state and federal laws and regulations and further to perform such obligations calculated to effect the release of bonds for the benefit of the Debtors' estates."

With the commencement of these bankruptcy proceedings, mining activity ceased at the

---

[5]*See* Footnote 1, above.

10

Alloy Mining Complex.  Frazier made an effort to reduce the liabilities of AppFuels and its affiliates to facilitate a sale of the assets at the Alloy Mining Complex.  Even with the initiation of bankruptcy proceedings, maintenance and reclamation work continued to some extent with respect to the KDC Permits.  Frazier wanted to ensure that the liabilities assumed by a potential buyer did not accumulate while there was a lapse in mining activity.  Potential purchasers of the Alloy Mining Complex soon appeared, including the A.T. Massey Coal Company ("Massey").

During this period, WVDEP continued to perform its regulatory functions, including inspecting the AppFuels permit sites and issuing notices with respect to various violations.  At the same time, WVDEP exercised its regulatory discretion to refrain from issuing certain notices of violations that might impair the CLO's ability to sell the Debtor's assets, including refraining from citing the AppFuels estate for reclamation and water treatment violations with respect to the KDC Permits.

On September 4, 2009, the Debtor submitted a motion under 11 U.S.C. § 363 to approve the sale of assets to Massey (the "Massey Transaction"), which the Court approved by Order entered on September 28, 2009 (the "Massey Sale Order").  Under the terms of the Asset Purchase Agreement (the "Massey Sale Agreement") approved by the Court, the Massey Transaction transferred substantially all of Debtor's assets associated with the Alloy Mining Complex; however, it expressly excluded the KDC Permits.  As part of the Massey Transaction, AppFuels, Massey and WVDEP entered into a Reclamation Transition Agreement (the "Reclamation Transition Agreement"), which governed the transfer of obligations to conduct reclamation work related to permits transferred to Massey.  In the Reclamation Transition Agreement, Massey expressly declined to assume any obligation to conduct reclamation with regard to the KDC Permits.

For AppFuels' creditors, the ideal outcome would have been to sell all of the mining related

11

permits held by the corporate family, including the KDC Permits. A sale of such permits would absolve AppFuels from any continued obligations related to environmental reclamation and thus would limit the future liability to creditors. Indeed, WVDEP recognized how important it was to be able to transfer the permits and worked with Frazier to facilitate the transfer of the permits. During these interactions between Frazier and WVDEP it became clear that to maximize the benefit to the creditors it was important that all of the permits be sold and that no 'orphan permits' remain. Unfortunately, the KDC Permits had little value and merely existed as reclamation projects that guaranteed future reclamation liability with virtually no benefit to the holder. As a result, Frazier was unable to find a buyer for the KDC Permits.

On March 21, 2011, WVDEP filed a general unsecured proof of claim for $282,829.00, which finalized the "pre-petition civil penalties, fines, assessments and damages incurred by the Debtors" relating to the KDC permits. WVDEP, however, differentiated between the pre- and post-petition claims. WVDEP specifically noted that "'final' total amount penalties that will be incurred by the Debtor during the pendency of this bankruptcy case is unknown at this time" and expressly reserved the right to apply for administrative expenses for post-petition violations at a later date.

A few months later, on August 11, 2011, Debtor filed its proposed Chapter 11 Plan of Reorganization and Disclosure Statement. In response, on October 5, 2011,WVDEP filed an objection to the Disclosure Statement, asserting, among other things, that Debtor had not adequately addressed what WVDEP estimated at the time would be $4.5-4.6 million dollars of liability for reclamation associated with the KDC Permits. It also asserted that "numerous environmental civil penalty violations and fees have been and continue to be incurred by the Debtors" and stated its intention that "post-petition civil penalties and fees will be addressed with the other administrative claims of WVDEP when it files its Application For Administrative Expenses." WVDEP also

12

objected to what it perceived as the Debtor's wrongful attempt to "subordinate WVDEP's post-petition administrative expense reclamation and civil penalty claims into general unsecured claims." Citing the same cases cited herein, WVDEP argued forcefully that it was entitled to administrative expense priority for reclamation liabilities associated with the KDC Permits.

On October 12, 2011, Debtor filed an amended Chapter 11 Plan and Disclosure Statement. In response to WVDEP's objection to the original plan and disclosure statement, Debtor added statements to the Disclosure Statement setting forth WVDEP's position but also disclaiming agreement with, and reserving the right to object to, that position. Debtor also amended its proposed plan, among other things adding a provision expressly stating that no environmental permits would be transferred to the liquidating trust established by the plan.

Around this time, WVDEP began to suspect that the reclamation would not continue on the KDC Permits going forward. During the bankruptcy case, it had become apparent to WVDEP that the reclamation associated with the KDC Permits was deficient and that proper reclamation needed to be conducted. WVDEP sent reports of violations to AppFuels, but the reports were being returned to WVDEP unopened. Recognizing that AppFuels was going to walk away from its environmental obligations, WVDEP began the formal process to revoke the KDC Permits on December 2, 2011, by issuing cessation orders under W.Va. Code § 22-3-17. The KDC Permits were not formally revoked until sometime after confirmation of the Debtor's plan of reorganization.

Around the same time, on November 29, 2011, WVDEP filed a motion for substantive consolidation of these various estates, reasserting the environmental concerns and arguments that it raised and asserted in its objection to Debtor's disclosure statement. In urging substantive consolidation, WVDEP also expressed particular concern that Debtor was "attempting to use the corporate form here to perpetrate an injustice, justify a wrong, to defeat public convenience and to

13

defend a crime" by "attempting to change an environmental obligation into a claim, have the claim subordinated to unsecured status and then compartmentalize the claim into a 'liability subsidiary' where there will be no distribution to WVDEP."  Debtor objected to WVDEP's motion and the matter was ultimately set for hearing on December 9, 2011, the date of the hearing on confirmation of Debtor's amended plan.

On December 7, 2011, WVDEP filed an objection to confirmation of Debtor's amended plan, raising the same environmental concerns and making the same arguments as were raised in its prior objection to Debtor's disclosure statement.  In this objection, however, WVDEP provided additional detail as to particular provisions of the plan that it found troubling and again expressed concern about Debtor attempting to "compartmentalize" its environmental liabilities in entities with no assets. It also objected to the plan on grounds that it "unlawfully releases, exculpates and acts as an injunction in favor of the Debtors and the above-mentioned individuals via an assertion of Bankruptcy Court jurisdiction in manner which abrogates or purports to abrogate State Sovereign and/or 11th Amendment immunity."

On December 9, 2011, the Court held a hearing to consider confirmation of Debtor's amended plan, with U.S. Bankruptcy Judge Joseph Scott, since retired, presiding.  At this hearing, counsel for WVDEP and Debtor engaged in a considerable discussion with the Court regarding WVDEP's objection to the proposed plan and its right to pursue an administrative expense claim against all of the Debtor entities, Debtor's opposition to WVDEP's position, and WVDEP's motion for substantive consolidation.  WVDEP ultimately withdrew its objection to confirmation and its motion for substantive consolidation.  From the transcript of the hearing, it is clear that WVDEP only did so with the understanding that it would be able to reassert its arguments as part of the administrative expense application process.  Debtor similarly expressly reserved its right to object

14

to WVDEP's position at that time.  As stated on the record by counsel for Debtor, "The way I look at this is they're not waiving anything, and we're not waiving anything.  This will be taken care of when and if they file an application for administrative expense, and we'll of course object to the payment of that by anybody other than Kanawha Development and to the – even to the treatment of their claims as an administrative expense.  So, I think we're – we're all clear that no one is waiving anything."  Transcript of December 9, 2011 Hearing, p. 49.

Shortly after the December 9, 2011 confirmation hearing, an Agreed Order of Confirmation of Debtors' and Committees' Plan of Orderly Liquidation and Distribution was submitted to the Court, which the Court entered on December 19, 2011 (the "Confirmation Order").  Among other things, the Confirmation Order approved Debtor's proposed plan of reorganization, subject to certain amendments set out in Paragraph 29 of the Confirmation Order, and further conditioned upon an express reservation of rights set out in Paragraph 30, as follows:

> Nothing in this Order shall be deemed to be a waiver or limitation of WVDEP's rights and the Plan Proponents' defenses, all of which are reserved and preserved as to WVDEP's right to file timely application(s) for allowance(s) of administrative expenses, as more specifically outlined and in accordance with the agreements made by the parties in open Court at the Confirmation Hearing.

(hereinafter, the plan, as approved and modified by the Court in the Confirmation Order, shall be referred to as the "Plan").

WVDEP filed its Application for Administrative Expenses on January 13, 2012 (the "WVDEP Applicaton").  In the WVDEP Application, WVDEP originally[6] sought administrative priority treatment for $3,589,690.00 for "on the ground environmental costs" plus $1,099,938.00 for post-petition penalty assessments. The $3,589,690.00 figure is made up of estimated reclamation

---

[6]WVDEP has since substantially revised the total amount demanded, down to $2,720,763.07.

costs at the sites covered by the KDC Permits of $1,986,882.00 plus $2,600,000.00 to establish a

trust to fund the estimated cost of water treatment at the sites in perpetuity, minus the $979,192.00

in reclamation bonds proceeds.  WVDEP expressly reserved it right "to amend this Application to

assert any subsequently discovered liabilities."  Indeed, the exhibit attached to the WVDEP

Application that itemized components of the claim included an entry of "$Unknown amount to

reclaim the over-head tram area" and stated "Note: This estimate does not include costs to reclaim

the overhead tram."  It also contained the following statement: "O-38-84 The 'Aerial Tramway'

portion of this permit site was not included in the original reclamation estimate done for this site by

the Office of Special Reclamation.  The steep slope and established trees and vegetation of the

tramway site are challenges to be considered when developing an estimated reclamation cost for this

area."  On the other hand, the WVDEP Application also contained a footnote stating as follows:

"The Court should note that these estimated 'environmental compliance costs' do not include the

costs associated with the Aerial Tramway at Coal Mining/NPDES permit site No. O-38-84, the

WVDEP is not seeking these costs from the Debtors."

On February 3, 2012, the Trustee and the AppPremFuels unsecured creditors committee filed

separate objections to the WVDEP Application, arguing that the amounts sought do not qualify as

administrative expenses.  In addition, the Trustee argued that WVDEP's claim should be brought

against KDC, not AppFuels.  The Court[7] held a hearing on the WVDEP Application on February

10, 2012, and on June 25, 2012, entered an Order overruling the WVDEP Application.

WVDEP appealed that decision to the Sixth Circuit BAP in July 2012.  On April 19, 2013,

the BAP rendered its decision in *In re Appalachian Fuels, LLC*, 493 B.R. 1, partially affirming and

---

[7]Judge Scott presided over this hearing too.

partially reversing this Court's June 25, 2012 Order. In its decision, the BAP distinguished between AppFuels and AppPremFuels. With regard to AppPremFuels, the BAP affirmed the denial of the administrative expense claims. Based on the evidence presented to the BAP, it was clear that only AppFuels, which worked on surface mines, conducted reclamation with respect to the KDC Permits. AppPremFuels conducted sub-surface mining operations and would not have dealt with the KDC Permits. The BAP also held that neither AppFuels nor AppPremFuels could be held liable for reclamation associated with the KDC Permits under a theory of "derivative" liability.

The BAP, however, also concluded that it was possible that AppFuels could be held *directly* liable as an "operator" under the Environmental Laws. As can be seen in the extensive excerpt from its opinion included in the Introduction to this Memorandum-Opinion above, the BAP looked at both the federal and West Virginia law to determine what liability extends to a non-owner operator. After analyzing the statutory language at both the federal and state level, and applicable case law, the BAP determined that an operator could be held liable for excess reclamation costs on KDC Permits. *Id*. Moreover, it noted that "[a]s long as reclamation work is still going on, a party can remain liable as an 'operator' even if the actual mining operations have stopped." *Id*. at 25 (citing *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1094 (6th Cir. 1981)). The BAP found that this Court had failed to consider direct operator liability and had failed to make fact findings that would allow application of such theory. It remanded these cases back to this Court to make appropriate findings of fact and determine whether AppFuels was an "operator" with respect to the KDC Permits. It also held that, if this Court found that AppFuels was an "operator," this Court would have to determine whether and to what extent WVDEP's claim should be treated as an administrative expense claim.

As ordered by the BAP, this Court held an evidentiary hearing on June 23-25, 2014, to consider whether AppFuels was an "operator" with respect to the KDC Permits and, if so, whether

17

and to what extent the WVDEP Application should be approved.  WVDEP presented several witnesses in support of the WVDEP Application, all of whom the Court found credible and persuasive.  The Trustee also presented largely credible witnesses; however, the Court found WVDEP's environmental consultant more persuasive than the Trustee's environmental consultant. Also, the Trustee provided no persuasive evidence to rebut WVDEP's evidence that AppFuels employees made all decisions and took all actions with respect to the KDC Permits.  The Court found WVDEP's evidence supporting its estimated costs of reclamation thorough, credible and persuasive.

## CONCLUSIONS OF LAW

As discussed above, the BAP remanded this proceeding back to this Court to determine whether Debtor might be held liable for reclamation obligations associated with the Permits as an "operator" under the Environmental Laws.  If so, the Court must then determine whether such liabilities, and others, should be afforded administrative expense priority under 11 U.S.C. § 503.

A. May AppFuels be held directly liable as an "operator" for the reclamation obligations associated with the KDC Permits?

The facts in the record weigh heavily, if not exclusively, in favor of a conclusion that AppFuels acted as an "operator" with respect to the KDC Permits and that, therefore, it may be held liable for associated reclamation.  The BAP in *In re Appalachian Fuels, LLC* remanded these cases back to this Court to make findings of fact that would determine whether AppFuels was such an "operator."  According to the BAP, there was a "genuine issue of material fact as to whether

AppFuels performed coal mining and reclamation operations under the KDC Mining permits and is thus liable for the reclamation obligations." *Id.*

As discussed above, credible, persuasive, and essentially un-rebutted testimony by AppFuels's former Chief Operating Officer shows that, prior to the initiation of the AppFuels bankruptcy case, "[e]verything was operated by Appalachian Fuels."   After Frazier took over AppFuels, first as assignee for the benefit of creditors, later as Chief Liquidating Officer for the AppFuels bankruptcy estate, he largely employed AppFuels employees in managing the estate assets associated with the surface mine portion of the Alloy Mining Complex, including reclamation work related to the KDC Permits.  Essentially, the bankruptcy estate of AppFuels continued to take all actions with regard to the KDC Permits.  The bankruptcy estate for KDC existed as a hollow shell, only nominally the holder of the KDC Permits.  In light of this clear record, applying the legal standards discussed in the Introduction to this Memorandum-Opinion above, the Court must conclude that AppFuels and the bankruptcy estate of AppFuels acted as an "operator" with respect to the KDC Permits.

### B. Should WVDEP's claim against Debtor be given administrative expense priority treatment under 11 U.S.C. § 503?

In determining whether to approve the WVDEP Application, the Court faces the more difficult task of analyzing the intersection of two principles of Sixth Circuit bankruptcy jurisprudence.  On one hand, a trustee in bankruptcy must ensure that the bankruptcy estate complies with applicable environmental laws during the pendency of the bankruptcy case, and expenses arising as a result of such compliance must be accorded administrative expense priority under 11

19

U.S.C. § 503.  *See  Lancaster v. State of Tennessee (In re Wall Tube & Metal Products Co.)*, 831 F. 2d 118, 122-24 (6th Cir. 1987) citing, *inter alia*, *Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Prot.*, 474 U.S. 494 (1986) and *Ohio v. Kovacs*, 469 U.S. 274 (1985); *see also* 28 U.S.C. § 959.  On the other hand, the Sixth Circuit requires that administrative expenses under 11 U.S.C. § 503 be strictly construed, because priority claims reduce the funds available for creditors and other claimants.  *See National Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835, 838 (6th Cir. 2010). Tension arises between these two principles here because of the unique nature of the "expenses" at issue in these cases–largely consisting of funds that will have to be expended in the future to correct existing environmental violations.

The Court necessarily begins its analysis with the Supreme Court's decision in *Midlantic*, the primary source of the Sixth Circuit's holding in *Wall Tube*.  In *Midlantic*, the Supreme Court considered "whether a trustee may abandon property under 11 U.S.C. § 554 in contravention of local laws designed to protect the public's health and safety."  *Midlantic*, 474 U.S. at 498, n.2.  There the debtor had stored over 70,000 gallons of contaminated oil in deteriorating and leaking containers. After unsuccessfully trying to sell the property upon which the containers were located, the Chapter 7 trustee notified the bankruptcy court and creditors  that he intended to abandon the property under 11 U.S.C. § 554(a).  Both the City and State of New York objected, on grounds that the abandonment would threaten the public's health and safety, and would violate state and federal environmental law.  As here, the governmental entities cited public policy considerations and the statutory requirement of 28 U.S.C. § 959(b) that a trustee "'manage and operate' the property of the estate 'according to the requirements of the valid laws of the State in which such property is situated.'"  *Id*. at 498.  The bankruptcy court approved the abandonment, the New Jersey District Court affirmed the bankruptcy court, and the Third Circuit Court of Appeals reversed.

Upon appeal from the Third Circuit, the Supreme Court held that the trustee could not use Bankruptcy Code § 554 to abandon the contaminated property. The Court began its analysis by considering the legislative history of § 554. It noted that prior to the adoption of 11 U.S.C. § 554, bankruptcy trustees' power to abandon property had been limited by a judicially created doctrine intended to protect legitimate state and federal interests. *Midlantic*, 474 U.S. at 500. It found that Congress had codified that judicially created restriction on trustees' power when enacting § 554, citing the rule of statutory construction that "if Congress intends for legislation to change the interpretation of a judicially created concept, it makes the intent specific." *Id.* at 501 (internal citation omitted). The Court then concluded that "[n]either the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health and safety." *Id.* at 502.

In reaching this conclusion, the Court first cited its own decision from the preceding term, *Kovacs*, 469 U.S. at 285, wherein it had held that a trustee must comply with environmental laws and "may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions." The Court then noted that "Congress has repeatedly expressed its legislative determination that the trustee is not to have *carte blanche* to ignore non-bankruptcy law." *Midlantic*, 474 U.S. at 502. By way of example, it cited the exceptions provided to the automatic stay by 11 U.S.C. § 362(b), "despite the importance of § 362(a) in preserving the debtor's estate," that "allow the Government to commence or continue legal proceedings." *Id.* at 503. It found that "Title 28 U.S.C. § 959(b) provides additional evidence that Congress did not intend for the Bankruptcy Code to pre-empt all state laws." *Id.* at 505. Significantly, it also stated: "Although the reasons elaborated above suffice for us to conclude that Congress did not intend for the abandonment power to abrogate certain state and local laws, we find additional support for

21

restricting that power in repeated congressional emphasis on its 'goal of protecting the environment against toxic pollution.'" *Id.* (internal citation omitted).  Taking all of this into account, the Court concluded that "[t]he Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." *Id*. at 506-07.

*Wall Tube* also involved a debtor with contaminated property.  There, the Chapter 7 trustee sold some of the debtor's property as part of his liquidation efforts but retained as part of the bankruptcy estate drums and storage tanks containing hazardous wastes.  The State of Tennessee's environmental inspectors analyzed the retained drums and storage tanks and reported them as "threatened release locations." *Wall Tube*, 831 F.2d at 121.  The State of Tennessee sought administrative expense treatment for the cost of inspection, which the bankruptcy court denied on grounds that such expenses were not "actual necessary costs and expenses of preserving the estate." *Id*.  In doing so, the bankruptcy court concluded that 28 U.S.C. § 959(b) does not apply to a Chapter 7 trustee liquidating an estate and found that the "State's activity neither benefitted the estate nor fulfilled a legal obligation under State law...." *Id.*  The District Court for the Eastern District of Tennessee affirmed the bankruptcy court, also concluding that 28 U.S.C. § 959(b) does not apply to liquidation trustees.

Upon appeal, the Sixth Circuit reversed the District Court and remanded the case back to the bankruptcy court, directing it to enter an order granting the State of Tennessee's administrative expense request.  The Sixth Circuit looked to *Midlantic* and concluded that "if the Wall Tube trustee could not have abandoned the estate in contravention of the State's environmental law, neither then should he have *maintained or possessed* the estate in continuous violation of that same law." *Id*. at 122 (emphasis original).  The Sixth Circuit rejected the lower courts' conclusion that 11 U.S.C. §

22

959(b) does not apply to trustees in the process of liquidating an estate, finding it "inconsequential" whether the trusting was liquidating or reorganizing an estate, "especially in the critical context of the public's welfare." *Id.* "In either case, an environmental hazard on the estate's property is within the control of the trustee." *Id.* Most importantly for this Court's purposes, the Sixth Circuit in *Wall Tube* looked to the "special empasis on the importance of complying with laws that protect the public health and safety" created by *Midlantic* and *Kovacs* and concluded that the funds expended by the State of Tennessee "in the absence of compliance by the debtor's estate" were "actual and necessary, both to preserve the estate in required compliance with state law and to protect the health and safety of a potentially endangered public." *Id.* at 123-24.

The Trustee cannot dispute that the Environmental Laws protect the public health and safety. Clearly, the Environmental Laws do so, and, therefore, the Debtor had a duty to maintain the bankruptcy estate in compliance with the Environmental Laws and could not abandon[8] any estate property in contravention of the same. Funds actually expended during the pendency of the cases by the Debtor to comply with the Environmental Laws, or by WVDEP on Debtor's behalf, would clearly constitute expenses eligible for priority treatment under 11 U.S.C. § 503(b).

Complicating these cases, however, is the fact that most of the "expenses" sought to be recovered by WVDEP in the WVDEP Application do not represent amounts already expended by WVDEP. In both *Midlantic* and *Wall Tube*, the creditors sought reimbursement for funds previously

---

[8]In attempting to distinguish *Wall Tube*, the Trustee argues that because KDC was the nominal holder of the KDC Permits, the KDC Permits were not property of the *AppFuels* estate and, therefore, the AppFuels estate technically could not have abandoned them. It suffices here to note that the liability at issue in these cases arose from AppFuels' failure to comply with the Environmental Law as an "operator" with respect to the Permits, not because AppFuels owned the Permits themselves. Moreover, an argument could be made that because AppFuels exercised certain rights with regard to the Permits, those rights, and their attendant liabilities, constitute property of the AppFuels estate that could not be abandoned under the teaching of *Midlantic*.

23

expended.  Here, the administrative expenses sought by WVDEP consist primarily of amounts that it *estimates* it will have to spend in the future to correct Debtor's failure to abide by the Environmental Laws.

This distinction forms the primary basis for the Trustee's objection to the WVDEP Application.  The Trustee urges the Court to construe § 503(b) strictly and deny it because the sum requested therein does not reflect expenses actually and necessarily incurred by WVDEP during the bankruptcy cases.[9]  The Trustee's position, however, would make it extremely difficult, if not impossible, for WVDEP to recover the vast majority of funds that it must spend to remedy the AppFuels estate's failure to abide by the Environmental Laws.  The Trust has succeeded to essentially all of the Debtor entities' assets, leaving the Debtor an empty shell.  WVDEP could conceivably pursue certain third parties, like the Addingtons, for reimbursement of reclamation costs, but it is uncertain whether any of such parties will have any recoverable assets, especially where the Trustee is also pursuing its own claims against them.

The Trustee makes several assertions as to why WVDEP's administrative expense claim does not represent "actual" and "necessary" costs under a strict interpretation of 11 U.S.C. § 503(b).  Relying upon *Zurich American Ins. Co. v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.)*, 371 B.R. 210 (E.D. Ky. 2007) *aff'd*, 536 F.3d 2008 (6th Cir. 2008), the Trustee argues that WVDEP's claim remains "contingent" and, therefore, its expenses will not become "actual" for § 503(b) purposes, until WVDEP has completed certain steps under West Virginia law–i.e., exhausted

---

[9]The Trustee also argues that WVDEP waived or otherwise lost its right to pursue administrative claims against the Trust through the Reclamation Transition Agreement and/or Plan and Confirmation Order, failed to provide credible proof of the necessity and/or cost of proposed reclamation activities, and improperly seeks priority treatment for certain civil penalties. Those arguments will be addressed below.

forfeited reclamation bond proceeds and calculated the amount, if any, of additional funds that must

be expended to complete reclamation. Citing *HNRC Dissolution*, among other cases, the Trustee

also argues that WVDEP's expenditure of funds after Plan confirmation cannot be deemed

"necessary" to preservation of Debtor's bankruptcy estate because the estate ceased to exist at Plan

confirmation. The Trustee argues more generally that WVDEP's claim fails the Sixth Circuit's

"benefit to the estate" test, as articulated in *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir.

1987). For its part, WVDEP asserts that its claim arose immediately upon the AppFuels estate's

failure to perform its necessary reclamation obligations with respect to the KDC Permits, which

occurred prior to confirmation.

1. Are the expenses "actual" expenses? The parties do seem to agree[10] on one point, that

the Sixth Circuit does not look to the timing of the expenditure of funds in considering whether a

claim may be afforded administrative expense priority under 11 U.S.C. § 503(b). Rather, it focuses

only on "when the acts giving rise to a liability took place." *Pension Benefit Guar. Corp. v.

Sunarhauserman, Inc. (In re Sunarhauserman)*, 126 F.3d 811, 818-19 (6th Cir. 1997) (citing *Matter

of Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (in denying administrative expense treatment, the

Court focused on when the commitment to place and pay for advertisements occurred rather than

when payment was made) and *In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1976) ("It is

only when the debtor-in-possession's actions themselves–that is, considered apart from any

---

[10]WVDEP, and, indeed, the Court, apparently misunderstood the Trust's argument at trial
on this point. It seemed initially that the Trust was objecting to WVDEP's expense request on
grounds that most of the funds for which reimbursement is sought have not actually been spent.
The Trust makes clear in its post-trial reply brief that it is "not arguing that administrative
expenses must have been actually paid during the pendency of the bankruptcy case." Doc. 2385,
p. 8. The Trust and WVDEP are apparently in agreement that the point in time at which a
creditor *expends* funds does not determine whether a claim may be accorded administrative
expense priority.

obligation of the debtor–give rise to a legal liability that the claimant is entitled to the priority of a

cost and expense of administration.")).   In *Sunarhauserman*, the Court  found certain pension

payments, due to be paid post-petition, ineligible for administrative expense treatment because the

liability for the same arose pre-petition.  *Id.* at 819.

      The fact that WVDEP has not yet spent the majority of funds that it estimates will have to

be expended on reclamation in and of itself has no bearing on when the obligation to pay for such

reclamation arose.  The Sixth Circuit has recognized that post-petition claims may be eligible for

administrative expense priority treatment even if in the form of unliquidated damages.  In *United

Trucking Serv., Inc. v. Trailer Rental Co., Inc. (In re United Trucking Serv., Inc.)*, 851 F.2d 159 (6th

Cir. 1988), the Sixth Circuit held that the damages for a post-petition breach of equipment lease was

properly treated as administrative expense.  It stated that

> United's asserted failure to maintain and repair the trailers in accord with the lease
> obligation allowed United, the debtor, to use the money saved and not paid for
> TRC's benefit as contemplated under the lease, to continue its operations.  This
> breach and misuse of TRC's trailers did benefit the bankrupt estate.  Accordingly,
> the damages under the breached lease covenant, to the extent that they occurred post-
> petition, provided benefits to the bankrupt estate and were properly accorded priority
> under § 503 to TRC.

*Id.* at 162.  Notably, the Court approved of the lower court's adoption of *estimated* cost of repairs

as the measure of damages rather than the cost of the repairs actually made.  *Id.* at 164.  Other

courts, including the Supreme Court, have allowed administrative expense treatment for types of

claims arising post-petition that would not necessarily, or even probably, be liquidated at the time

of plan confirmation.  *See e.g., Reading Co. v. Brown*, 391 U.S. 471 (1968) (tort claims); *Caradon

Doors & Windows, Inc. v. Eagle-Pilcher Indus., Inc. (In re Eagle-Pilcher Indus., Inc.)*, 447 F.3d 461

(6th Cir. 2006) (patent-infringement claims); and *In re Cook & Sons Mining, Inc.*, 2005 WL

2386238 (E.D.Ky 2005) (breach of contract).

In the relatively recent *HNRC Dissolution*, which was affirmed by the Sixth Circuit, the Court looked to the time when a legal obligation to pay arises to determine whether a claim is eligible for administrative expense treatment. *See In re HNRC Dissolution*, 371 B.R. at 226. In that case, the creditor in question sought administrative expense treatment for insurance payments it believed it would have to make in the future for injuries occurring during the pendency of the bankruptcy case. In affirming the bankruptcy court's denial of administrative expense treatment, the Court stated: "The bottom line remains that Zurich is not contractually obligated to pay any of the deductible obligations in question until claims are filed, which will necessarily occur post-confirmation." *Id*. It found also that

> ....it is the special case here that the deductible obligations do not even exist until claims arise whereby Zurich must advance payment.
>
> As such, this is not a situation where Zurich's claim encompasses only pre-confirmation expenses from post-petition events that will be paid post-confirmation; rather, Zurich's claim requests expenses that will necessarily be paid post-confirmation because the "claims" giving rise to the expenses will necessarily occur post-confirmation.

*Id*. at 228. From the foregoing, it is logical to conclude that the Court in *HNRC Dissolution* would have decided in favor of granting administrative priority for the expenses if the converse had been true; that is, if the expenses had indeed been "pre-confirmation expenses from post-petition events that will be paid post-confirmation."

Did the WVDEP claim arise pre-confirmation or post-confirmation? The Trustee's asserts the latter, arguing that, under West Virginia law, WVDEP's claims against persons defaulting on reclamation obligations remain contingent–do not arise–until after WVDEP follows the applicable procedures for revoking permits and making use of reclamation bonds. The Trustee relies upon

Section 38-2-12.4 of the West Virginia Code of State Rules (the "West Virginia Rules") in support

of its argument.   It points in particular to Section 38-2-12.4.b of the West Virginia Rules, which

states that "[in] the event forfeiture of a bond is required by this section....the proceeds shall be used

by the Secretary to accomplish completion of reclamation...." Section 38-2-12.4.c of the West

Virginia Rules states that "[a]fter notice of forfeiture has been served, the Secretary shall in a timely

manner, but not later one hundred eighty (180) days after such notice, initiate reclamation operations

to reclaim the site in accordance with the approved reclamation plan or modification thereof...."

Section 38-2-12.4.d of the West Virginia Rules states that "[w]here the proceeds of bond forfeiture

are less than the actual cost of reclamation, the Secretary shall make expenditures from the special

reclamation fund to complete reclamation. ..." Section 38-2-12.4.e of the West Virginia Rules states

that "[t]he operator or permittee shall be liable for all costs in excess of the amount forfeited. ..."

The Court has considered the foregoing provisions of the West Virginia Rules carefully and

concludes that they do not establish a permit operator's fundamental liability for reclamation but

rather are the procedures by which WVDEP liquidates its already existing claim against the operator

for that operator's failure to abide by its permit obligations.  As discussed above in the Introduction

to this Memorandum-Opinion, under the Environmental Laws, surface coal mining activities can

only be conducted under the auspices of a permit.  *See* W.Va. Code § 22-3-8(a).  In order for a

permit to be issued, among other requirements, an applicant must submit and obtain approval of a

detailed reclamation plan.  *See* W.Va. Code §§ 22-3-9(a)(16) and 22-3-10.  The permittee and all

successor permittees and operators of the permitted site become obligated to comply with all permit

requirements as a condition of permit issuance, including correction of existing violations.  *See*

W.Va. Code § 22-3-17 and W.Va. Code R. 38-2-3.25.  Thus, an operator's duty to perform

reclamation arises from the moment it begins to operate under the auspices of a permit and any

breach of that duty subjects it to civil liability as well as criminal penalties, e.g., the cost to WVDEP

of performing the unperformed obligations on its behalf.  *See* W.Va. Code § 22-3-17.   In other

words, WVDEP's "damage" claim arises from the moment of the operator's failure to perform–i.e.

the "acts giving rise to a liability."  *In re Sunarhauserman*, 126 F.3d at 818.  What follows under

the auspices of  Section 38-2-12.4 of the West Virginia Rules is simply the process by which the

damage claim is liquidated into a sum certain.

     Unlike the duties at issue in *HNRC Dissolution*, which would only arise, if at all, upon the

satisfaction of  certain  contractual  obligations  after  plan  confirmation  and  dissolution  of  the

bankruptcy estate, the AppFuels estate had an ongoing duty to comply with the Environmental Laws

during the life of the bankruptcy, which it clearly breached by failing to perform the reclamation

obligations under the KDC Permits.  Although the record is somewhat unclear as to the precise

moment at which the AppFuels estate failed to perform its obligations under the KDC Permits, it

certainly  signaled  its  intention  to  abandon  those  obligations  when  it  filed  its  proposed  plan  of

reorganization on August 11, 2011.  That proposed plan, which, as amended, became the confirmed

Plan,  contemplated  abandonment  of  the  KDC  Permits  and  made  no  express  provision  for

continuation by the Trustee or any other entity of the reclamation required under the KDC Permits.

Thus, at least as of the instant before the Court's entry of the Confirmation Order,[11] it became certain

that no Debtor entity or successor in interest would complete the reclamation required with respect

to the KDC Permits.   Under these circumstances, the Court must agree with WVDEP that the

---

[11]WVDEP asserts that the Debtor walked away from its obligations well before this time.
Although the record does support this assertion, as discussed below, the Court need only
conclude that Debtor abandoned its obligations at least by the date of Plan confirmation.

reclamation liability arose prior to confirmation of the Plan and that the expenses are, therefore, "actual."[12]

2. Are the expenses "necessary" expenses?  The Trustee argues that WVDEP's expenditure of funds after Plan confirmation cannot be deemed "necessary" to the preservation of Debtor's bankruptcy estate because the estate ceased to exist at Plan confirmation.  *See e.g., In re Frank Meador Buick, Inc.*, 59 B.R. 787 (Bankr. W.D.Va. 1986).  This is a red herring.  First, as seen from the immediately preceding discussion, the Court's inquiry focuses on when WVDEP's claim arose, which does not depend on the timing of WVDEP's expenditure of funds.  Second, as made clear by the *United Trucking Service* case discussed above, damages arising from a debtor's failure to perform post-petition obligations represent a special case and are treated as benefitting the estate for purposes of Bankruptcy Code § 503(b).  *See In re United Trucking Service, Inc.*, 851 F.2d at 162. Here, the AppFuels estate did not expend the resources during the pendency of its bankruptcy case to satisfy its obligations as operator under the KDC Permits.  Essentially, it re-directed those

---

[12]The Court does not find a conceptual difficulty arising from what might be perceived as a simultaneous confirmation of the Plan and termination of the Debtor's estates.  Although generally a Chapter 11 bankruptcy estate terminates upon confirmation of the plan of reorganization, under 11 U.S.C. § 1141(b) that is not always the case.  11 U.S.C. § 1141(b) states as follows: "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of the plan vests all of the property of the estate in the debtor."  Thus, it is possible, as is the case here, that a plan or confirmation order will designate a different "effective date" for termination of the estate from the date of entry of the order confirming the plan.  In these cases, there indeed is a separate "Effective Date" provided for in the Plan, on which the various actions contemplated by the Plan will take place, including the transfer of the bankruptcy estate "Assets" to the Trust.  The Effective Date was January 3, 2012.  The Confirmation Order was entered on December 19, 2011.  Clearly, the Plan contemplated continued existence of the bankruptcy estate for the fifteen days between the date of entry of the Confirmation Order and the Effective Date. Otherwise, "Assets" would not have been defined as including "as of the Effective Date" assets "defined by Code § 541," which governs "property of the estate," and property held by or on behalf of a person whose authority at that time derived from bankruptcy appointment.

resources elsewhere, to the benefit of creditors other than WVDEP. This gave WVDEP a claim against the AppFuels estate for funds that were "necessary" for the preservation of the estate under the teachings of *Midlantic*, *Wall Tube* and *United Trucking Service.*

3. What about the "benefit to the estate" test? The Trustee argues that the expenses sought to be recovered fail the more general "benefit to the estate" test enunciated in *In re White Motor Corp.*, 831 F.2d 106 (6th Cir. 1987) (whether the claimed expense arose from a transaction with the estate or claimant gave consideration to the debtor-in-possession and the same directly and substantially benefitted the estate). That more general test, however, is tempered by the holding in *Wall Tube* in the special circumstances where the expenses are related to compliance with laws protecting the public health and safety. As discussed above, *Wall Tube* essentially mandates that such expenses be treated as administrative expenses under Bankruptcy Code § 503, without needing to resort to other tests that might be applied in other contexts.

Even if the "benefit to the estate" test were to be applied, however, the expenses at issue did arise from a transaction between AppFuels's estate and WVDEP and/or consideration given by WVDEP to the estate. WVDEP allowed AppFuels' estate to act as an operator under the KDC Permits and deferred permit enforcement and revocation proceedings during most of the bankruptcy case so that the CLO could try to sell the KDC Permits. Such transaction and/or consideration substantially benefitted AppFuels' estate, and more generally, the Debtor, because it allowed the CLO to direct resources not expended on compliance with the KDC Permits elsewhere within the Debtor's estate, to the ultimate benefit of creditors. WVDEP's actions, and deferral of action, also allowed the estate assets to be marketed without a regulatory "cloud," which facilitated the sale of a substantial portion of the assets.

31

4.  Did WVDEP waive its right to pursue administrative expense treatment?  The Trustee

also argues that WVDEP waived its right to pursue administrative expense treatment for various of

the expenses set forth in the WVDEP Application.

a.  Does the Plan bar administrative expense treatment for WVDEP's claim?

The Trustee argues that the confirmed Plan bars payment of WVDEP's claim as an

administrative expense.  It cites the last sentence of Paragraph 29 of the Confirmation Order and

Section 4.1.2 of the Plan in support of its argument.  Paragraph 29 of the Confirmation Order, titled

"Errata to the Plan," contains several amendments to the Plan and the last sentence reads as follows:

"Nothing in this section, however, shall cause permit or authorize WVDEP from seeking financial

recovery from the Debtors, the Liquidating Trust, or the AppPremFuels Funds."  The pertinent

portion of Section 4.1.2 of the Plan states as follows: "... Any claim of the West Virginia Parties

related to reclamation obligations of the Debtor have been fully satisfied by the assumption of

liabilities by third parties and/or the transfer of any permit on which AppFuels was liable.  Any

remaining West Virginia Parties Reclamation Claims not treated previously shall be transferred to

and become an AppFuels Class 9 Unsecured Claims."

A full and fair reading of all of the provisions of the Confirmation Order and the Plan leads

to the Court to conclude that the Plan does not bar treatment of WVDEP's claim as an administrative

expense.  Paragraph 30 of the Confirmation Order expressly, and unequivocally, preserves

WVDEP's right to pursue administrative expense treatment for reclamation expenses, especially

when considered in the context of the record of the December 19, 2012 confirmation hearing, which

is incorporated by reference into the Confirmation Order.[13]  WVDEP clearly expressed its intention

_____

[13]Here, the Court is unpersuaded by the Trustee's attempt to distinguish between
preserving the right to seek allowance of an administrative clam and preserving the right to

to pursue administrative expense treatment of its reclamation costs and the Court and the Trustee

understood that this would be the case.  WVDEP withdrew its objection to Plan confirmation on this

understanding, and the Court could not have confirmed the Plan consensually otherwise–it would

have had to rule on the merits of WVDEP's position prior to Plan confirmation.

Moreover, the provisions cited by the Trustee in support of its argument do not actually

operate to bar WVDEP from seeking administrative expense treatment for its claim.  The last

sentence of Paragraph 29 of the Confirmation Order must be read in the context of the immediately

preceding sentences, which state as follows:

> Nothing in this Plan shall prohibit or is intended to prohibit the West Virginia
> Department of Environmental Protection ("WVDEP") from asserting its rights under
> the "police or regulatory power" of such agency.  WVDEP shall be allowed to take
> administrative actions or file in State or Federal Court, as appropriate, against all
> persons or entities that have been, are currently, or are discovered in the future, to be
> in violation of State law.  WVDEP shall be deemed to be allowed to: (i) to take State
> enforcement actions as needed; (ii) to pursue the individuals who owned or
> controlled AppFuels through alternative enforcement actions; and/or (iii) to link
> AppFuels' owners/controllers to violations on the Applicant/Violator System.

Those sentences clarify that the Plan would not result in the waiver by WVDEP of any of its "police

or regulatory powers."  Read in light of this express preservation of rights, the last sentence of

Paragraph 29 of the Confirmation Order must be interpreted as merely indicating that such

preservation, "this section," would not *by itself* give WVDEP the right to pursue recovery from the

Debtor or the Trustee.  Of course, WVDEP's right to pursue administrative expenses against the

Debtor or Trustee *was* expressly preserved by Paragraph 30 of the Confirmation Order.

Section 4.1.2 of the Plan seems on its face to provide for unsecured treatment of WVDEP's

claim.  Again, though, that provision must be read in conjunction with the express reservation of

_____

payment of the same.

rights by WVDEP in Paragraph 30 of the Confirmation Order, keeping in mind that, under Paragraph 12 of the Confirmation Order, the Confirmation Order "controls the Plan."  Reading both together leads the Court to the very logical conclusion that WVDEP's claim would be treated as an unsecured claim only to the extent that it was not otherwise qualified for administrative expense treatment.

b.  Did WVDEP waive its right to reimbursement for reclamation expenses associated with the KDC Permits in the Reclamation Transition Agreement?

The Trustee cites to one of the preliminary recitals of the Reclamation Transition Agreement in support of its position that the Agreement served to waive WVDEP's right to pursue reimbursement for the reclamation associated with the KDC Permits.  That recital states as follows: "This Agreement is intended to address all previously cited violations, current violations, and all existing site conditions of the Alloy Mining Complex, whether or not such violations are subject to an existing reclamation plan, which are the result of the Debtor's prior operations at the Alloy Mining Complex."  The Trustee also points to the language of Section 5 of the Reclamation Transition Agreement, which states in pertinent part as follows: "This Agreement is intended to address all previously cited violations, current violations, and all existing site conditions of the Alloy Mining Complex, whether or not such violations are subject to an existing reclamation plan, which are the result of the Debtor's prior operations at the Alloy Mining Complex."

Based on a full and fair reading of all of the provisions of the Reclamation Transition Agreement, however, the Court must conclude that WVDEP did not waive its rights with respect to the KDC Permits.  The other recitals to the Reclamation Transition Agreement make clear that the Agreement was being entered into in conjunction with Massey's purchase of the Alloy Mining Complex assets other than the KDC Permits, and, indeed, makes reference to a list of permits and

34

violations of the same that does not include the KDC Permits.  In Sections 1.(a) and 2.(a) of the

Reclamation Transition Agreement, Massey agrees to perform the reclamation plans "described on

Schedule 1" and "described on Schedule 2."  Those schedules do not include the KDC Permits.  In

Section 6.(a), "WVDEP recognizes that Massey is not assuming any responsibility or liability under

certain permits particularly set forth on Schedule 3 attached hereto."  Schedule 3 lists the KDC

Permits.  Reading the language cited by the Trustee in context with the foregoing, the Court must

conclude that Reclamation Transition Agreement was intended to apportion liability for reclamation

associated with only those permits that *were* being transferred to Massey in its purchase of the Alloy

Mining Complex.

   c.  Did WVDEP waive its right to pursue administrative expense treatment for certain

expenses not included in the original WVDEP Application?

   The Trustee argues that WVDEP cannot pursue administrative expense treatment for certain

expenses that it did not include in the original WVDEP  Application.  It points generally to the

deadline in the Plan for filing administrative expense applications.  In the case of expenses

associated with the so-called "Aerial Tramway," the Trustee also cites the following statement in

a footnote to the WVDEP Application wherein WVDEP appears to waive pursuing such expenses:

"The Court should note that these estimated 'environmental compliance costs' do not include the

costs associated with the Aerial Tramway at Coal Mining/NPDES permit site No. O-38-84, the

WVDEP is not seeking these costs from the Debtors."

   As with the Trustee's other waiver assertions, a full and fair reading of all of the relevant

provisions of the Plan and WVDEP Application leads the Court to an opposite conclusion.  In

Section V of the WVDEP Application, WVDEP states as follows: "This Application reflects the

known liabilities of the Debtors to the WVDEP.  The WVDEP reserves its rights to amend this

Application to assert any subsequently discovered liabilities."  In the schedule attached to the

WVDEP Application that itemized WVDEP's estimated expenses, WVDEP noted that "[t]he 'Aerial

Tramway' portion of this permit site was not included in the original reclamation estimate done for

this site by the Office of Special Reclamation" and that "[t]he steep slope and established trees and

vegetatation of the tramway site are challenges to be considered when developing an estimated

reclamation cost for this area."  Also in that attachment, WVDEP included a line item for "$Unkown

amount to reclaim the over-head tram area" and a note that "[t]his estimate does not include costs

to reclaim the overhead tram."  Reading the Trustee's cited language in context with the foregoing,

the Court concludes that the original WVDEP Application did not by itself waive any of WVDEP's

rights to pursue administrative expense treatment for expenses not included therein and that WVDEP

preserved its right to amend the WVDEP Application as it gained a better understanding of all of

its reclamation expenses with respect to the KDC Permits.

That begs the question, of course, as to whether the terms of the Plan itself permit WVDEP

to amend the WVDEP Application after the deadline for filing administrative expense applications.

The Plan and Confirmation Order both require that claims for administrative expenses be filed

within thirty days after the effective date of the Plan or "be forever barred."  On the other hand,

neither the Plan nor the Confirmation Order specify what must be included in such claims.  The Plan

and Confirmation Order are also silent as to the process by which such claims will be liquidated.

There is no express prohibition of amending otherwise timely filed claims.  The Court, therefore,

must supply the missing details, which could conceivably include amendment of administrative

expense applications.

In this regard, the Court is aware of the well-established judicial doctrine of permitting

amendment of claims after plan confirmation only under compelling circumstances.  *See e.g., IRT*

*Partners, L.P. v. Winn-Dixie Stores, Inc. (In re Winn-Dixie Stores, Inc.)*, 639 F.3d 1053, 1056.  The

rationale for this doctrine is that allowing free amendment of claims after confirmation would upset

the bargained-for expectations of the other creditors and perhaps result in the plan becoming

unfeasible.  In these cases, compelling circumstances do exist that warrant permitting WVDEP to

amend the WVDEP Application.  All parties knew or should have known *prior to Plan confirmation*

that WVDEP intended to pursue a significant administrative expense claim for all of the reclamation

associated with the KDC Permits.  WVDEP filed pleadings objecting to the Debtor's originally

proposed reorganization plan and the amended proposed plan, as well as a motion for substantive

consolidation of the Debtor entities, all of which were premised upon WVDEP's assertion that

various Debtor entity estates remained liable for all of the costs of reclamation associated with the

KDC Permits.  WVDEP agreed to Plan confirmation only with the express reservation of its right

to pursue administrative expense priority for those costs.  Therefore, no party can reasonably argue

that WVDEP's pursuit, as promised, of all reclamation costs comes as a surprise.  The Court

concludes that, under the particular facts and circumstances of these cases, WVDEP may amend the

WVDEP Application to assert expenses not originally included.[14]

    5.  May the penalties component of the WVDEP Application be treated as a priority

administrative expense?  The Trustee asserts that amounts requested in the WVDEP Application for

penalties assessed under W.Va. Code § 22-3-17 should not be given administrative expense priority

because they are not compensatory and do not otherwise constitute a cost "ordinarily incident to

operation of a business."  For support, the Trustee cites *Alabama Surface Mining Commission v.*

*N.P. Mining Company, Inc. (In re N.P. Mining Company, Inc.)*, 963 F.2d 1449 (11th Cir. 1992),

---

[14]Here it bears repeating that WVDEP has amended its claim to *reduce* the amount sought
by around $900,000.

wherein the Court held that only post-petition penalties assessed while the debtor was actually engaged in mining activities could be treated as administrative expenses.

Basing its decision on 28 U.S.C. § 959(b)'s requirement that "trustees 'operate' an estate in compliance with state law,"[15] the Court in *N.P. Mining Company* found that "punitive, civil penalties assessed for postpetition mining activities qualify as an administrative expense under section 502(b)(1)(A)." *Id.* at 1453. The Court went further, however, to limit such administrative expense treatment to only those penalties that had been assessed as a consequence of "mining operations" after the petition was filed. *Id.* The Trustee argues that WVDEP assessed its penalties either for pre-petition conduct, making it a pre-petition claim, or for conduct occurring after mining operations had ceased, making it ineligible for administrative expense treatment under the teaching of *N.P. Mining Company*.

As an initial matter, this Court agrees with WVDEP that the penalties in question all relate to post-petition violations. The only remaining issue is whether this Court should follow the Eleventh Circuit's holding in *N.P. Mining Company*. On one hand, this Court agrees with the Eleventh Circuit's reasoning behind its conclusion that "punitive, civil penalties assessed for postpetition mining activities qualify as an administrative expense." On the other hand, this Court does not believe that it should follow *N.P. Mining Company* to conclude that only penalties arising from active mining operations merit administrative expense treatment.

The Court in *N.P. Mining Company* essentially based its ultimate holding on its view that penalties for violations occurring after active mining operations ceased, such as for failure to abate

---

[15]28 U.S.C. § 959(b) applies to these cases as well.

violations, were different in nature than penalties for violations arising from active mining.  It

distinguished *Wall Tube*, finding

> Here, there is no threat to public health or safety.  Nor will the fines pay for
> environmental cleanup.  Further, the mining sites–which N.P. leased and did not
> own–are not part of the bankruptcy estate, so abating violations there does not even
> provide an indirect benefit to the estate by bringing the property into compliance.

*Id.* at 1458.  While it may be that the facts and circumstances leading to the decision in *N.P. Mining*

*Company* were very different than are present in these cases,[16] this Court finds that it cannot agree

with that Court's assessment that violations of environmental regulations related to post-mining

activity, such as failure to conduct reclamation, are legally different in nature from violations

incurred during mining activity.  Under the facts and circumstances of these cases, including the

application of the Environmental Laws, it is clear that an operator under a permit must comply with

permit requirements whether engaging in active mining activities or not.  The relevant portions of

the Environmental Laws make no distinction between active and inactive mining operations.  *Wall*

*Tube* requires that non-operating debtors comply with Environmental Laws under 28 U.S.C. §

959(b).  Accordingly, this Court concludes that the penalties portion of the WVDEP Application

may be given administrative expense priority.

6.  Is WVDEP's estimate of reclamation expenses sufficient for the the Court to grant such

expenses  administrative expense priority?  Much of the testimony and evidence presented at trial

concerned the efforts made and methodology used by WVDEP in determining how much it will cost

to accomplish all of the reclamation work necessary for the KDC Permits.  As noted above, the

Court found such testimony and evidence thorough, credible and persuasive.

---

[16]Here, by contrast, credible testimony demonstrated that failure to complete reclamation
*would* be a threat to public health and safety.  At least a portion of the fines in question *would*
pay for then proposed reclamation.  The sites in question *were* part of the bankruptcy estate.

In addition to challenging the necessity of the work proposed by WVDEP and the methodology used to calculate expected costs of the same, however, the Trustee argues that WVDEP failed in its burden of proof because WVDEP never introduced the KDC Permit reclamation plans themselves into evidence. The Trustee essentially argues that there is no way for the Court to determine that the estimated expenses are reasonable and necessary because the Court cannot compare what is proposed by WVDEP with what must be done under the terms of the KDC Permits. For its part, WVDEP asks the Court to take judicial notice of the KDC Permits, which are public records.

If it were necessary at this time to order the payment of a sum certain to WVDEP, the Court would be required to undertake a detailed examination of the reclamation plans themselves, whether through judicial notice or by ordering the record to be supplemented. But, the Court need not order funds to be paid to WVDEP at this time. The Court need only establish an "outside" estimate of costs be established, so that the Trustee can set aside funds for the same to be paid at a later time. WVDEP has begun little, if any, of the necessary reclamation work. Prudence dictates that the Court order the Trustee to make payments to WVDEP only as work is completed, subject to Court final review for reasonableness and consistency with the KDC Permit reclamation plans. That way, funds will only be distributed to WVDEP as, and if, needed. Although perhaps unnecessary, this will also provide an extra layer of discipline to WVDEP to keep reclamation costs as low as possible. More practically, the Court anticipates that the Trustee will appeal the Court's decision here and it is possible, given the complexity of the issues in these cases, that this Court's decision might be reversed. Rather than having the Trust make a large distribution to WVDEP only to have to pull it back later, with possible complications from the fact that WVDEP is a governmental entity, it is better that distributions, if any, be made in relatively small amounts only as needed. On the other

40

hand, the Court also believes that the Trustee should maintain a reserve of funds sufficient to pay WVDEP's estimated costs so that such funds will be available if WVDEP ultimately prevails on appeal.

## CONCLUSION

For the foregoing reasons, in accordance with Federal Rule of Bankruptcy Procedure 9021, the Court by separate Order to be entered this same date in conjunction with this Memorandum-Opinion will overrule the Trustee's objection to the WVDEP Application and sustain the WVDEP Application, under the conditions and to the extent set forth in that Order.

## A FINAL *MEA CULPA*

In retrospect, the Plan should not have been confirmed without more express provision being made for payment by Debtor's estate, or the Trust, of all of the costs of reclamation with respect to the KDC Permits. *Midlantic* and *Wall Tube* require this and this Court should have recognized at the time of confirmation that the Plan might be interpreted as shifting reclamation liability from the Debtor/Trust to the State of West Virginia. Under such an interpretation, the Plan would violate the provisions of 11 U.S.C. § 1129(a), notwithstanding this Court's finding otherwise in the Confirmation Order. *But see Forklift LP Corp. v. iS3C Consultancy Serv. Ltd. (In re Forklift LP Corp.)*, 363 B.R. 388, 394 (Bankr. Del. 2007) (when multiple interpretations of a plan are possible, courts should favor an interpretation that is consistent with the Bankruptcy Code over one that contravenes it). If the Court's decision set forth in this Memorandum-Opinion and accompanying Order are ultimately reversed, the Debtor will have accomplished in the Plan something not permitted under *Midlantic* and *Wall Tube*, meaning that the Plan should not have been confirmed.

Unfortunately, the Plan *was* confirmed and now operates as *res judicata*. *See, e.g., Browning v. Levy*, 283 F.3d 761, 772 (6th Cir. 2002).  The best that this Court can do now is to provide detailed findings of fact and conclusions of law for review in the appeal that will undoubtedly follow and, more generally, to offer these jointly administered cases as a lesson to future bankruptcy courts.

Thomas H. Fulton
United States Bankruptcy Judge

Dated:  November 19, 2014